# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 1:21-cv-23472-RNS

Ryan Birmingham, Roman Leonov, Steven Hansen, Michell Parent, and Jonathan Zarley, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

Alex Doe; John Does 1–3; Peter Mohylny; Ester Holdings Inc.; The Investing Online; Vsevolod Tovstun; Borys Konovalenko; Mayon Holding Ltd; Mayon Solutions, LLC; Mayon Solutions Ltd; Marina Garda; Daria Eckert; Olga Tielly; Anna Shymko; Timothy Stubbs; Wealthy Developments LP; Anton Bilous; Aware Choice Ltd; Ivan Hrechaniuk; Profit Media Group LP; VDD-Trading, Ltd; Dmytro Fokin; Manuchar Daraselia; Olga Abrykosova; Auro Advantages, LLC; Notus, LLC; Alla Skala; Shopostar, LLC; Nataliya Los; Global E-Advantages LLC; Easy Com, LLC; Jase Victor Davis; Grovee, LLC; Jared Goodyear; Brass Marker s.r.o.; Sergiy Prokopenko; Trans-Konsalt MR Ltd; IT Outsourcing Co., Ltd; Art Sea Group Ltd; ePayments Systems Ltd; Boonruk Ruamkit Co., Ltd; Nattpemol Krinara; and Papahratsorn Raviratporn,

      Defendants.

**CLASS ACTION**

_____/

## AMENDED COMPLAINT[1]

    Plaintiffs Ryan Birmingham, Roman Leonov, Mitchell Parent, Jonathan Zarley, and Steven Hansen ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring suit against the captioned Defendants.

---

[1] This version of the Amended Complaint corrects a few scrivener's errors appearing in the Proposed Amended Complaint attached to the Motion for Leave to Amend—specifically, misspellings of the name of one Defendant; repeating one Defendant in the case caption; and using the incorrect font size in footnotes. It is otherwise identical to the Proposed Amended Complaint attached to the Motion for Leave to Amend [ECF No. 61-1].

## NATURE OF THE ACTION

1.　　Between 2018 and 2021, Plaintiffs and similarly situated customers were victims of a nearly $75 million international scheme that defrauded them of money or cash equivalents. The scheme—hosted entirely on RoFx.net[2]—lured victims with a purported "robotically operated foreign exchange trading" platform, which promised safe, easy, and highly lucrative profits (hereinafter "RoFx", "RoFx Scheme", or "Scheme").

2.　　The RoFx Scheme revolved around a supposed artificially intelligent algorithm which could identify profitable foreign exchange trades to be executed by third-party brokers. Customers were enticed to contribute their funds to the Scheme—and, in return for a service fee, customers would earn passive income, courtesy of the RoFx software and its network of brokers. The Scheme was promoted online via, inter alia, elaborately crafted sponsored content disguised as legitimate financial reporting—which was cited or republished by major news outlets.

3.　　The entire Scheme was an online fiction. There is no RoFx entity running any smart trading software. No foreign exchange trading was done using RoFx customer funds. The RoFx Scheme had only one purpose: steal as much money as possible from their "customers" and keep them from realizing what was actually happening until it was too late. And for nearly four years the RoFx Scheme was wildly successful, bilking unsuspecting victims of $75 million or more. The Scheme was fictitious but the harm very real.

4.　　After obtaining monies from their victims, the persons operating the RoFx Scheme (the "RoFx Operators") laundered the funds through a complicated, globe-sprawling web of ever-shifting shell companies and financial institutions. This next phase—the Money Laundering

---

[2] The operators of the RoFx Scheme appear to have migrated their entire scheme to other websites—and are brazenly continuing to foist their Scheme on other unsuspecting victims.

Enterprise—includes dozens of persons and entities spanning at least three continents. Defendants went to extraordinary lengths to steal *and* conceal.

5.     However, despite their best efforts, Plaintiffs and their counsel have begun to unravel the shroud of secrecy and confusion Defendants created with such deliberate care and caution. Plaintiffs now bring this action on behalf of a global class of RoFx customers under Federal Rule of Civil Procedure 23. Plaintiffs, on behalf of the class, bring claims for Defendants' (I) Violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c); (II) RICO Conspiracy in violation of 18 U.S.C. § 1962(d); (III) Fraud; (IV) Conspiracy to Commit Fraud; (V) Aiding and Abetting Fraud; (VI) Conversion; (VII) Conspiracy to Commit Conversion; (VIII) Aiding and Abetting Conversion; and (IX) Unjust Enrichment.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the laws of the United States—specifically, the RICO Act, 18 U.S.C. §§ 1962 and 1964. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2): this is a civil class action with an amount in controversy exceeding $5,000,000, exclusive of interest and costs; and minimal diversity exists. Specifically, at least one Plaintiff is a citizen of a State and numerous defendants are citizens of foreign states.

7.     This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b) because the ends of justice requires the geographically disparate Defendants be brought before this Court to answer for their unlawful conduct, as they went to great lengths to inflict injury on Plaintiffs and the Class and to conceal their involvement in the conduct alleged herein.

8.     The Court also has general personal jurisdiction under Fla. Stat. § 48.193(2), as the RoFx Operator Defendants engaged in substantial and not isolated activity within Florida;

specifically, the RoFx Operator Defendants operated an entirely online scam through a website and domain hosted by a company in Florida; and purported to have a place of business in Miami, Florida. The Court also has specific personal jurisdiction over the RoFx Operator Defendants under Fla. Stat. § 48.193(1)(a)(1), because the RoFx Operators conducted, operated, engaged in, or carried out a business in Florida.

9.      Personal Jurisdiction over each Defendant is also proper under Fla. Stat. § 48.193(1)(a)(2) because Florida residents were harmed, in Florida, by Defendants' tortious acts in Florida directed into Florida by Defendants, or Defendants conspired to commit or aided and abetted such tortious acts.

10.      Alternatively, the Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(2) for the federal claims herein, for any Defendants not subject to the jurisdiction of any state's courts—because doing so would be consistent with due process.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b)(3). The action cannot be brought under § 1391(b)(1) or (2): Defendants are spread across numerous domestic and foreign States and there is no single judicial district in which a substantial part of the events giving rise to the claims herein occurred. Section 1391(b)(3) thus applies because at least one Defendant is subject to this Court's personal jurisdiction with respect to the action.

## PARTIES

### I. Plaintiffs

12.      **Ryan Birmingham** is a RoFx customer and citizen and resident of Leeds, Maine.

13.      **Roman Leonov** is a RoFx customer and citizen and resident of Miami, Florida.

14.      **Mitchell Parent** is a RoFx customer and citizen and resident of Fort Myers, Florida.

15.     **Jonathan Zarley** is a RoFx customer and citizen and resident of Kamuela, Hawaii.

16.     **Steven Hansen** is a RoFx customer and citizen and resident of Gilbert, Arizona.

## II. Defendants

### A. Operators of the RoFx Scheme

17.     **"Alex" Doe**[3] directed key aspects of the RoFx Scheme and is a citizen of Ukraine.

18.     **John Does 1–3** (collectively with Alex, the "**RoFx Operators**") operated the RoFx Scheme and, upon information and belief, are each citizens of Ukraine.

19.     **Peter Mohylny** is a Ukrainian resident. Upon information and belief, Mohylny is a Ukrainian citizen who, as agent of the RoFx Operators, managed and paid for the RoFx.net domain from which the RoFx Scheme emanated.

### B. Promoters of the RoFx Scheme

20.     **Ester Holdings Inc.**, now de-registered, was a corporation organized in Vanuatu with a principal place of business in Cyprus. Ester also purports to be incorporated in the British Virgin Islands with a customer support address in Switzerland. Ester is thus a citizen of several foreign states.

21.     **The Investing Online** is an entity of unknown citizenship.

### C. Money Laundering Defendants

*Company Organizers*[4]
_____

22.     **Vsevolod Tovstun** is a Ukrainian citizen and agent of Alex with respect to the RoFx Scheme, focused on creating Front Companies for the Money Laundering Enterprise.

23.     **Borys Konovalenko** is a Ukrainian citizen and current manager of Mayon Solutions, LLC; and is director and 70% shareholder of Mayon Holding Ltd. He played a pivotal

_____

[3] "Alex" may be a pseudonym, but he is referred to as Alex hereinafter.
[4] Company Organizers' roles within the RoFx Scheme are described *infra* Part III.C.

role in forming Defendants Shopostar LLC, Notus LLC, Global E-Advantages LLC, and Easy Com LLC.

24.     **Mayon Holding Ltd** is a limited company organized and with a principal place of business in Hong Kong, and thus a citizen of Hong Kong, China. It is the ultimate parent of Mayon Solutions, LLC; and Mayon Solutions Ltd.

25.     **Mayon Solutions, LLC** is a New Hampshire limited liability company currently managed by Konovalenko. Mayon Holding Ltd is the sole member of Mayon Solutions, LLC, making it a citizen of China.

26.      **Mayon Solutions Ltd** is a private limited company organized and with a principal place of business in the United Kingdom, and thus a citizen of the United Kingdom. Its sole shareholder is Mayon Holding Ltd. Konovalenko is the Co-Founder and Executive Director of Mayon Solutions Ltd.[5]

27.     **Marina Garda** is a citizen of Hungary and was an owner of Mayon Holding Ltd.

28.     **Daria Eckert** is a citizen of Ukraine and was manager of Mayon Solutions, LLC.

29.     **Olga Tielly** is a United Kingdom citizen and was a director of Mayon Solutions Ltd.

30.     **Anna Shymko** is a Ukrainian citizen who formed Defendant Easy Com, LLC and purchased—and then dissolved—Defendant Notus, LLC.

31.     **Timothy Stubbs** is a citizen of Mississippi or Georgia. Stubbs manages Defendant Grovee, LLC. Stubbs' Mississippi addresses are associated with company filings from Notus, Shopostar, Borys Konovalenko, Nataliya Los,  Anna Shymko, and Alla Skala.

---

[5]  Borys Konovalenko, LINKEDIN,  https://www.linkedin.com/in/boriskonovalenko?trk=org-employees (last visited Jan. 31, 2022).

*Front Companies and Principals*[6]

*Front Companies in the United Kingdom*

32.     **Wealthy Developments LP** is a limited partnership organized and with a principal place of business in Scotland.

33.     **Anton Bilous** is a Ukrainian citizen and partner of Wealthy Developments LP.

34.     **Aware Choice Ltd** was a private limited company organized and with a principal place of business in the United Kingdom, and thus a citizen of the United Kingdom. Aware Choice is now dissolved.

35.     **Ivan Hrechaniuk** is a United Kingdom citizen and was a director of Aware Choice.

36.     **Profit Media Group LP** is a limited partnership organized and with a principal place of business in Scotland.

37.     **VDD-Trading, Ltd** was a United Kingdom limited company with a principal place of business in the United Kingdom, and thus a citizen of the United Kingdom. VDD is now dissolved.

38.     **Dmytro Fokin** is a Ukrainian citizen and was a director of both Aware Choice and VDD-Trading.

39.     **Manuchar Daraselia** is a Ukrainian citizen and was a director of VDD-Trading.

*Front Companies in the United States*

40.     **Olga Abrykosova** is a Ukrainian citizen and agent of Alex with respect to the RoFx Scheme, focused on the Money Laundering Enterprise and United States-based Front Companies.

41.     **Auro Advantages, LLC** is a Delaware limited liability company.

42.     **Notus, LLC** was a Colorado limited liability company and is now dissolved.

---

[6] Front Companies' roles within the RoFx Scheme are described *infra* Part III.C.

43.     **Alla Skala** is a Canadian citizen and a member of Notus, LLC.

44.     **ShopoStar, LLC** is a Colorado limited liability company with its sole member, Nataliya Los, a Ukrainian citizen; ShopoStar is thus also a Ukrainian citizen.

45.     **Nataliya Los** is a Ukrainian citizen and member of ShopoStar, LLC.

46.     **Global E-Advantages LLC** is a Delaware limited liability company.

47.     **Easy Com, LLC** is a New Hampshire limited liability company whose sole member is a citizen of Missouri, making Easy Com a citizen of Missouri.

48.     **Jase Victor Davis** is a citizen of Mississippi and member of Easy Com, LLC.

49.     **Grovee, LLC** is a Delaware limited liability company.

50.     **Jared Goodyear** is a citizen of South Carolina.

51.     Front Companies in Other Jurisdictions

52.     **Brass Marker s.r.o.** is a limited liability company organized and with a principal place of business in the Czech Republic, and thus a citizen of the Czech Republic.

53.     **Sergiy Prokopenko** is a Czech citizen and officer of Brass Marker s.r.o.

54.     **Trans-Konsalt MR Ltd** is a limited company organized and with a principal place of business in Bulgaria, and thus a citizen of Bulgaria.

55.     **IT Outsourcing Co., Ltd** is a limited company organized and with a principal place of business in Thailand, and thus a citizen of Thailand.

56.     **Art Sea Group Ltd** is a limited company organized and with a principal place of business in South Korea.

*Layering Companies and Principals*[7]

57.     **ePayments Systems Ltd** is a limited company organized and with a principal place of business in the United Kingdom, and thus a citizen of the United Kingdom.

58.     **Boonruk Ruamkit Co., Ltd** is a limited company organized and with a principal place of business in Thailand, and thus a citizen of Thailand.

59.     **Nattpemol Krinara** is a citizen of Thailand and managing director of Boonruk Ruamkit and IT Outsourcing.

60.     **Papahratsorn Raviratporn** is a citizen of Thailand and shareholder of Boonruk Ruamkit and IT Outsourcing.

## III. Substantive Allegations

### A.  The RoFx Scheme

61.     The **RoFx Operators** purportedly developed a foreign exchange ("forex") trading robot—a software algorithm employing artificial intelligence to automate forex trading decisions.

62.     The RoFx Operators offered customers an opportunity to contribute their money to the Scheme. In exchange for a service fee, the RoFx Operators would use their software to direct third-party brokerages to make highly lucrative foreign exchange trades on behalf of the customers, who would passively reap substantial profits.

---

[7] Layering Companies' roles within the RoFx Scheme were frequently hybrid and are described *infra* Part III.C.

*RoFx.net Representations*



63.     Via the website RoFx.net, the RoFx Operators made numerous representations to encourage customers to contribute money to the Scheme.

64.     RoFx.net described the RoFx robot as a "fully automated Forex trading solution," and touted that "YOU NO LONGER NEED ANY SPECIAL KNOWLEDGE, OR TRADING EXPERIENCE!"

***Using the RoFx Robot was Purportedly Safe and Customers Could Freely Withdraw Funds***

65.     RoFx.net claimed to operate from offices in the United States, London, and Hong Kong, providing RoFx with the façade of a legitimate international company.

66.     RoFx.net customers could contact RoFx at the phone numbers listed for each office, a website-based chat system, or by email. The RoFx Operators were responsive to customers through each channel, contributing to the illusion of an actual enterprise.

67.     RoFx.net contained an extensive Frequently Asked Questions ("FAQ") designed to reassure customers by emphasizing the longevity and widespread adoption of the RoFx robot:

**WHO ARE WE?**

RoFx is the team of software developers and traders with significant experience in the international currency and financial markets. In 2009, we created the robotic system and tested it in real trading. The RoFx robot has been demonstrating positive trading dynamics since 2010. This means that over the past 8 years the number of successful bids significantly exceeds the number of unprofitable ones. In 2010, we decided to grant access to the RoFx signals to the public to invite investments and thus to increase the company's working capital. The RoFx robot is a complex innovative system that helps you trade on FOREX without knowing anything about trading. It is fully automated high-tech system that is based on Artificial Neural Network. We invest your money with safety of bank deposit and profitability of Forex & Crypto market

**WHAT IS THE RoFx ROBOT?**

The RoFx robot is a complex innovative system that helps you trade on FOREX without knowing anything about trading. The robot algorithms are set to analyze the market on the 24/7 basis and to make bids with a minimum risk. Therefore, RoFx brings regular dividends to its customers. . . . .

**WHY SHOULD I TRUST YOU?**

RoFx has been on the market since 2009 and have got more than 50,000 satisfied customers all over the world. Every business is created by people and survives by benefiting other people, we wouldn't survive if our Customers didn't trust us. Our robot has started showing positive dynamics since 2010, that means that over the past 8 years the number of successful bids made by the robot significantly exceeds the number of unprofitable ones. Our team is constantly improving our AI technology by developing new algorithms and upgrading the system, striving to deliver the best service to our Customers. Today, more than 30,000 people around the world get passive income with RoFx.

68.     The RoFx.net FAQ contained representations regarding the minimal risk and

safety of customers' funds (emphasis added below):

**IS IT POSSIBLE TO LOSE MONEY?**

The stop-loss system is set to minimize your losses on bad days. The company uses no leverage. This means the company never borrows money and is trading only with its own funds and its customers` funds, which significantly minimizes the trading risks.

**The company guarantees the safety of your funds.** This means that when the company suffers a loss its customers make no profit, and any losses are compensated from the reserve fund of the company.

69.     RoFx.net further represented that customers could "withdraw [their] available balance [at] any time."

70.     RoFx.net also explained that it worked with regulated brokers who conducted the actual foreign exchange trading, further providing the RoFx Scheme with an aura of legitimacy:

> **IS RoFx REGULATED?**
>
> Being a software company, owners of AI technology and a managing company RoFx does not need to be regulated. RoFx cooperates with top European, American and Asian brokerage platforms, licensed and regulated by the corresponding authorities.

### _Investing with the RoFx Robot Was Purportedly Extremely Profitable_

71.     RoFx.net published trading statistics demonstrating the purported performance of the RoFx robot. These statistics showed 83% or greater annual profit since 2009 with an average annual profit during this time of 92.8%.



*Figure 1: Profit Statistics Posted on RoFx.net*

72.     RoFx.net provided a "profit margin calculator" which purported to provide expected investment gains depending on the investment amount and length of trading period. Daily profits ranged from .38% to .97%. *See* Ex. 1, RoFx Feature Emails, at 3.



***RoFx Customers Were Rewarded for Maintaining Large Account Balances***

73.     RoFx.net divided customers into tiers based on account balance—incentivizing customers to contribute large amounts and maintain large account balances for larger returns:

| USD/EUR | | BTC |
|---|---|---|

**ADVANCED COMPOUND Trial**

1,000 – 5,000
Amount (USD/EUR)

Manual Trading Period Selection[1]

| 50 | 50 |
|---|---|
| Your share in the daily trading profit (%) | Performance fee (%) |

**ADVANCED COMPOUND Easy start**

5,000 – 10,000
Amount (USD/EUR)

Manual Trading Period Selection[1]

| 60 | 40 |
|---|---|
| Your share in the daily trading profit (%) | Performance fee (%) |

**ADVANCED COMPOUND Moneymaker**

10,000 – 50,000
Amount (USD/EUR)

Manual Trading Period Selection[1]

| 75 | 25 |
|---|---|
| Your share in the daily trading profit (%) | Performance fee (%) |

**ADVANCED COMPOUND Gold**

50,000 – 100,000
Amount (USD/EUR)

Manual Trading Period Selection[1]

| 85 | 15 |
|---|---|
| Your share in the daily trading profit (%) | Performance fee (%) |

**ADVANCED COMPOUND VIP**

100,000 – UNLIMITED
Amount (USD/EUR)

Manual Trading Period Selection[1]

| 95 | 5 |
|---|---|
| Your share in the daily trading profit (%) | Performance fee (%) |

[1] You can manually select the package trading period from the following options:
- 120 trading days
- 160 trading days
- 270 trading days
- 360 trading days

**Advantages of Advanced Compound Packages:**
- profit compounding by default without updating the trading period
- add funds option do not roll over trading period of package
- the highest profit as compared to all packages

74.     RoFx.net also encouraged large customer contributions and account balances by offering "VIP clients whose accounts balance start from $100,000" the opportunity to apply for a special annual VIP conference available only to those "VIP" clients.

75.     RoFx.net offered a referral program incentivizing current customers to recruit others into the Scheme, offering a 2% "referral payment" based on the current customer's account balance—thus, the larger the balance, the more each referral payment was worth.

76.     To further the illusion of security and legitimacy, the RoFx Operators published on RoFx.net a personalized data dashboard for each customer, which purported to show customers their account balances and profits earned via the Scheme.

### RoFx Representations via Emails to RoFx Customers

77.     Between 2018 and September 2021, the RoFx Operators sent new RoFx users emails substantially similar to the below:

We are happy to inform you that you have successfully validated your account.
Functions "Fund account" and "Withdrawal" without limitation are available for you now.

WITH US YOU RECEIVE:
* Up to 12% monthly profit
* Safety of your start deposit
* Loss coverage guarantee
* No prior experience or knowledge required
* User friendly interface
* Fully automated trading process (we do all work for you, you just receive your profit)

RoFx -- is the Power to Invest Your Money with Safety of Bank Deposit and Profitability of Forex & Crypto Market!

In case you need any assistance, do not hesitate to contact us by email, chat or phone and one of our Customer Support Managers will personally help you.

Sincerely Yours,
Customer Support Team
support@rofx.net
+44-20-3936-1401 (UK)
+1-888-631-2337 (USA)

- 16 -

78.     Between 2018 and September 2021, the RoFx Operators also sent numerous emails via the RoFx.net domain to all existing RoFx customers, reinforcing the representations made via RoFx.net.

a.      Emails emphasized continued improvements and tweaks to RoFx account packages and website features, including the aforementioned RoFx.net Profit Calculator. *See* Ex. 1 at 2–3.

b.      Several emails reference "thousands" of customers, "numerous" requests for changes to RoFx services, and the popularity of RoFx account packages, implying that RoFx could be trusted due to its widespread adoption. *See* Ex. 1 at 4–6.

c.      Other emails encouraged RoFx customers to keep funds in the scheme by advertising different lock-in packages that would provide increased profitability for customers willing to commit funds to the Scheme. *See* Ex. 1 at 2.

d.      On September 3, 2021, the RoFx Operators sent an email to all customers prompting them to apply for a January 20, 2022 "VIP Conference" in London only available to customers with an account balance of $100,000 or more. *See* Ex. 1 at 7.

### *RoFx Representations via Third-Party Websites*

79.     Together with the **Promoter Defendants**, the RoFx Operators published, or caused to be published, numerous representations on other websites to attract customers to the RoFx Scheme by creating an aura of legitimacy and trustworthiness.

80.     Reader's Digest, a once-trusted household publisher, hosted, and as of January 31, 2022, continues to host, a glowing review of RoFx.net on their website, www.readersdigest.co.uk, entitled "RoFx Review: Safe and trusted way for steady passive income":

> The problem with most trading robots in the market is that they offer great results for a certain period but fail to keep up the performance for a long time. The ridiculous claims of the robots to give you 200% monthly gain are meaningless with little to no backtesting history. Novice traders are easily fooled by these scammers. RoFx, however, provides the traders with a clear and straightforward concept through an easy-to-use user interface. Daily gains made by the robot, verified records of MyFxBook, and 24/7 customer support show the credibility of the robot. The 8%-10% monthly gain offered by the robot is enough to make any professional trader happy.

The Reader's Digest article specifically references "verified records of MyFxBook" providing a trading history that shows the credibility and reliability of the RoFx trading robot.

81.    MyFxBook publishes trading activity of entities providing it trading data.[8] At the direction of the RoFx Operators, from July 2018 to July 2021, Promoter Defendant **Ester Holdings** published purported daily RoFx trading activity on MyFxBook.com. The published trading activity was consistent with RoFx profitability claims.



82.    Between January 2018 and July 2021, the RoFx Operators hired Promoter Defendant **The Investing Online** to author, publish, and distribute several articles describing the RoFx Scheme. The Investing Online articles emphasized the innovative nature of the RoFx trading robot and the longevity and widespread adoption of the RoFx robot by tens of thousands of customers, consistent with the claims published on RoFx.net. The Investing Online articles were

---

[8] MyFxBook offers trading audit services, but verification of trades is not required for publishing trades on MyFxBook.

then re-published or cited by scores of websites, often parroting the original language word-for-word. *See* Ex. 2; Ex. 3, Articles Promoting RoFx IPO, at 13–14.

83.     Between January 2018 and September 2021, the RoFx Operators created and distributed, or caused to be created and distributed, advertisements eventually published via FaceBook and Reddit. These advertisements parroted the same representations made by the RoFx Operators on the RoFx.net website.

84.     Between June 7, 2018, and September 21, 2021, the RoFx Operators published, or caused to be published, dozens of glowing reviews of the RoFx Scheme on the website Trustpilot at https://www.trustpilot.com/review/www.rofx.net. These positive reviews emphasize the safety, profitability, accessibility, transparency, and longevity of the RoFx Scheme. *See* Ex. 4, Trustpilot Reviews.

### *The RoFx Initial Public Offering and Initial Coin Offering*

85.     In late 2020, the RoFx Operators represented their intent to take the RoFx robot public via an initial public offering ("IPO").

86.     On September 11, 2020, the RoFx Operators sent the following email to all RoFx customers, with the subject "RoFx: pre-IPO":

> Many of you are already aware that RoFx is preparing for an IPO (Initial Public Offering) in the third quarter of 2021.
>
> We have been receiving multiple requests from you if we are going to have the pre-IPO and its date. Thus, we would like to have you informed that we plan the pre-IPO exclusively for our VIP package holders approximately 2 months to go before the IPO. You will be notified accordingly in advance.

87.     On or about October 16, 2020, the RoFx Operators directed The Investing Online to author, publish, and distribute a press release regarding the RoFx initial public offering. The press release disclosed that Berkshire Hathaway was currently negotiating for a majority position in RoFx:

> RoFx's IPO is one of the most anticipated events in the financial market for many reasons. After ten years of successful journey, and immense popularity, most of the experts believe that this IPO is going to be a grand success. But there is one reason why there is so much talk about this IPO in financial forums, and that is Buffet's interest. There are talks among market experts that RoFx is going IPO as they have become an interest of Berkshire Hathaway, Warren Buffett's company, that currently negotiates for buying of RoFx majority stock holding. According to the terms of the agreement, Berkshire Hathaway should invest $500 million in AI development that will significantly improve RoFx trading results. This not only increases the interest among the investors but also proves the credibility of the RoFx company.

88.     The RoFx IPO press release was widely re-published or cited by major news outlets, including AP News and Yahoo. *See* Ex. 3.

89.     On October 16, 2020, the RoFx Operators sent another email to all RoFx customers, stating:

> This week many mass media announced that Berkshire Hathaway that belongs to Warren Buffet is intended to buy majority stock holding of RoFx which is going IPO. We would like to inform that this is a premature announcement. We will keep you updated.

90.     Around this same time, the RoFx Operators used Warren Buffet's image on their Facebook page to reinforce Mr. Buffet's purported involvement with the RoFx Scheme.



91.     In early 2021, the RoFx Operators informed all RoFx customers via email and website representations that they would also launch an initial coin offering ("ICO"). *See* Ex. 5, RoFx ICO Emails, at 2–3. Customers would have the opportunity to purchase "BRKROFX" digital tokens, a name implying the involvement of Berkshire Hathaway. BRKROFX tokens would represent value in the newly-developed "V2.0" RoFx platform which would provide "daily trading performance" of ".97%". The RoFx Operators included a link in the email to a BRKROFX ICO white paper, which the RoFx Operators hosted on RoFx.net:

# **BRK**ROFX

## **ICO**Details

○ Pre-Sale Date: **March 1 - April 30, 2021.**

○ ICO Date: **June 1st, 2021.**

○ 1 token = 1 US Dollar.

○ BRKROFX Tokens total supply: 1,000,000,000.
  ● Pre-sale: 200,000,000 tokens.
  ● Public sale: 100,000,000 tokens.

○ Simple access via Myetherwallet, MyCrypto and other Ethereum web & mobile wallets.

○ Simple tracking and monitoring starting from Pre-Sale & Public Sale event on Etherscan and other resources.

○ Starting from June 1st, 2021 available on the following exchanges: Coinbase, Binance, Kraken, Bitfinex, Bithumb, Bitstamp and others.

○ Token packages subscription is available starting from March 1st, 2021
  https://rofx.net/brkrofx

## **ICO**Mission

○ Raised funds are specifically intended for a new edge AI-based trading platform V2.0 development in order to increase trading robot profitability and ensure it's transparency and efficiency.

○ Estimated average daily trading perfomance of the new platform V2.0 is 0.97%. Release is scheduled on March 31st, 2021. New AI platform V2.0 will be available for BRKROFX token packages only.

○ Revenue generated by the company is distributed proportionally between all token holders on the annual basis.

### **Tokens Allocation Model**



### **BRKROFX Token Pre-sale Discounts**

| Customer Package Type | Pre-Sale Discount |
|---|---|
| Trial | 1% |
| Easy start | 2% |
| Moneymaker | 3% |
| Gold | 4% |
| VIP 100,000 - 1,000,000 | 5% |
| VIP 1,000,000 - 2,000,000 | 6% |
| VIP 2,000,000 - 3,000,000 | 7% |
| VIP 3,000,000 - 5,000,000 | 8% |
| VIP more than 5,000,000 | 9% |

*Figure 2: BRKROFX White Paper Posted on RoFx.net*

92.    The BRKROFX white paper encouraged customers to create and maintain a large account balance in order to qualify for progressively more rewarding discounts during the ICO pre-sale, scheduled for March 1 to April 30, 2021.

93.    On February 25, 2021, in preparation for the ICO pre-sale, the RoFx Operators created the BRKROFX tokens via a smart contract hosted on the Ethereum blockchain. On that same day, they distributed the BRKROFX tokens consistent with the "Tokens Allocation Model" provided in the BRKROFX white paper:



94.    On March 1, 2021, the RoFx Operators announced the launch of the ICO pre-sale via RoFx.net and emails to RoFx customers, again linking to the BRKROFX white paper:

> Going public is a monumental event for any company. We have been heading towards this outstanding occasion for 12 years. It has been 12 years of efficient work, high achievements and absolutely unique challenges.
>
> We have been one of the pioneers who implemented AI to Forex trading and the first who demonstrated such level of stable profitability for many years. The next important milestone is going public and successful completion of a V2.0 trading platform development, trading performance of which is much higher. We have been working on a new AI platform V2.0 since 2017 and now we are proud to release it on March 31st, 2021.

> ICO Pre-sale dates: March 1 - March 31 , 2021 (for RoFx Customers ONLY).

95.     In the BRKROFX white paper, the RoFx Operators listed the BRKROFX token price as $1 USD per token. *See* Ex. 5 at 2; *supra* fig.2.

96.     The RoFx Operators offered, via emails, existing RoFx customers the opportunity to purchase BRKROFX using funds from their RoFx account—contingent on the RoFx customer agreeing to commit those funds for up to 120 days, preventing withdrawals.

97.     By the end of the ICO pre-sale on March 31, 2021, the entire pre-sale token allocation—200 million BRKROFX tokens—had been distributed.

98.     On March 31, 2021, the RoFx Operators reacted to the purported demand for BRKROFX tokens by sending an email to all RoFx customers adjusting the pre-sale—making the "public sale" tokens available to RoFx customers during an extended pre-sale period:

> We are thrilled to announce that during token Pre-sale, its demand has significantly outreached supply. We have received many requests from our Customers expressing regrets they did not succeed to buy BRKROFX till the pre-sale end.
>
> Our Customers have always been our top priority, thus RoFx Management decided to extend the pre-sale till April 30, 2021 and allocate 100 000 000 tokens from the Public sale to Pre-sale.

99.     On April 1, 2021, to encourage continued purchases of the BRKROFX tokens, the RoFx Operators sent an email to RoFx customers with the subject "RoFx launches the AI platform V2.0", including a link to the "Upgraded AI V2.0" profit calculator:

> We are happy to announce that RoFx launches the AI platform V2.0 today. We have been working on this new platform since 2017 and now we are proud to release it.
>
> All token packages have been switched to new AI V 2.0 platform.

100.    On June 1, 2021—the date of the purported BRKROFX ICO—the RoFx Operators sent an email to customers rescheduling the ICO date "due to delay in compliance procedure conducted by the financial authorities[.]"

101.    Subsequently, the RoFx Operators sent an email claiming the previously disclosed IPO would be delayed until the third quarter of 2021. *See* Ex. 5 at 3.

**B.  The RoFx Reality**

102.    Nearly every one of the representations made by the RoFx Operators listed in Section III.A, *supra*, is false, made to lure customers and keep them hooked on incredible and entirely illusory paper profits.

103.    RoFx does not exist as a legal entity in any jurisdiction, is not a registered business name for any entity or person, and is not a registered trademark or copyright.

104.    The RoFx Operators never developed a software algorithm for automated foreign exchange trading.

105.    The RoFx Operators did not have offices at any of the three addresses listed on RoFx.net for Miami, London, or Hong Kong.

106.    All representations regarding the safety of customer funds were false. There was no reserve fund covering customers' losses. All explicit and implicit representations that any aspect of the RoFx Scheme was regulated or conducted via regulated entities was false and intended to induce new and continued contributions to the Scheme.

107.    The RoFx Operators never engaged in foreign exchange trading on behalf of customers. The trading activity posted by Promoter Defendant Ester Holdings on MyFxBook.com was fictitious, intended to give the false impression that the RoFx Operators were actually conducting foreign exchange trades via third-party brokers.

108.    Because no foreign exchange trading was done using RoFx customer funds, all claims of RoFx foreign exchange trading profitability were complete fabrications. Instead, the RoFx Operators simply pooled customers' monies, only allowing customers to redeem small amounts from their accounts to garner further trust. The remainder of the funds was used to pay others for their roles in the Scheme or taken as illicit gains by the RoFx Operators themselves. Thus, any account balances reported by the RoFx Operators to customers were illusory, existing only on paper.

109.    Because RoFx customer account balances were illusory, the referral fees "paid" to existing customers for bringing in new customers were fictions serving no other purpose but to lure more unsuspecting customers into the Scheme.

110.    RoFx customers were not free to withdraw their funds at any time, regardless of account package or tier. Only small withdrawals were occasionally permitted to further the illusion of the RoFx Scheme's legitimacy. But the RoFx Operators prevented large withdrawals by creating an endless parade of obstacles, such as never-ending requests for verification and Know-Your-Customer ("KYC") documents or by falsely claiming that regulatory or anti-money laundering ("AML") requirements were preventing large withdrawals.

111.    All representations regarding RoFx account tiers, different trading algorithms, lock and no-lock packages, special VIP Conferences, and ICO pre-sale discounts were false and intended solely to keep customers' funds enmeshed in the Scheme.

112.    The RoFx Operators exaggerated the popularity and widespread adoption of the RoFx trading robot to encourage continued contributions. In reality, there were far fewer than the 30,000 to 70,000 claimed customers. The actual number of customers was between 1,000 and 2,000.

113.    There was never a planned RoFx IPO.

114.    Warren Buffet and Berkshire Hathaway were not interested in ownership of the RoFx Scheme. The RoFx Operators made these misrepresentations to encourage further contributions by customers. *See* Ex. 3.

115.    There was never going to be a BRKROFX ICO—only the token pre-sale, which was exclusively directed to existing RoFx customers.

116.    Although the RoFx Operators did create and distribute BRKROFX tokens, these tokens were never going to serve any purpose, contrary to the RoFx Operators' claims. The BRKROFX tokens are worthless.

117.    The RoFx Operators created the illusion of an active BRKROFX ICO pre-sale by distributing tens of millions of BRKROFX tokens to addresses which were actually under the control of the RoFx Operators. Examining the Ethereum blockchain reveals substantial BRKROFX trading activity, but this activity is artificial, intended only to create excitement among customers and encourage further contributions to the RoFx Scheme. The RoFx Operators reinforced this illusion by sending emails to customers regarding fictitious popular demand for the BRKROFX tokens. *See* Ex. 5 at 4.

118.    The opportunity to purchase BRKROFX tokens using funds in an existing RoFx customer account—in exchange for locking in those funds—was only intended to discourage RoFx customers from withdrawing their assets.

119.    Both the purported IPO and BRKROFX ICO were illusory mechanisms purely intended to attract additional contributions from customers.

120.    The RoFx Operators' claims of a 12-year long RoFx Scheme are false.

121.    Instead, the RoFx Scheme began on or about October 1, 2016, when the RoFx Operators registered, or directed the registration of, the RoFx.net domain using the stolen identity of a Belizean citizen. On September 9, 2017, the RoFx Operators renewed the RoFx.net domain through domain services provider Network Solutions, LLC, based in Jacksonville, Florida. The RoFx Operators renewed the RoFx.net domain again on June 19, 2018.

122.    The RoFx.net domain remained unused until approximately January 2018. It was then that the RoFx Operators published the RoFx.net website and distributed false press releases as paid sponsored content via Promoter Defendant The Investing Online on numerous third-party websites. *See* Ex. 3.

123.    RoFx.net, hosted via Network Solutions in Florida, was the source from which most of the RoFx Scheme's misrepresentations oozed, including the RoFx.net website, numerous RoFx.net customer interactions, and plentiful RoFx.net emails.

124.    From about June 2018 to July 2021, the RoFx Operators began posting false trades via Promoter Defendant Ester Holdings. Again, no trades were ever conducted.

125.    From about June 2018 to September 2021, the RoFx Operators published false reviews on Trustpilot using fabricated "customers" to provide rave reviews for the illusory Scheme. *See* Ex. 4.

126.    Between January 2018 and September 2021, relying on the web of deception spun by the RoFx Operators, over 1,000 RoFx customers contributed approximately 75 million USD to the RoFx Scheme, including amounts invested when purchasing BRKROFX tokens. *See* Exs. 1–6.[9]

---

[9] Plaintiffs' counsel solicited information from potential class members regarding their contributions to the RoFx Scheme. Ex. 6, Claimant Transactions, lists transactions from RoFx

127.    On or about September 17, 2021, the RoFx Operators shut down RoFx.net and stopped responding to customers.

**C.  The Money Laundering Enterprise**

128.    The RoFx Operators utilized the illusory promise of a safe, highly lucrative, foreign exchange trading platform to lure contributions from Plaintiffs. With the assistance and participation of numerous Defendants, the RoFx Operators obscured their financial trail by laundering money across the globe through a variety of **Company Organizers**, **Front Companies**, **Layering Companies**, and **Cash-Out Companies**.

129.    Each of these Defendant Groups played a pivotal role in the Money Laundering Enterprise, whose goal was to obscure, hide, and clean the funds from the RoFx Scheme on behalf of the RoFx Operators. The roles are defined as follows:

a.    Company Organizers: individuals and entities creating, acquiring, and transferring Front Companies. Company Organizers also directed the dissolution of Front Companies to further obscure the evidentiary trail linking illicit funds to Defendants.

b.    Front Companies: clean companies—companies not subject to any particular scrutiny—able to satisfy KYC and AML requirements and establish bank accounts. Front Companies and their principals established or used existing bank accounts primarily to receive RoFx customer funds, introducing the illicit funds into the financial system for onward movement through the RoFx money laundering network. Front Companies were generally only actively involved in the scheme for a finite period of time. Certain of the Front Companies—Trans-Konsalt, Aware Choice, and VDD—assumed hybrid roles, both receiving customer funds and acting as a conduit for sending limited RoFx customer "withdrawals" back to customers in furtherance of the Scheme, *see supra* ¶ 110, and to conceal the existence of the Money Laundering Enterprise.

c.    Layering Companies: existing companies with a high volume of financial transactions, selected to obfuscate the flow of illicit funds. Layering Companies received transactions from *both* RoFx customers and Front Companies and then, as directed by the RoFx Operators, sent the illicit funds onward to Cash-

customers to different RoFx affiliates. This is just a subset of the thousands of transactions submitted by the 750 potential class members. Review of this information is ongoing and the number of potential class members is expected to increase.

Out Companies, other Layering Companies, or returned dribbles of payments back to RoFx customers as "withdrawals" in furtherance of the Scheme and to conceal the existence of the Money Laundering Enterprise.

d.   Cash-Out Companies:[10] the exit point for the illicitly obtained funds. Cash-Out Companies established accounts around the world and received funds from Front and Layering Companies. Money mules withdrew and couriered cash from Cash-Out Companies to the RoFx Operators.



*Figure 3: The Money Laundering Enterprise*

130.   This complex money laundering scheme was necessary to avoid scrutiny of the illicit transactions. As the scheme snowballed, the RoFx Operators created additional Front Companies to further distribute the transaction volume and dampen suspicion.

131.   The RoFx Operators directed customers to send funds to accounts held by the various Front Companies. When customers inquired as to why the Front Companies were not named "RoFx" or similar, the RoFx Operators explained the different entities were used for regulatory reasons. This was false.

---

[10] Plaintiffs are still analyzing available information to determine the identities of the RoFx Cash-Out Companies.

*Initial Flow of Funds Through the United Kingdom and the Czech Republic*

*Wealthy Developments, Anton Bilous, and ePayments*

132.    Sometime prior to January 15, 2018, the RoFx Operators established Front Company **Wealthy Developments** via **Anton Bilous**.   Bilous created a bank account and deposited funds—funds provided by the RoFx Operators.

133.    At this time, in January 2018, Defendant **ePayments Systems Ltd** was an Authorized Electronic Money Institution regulated by the United Kingdom's Financial Conduct Authority. ePayments offered prepaid Mastercards, "safe and instant transfers", and emphasized its cross-border and global transaction capabilities. Banners on the ePayments site touted its services to businesses:

      a.    "PAY CLIENTS AND PARTNERS AROUND THE WORLD"

      b.    "MAKE TRANSFERS TO ALTERNATIVE PAYMENT SYSTEMS"

134.    The RoFx Operators needed both a Front Company capable of receiving funds and a Layering Company with existing financial transactions which would offer cover for the international and illicit transactions the RoFx Operators needed to disguise. ePayments ticked all the right boxes.

135.    On or around January 15, 2018, the RoFx Operators, directly or via Bilous, established a relationship with ePayments: ePayments would receive funds from RoFx customers and route the illicit funds as directed by the RoFx Operators—with little or no scrutiny. In return, ePayments would receive an "affiliate fee."

136.    On January 29, 2018, Bilous, through Wealthy Developments, sent $15,350 to ePayments. This was, apparently, the first of several "affiliate fee" payments. *See* Ex. 9, Transfers to Layering Companies, at 2.[11]

137.    On that same day, January 29, 2018, the RoFx Operators directed one of the earliest RoFx customers to contribute his funds to the RoFx Scheme by depositing €4,999 with ePayments.[12] The RoFx customer did so. *See* Ex. 6, Claimant Transfers, at 1.

138.    The RoFx Operators continued to use ePayments' services as conduit to their Scheme through at least September 5, 2018—directing RoFx customer funds directly to ePayments. *See id.* Around this time ePayments apparently ceased *directly* receiving RoFx customer funds.

139.    However, in addition to serving as a conduit between customer funds and the RoFx platform, ePayments acted as a Layering Company in the Money Laundering Enterprise: accepting funds from various RoFx Front Companies and transacting those assets as directed by the RoFx Operators. *See* Ex. 9 at 1. ePayments continued in this role until at least July 2019.

140.    However, in April 2018, the RoFx Operators, concerned about the increasing number of transactions through ePayments, began directing some customers to send funds to Wealthy Developments.  Bilous, using Wealthy Developments' bank account, sent the funds onward as directed by the RoFx Operators.  Bilous continued to use Wealthy Developments and its bank account as a Front Company for the RoFx Operators through September 2018. *See* Ex. 6 at 1.

---

[11] Exhibit 9 is a mere window into the universe of financial transactions involving Layering Companies. The exhibit is limited to information produced by nonparties; further discovery will expand our understanding of the RoFx financial web.

[12] ePayments and Boonruk Ruamkit were not exclusively used as intermediary Layering Companies and were, on occasion, direct recipients of RoFx customer funds.

### *Aware Choice, Dmytro Fokin, and Ivan Hrechaniuk*

141.    Sometime prior to June 12, 2018, the RoFx Operators became increasingly worried about the RoFx customer transaction volume, despite that volume already being distributed between ePayments and Wealthy Developments.

142.    To address this concern, the RoFx Operators activated another Front Company: **Aware Choice**. Aware Choice's directors **Dmytro Fokin** and **Ivan Hrechaniuk** created a bank account to use for RoFx transactions.

143.    Between June 2018 and June 2019, the RoFx Operators directed some customers to send monies to Aware Choice. *See id.* at 1-5. Fokin and Hrechaniuk, using Aware Choice's bank account, sent the funds onward as directed by the RoFx Operators.

144.    The RoFx Operators then directed Fokin and Hrechaniuk to begin using Aware Choice and its bank account for a different purpose: specifically, between September 2019 and January 2020, the RoFx Operators collected substantial funds ($1.9 million or more) from their United States Front Companies and sent those monies to Aware Choice. *See* Ex. 7, Transfers Between Defendants, at 2. Fokin and Hrechaniuk then sent those funds onward as directed by the RoFx Operators. During this time, upon information and belief, Aware Choice was used as a Cash-Out Company for the benefit of the RoFx Operators, with money mules carrying cash to the RoFx Operators.

145.    After Aware Choice had served its purpose, the RoFx Operators directed Fokin and Hrechaniuk to dissolve Aware Choice to conceal their wrongdoing. And Fokin and Hrechaniuk did so on March 23, 2021.

***Brass Marker and Sergiy Prokopenko***

146.    By October 2018, the RoFx Operators were attracting more and larger investments. At this point in the scheme, the RoFx Operators were exclusively using the SWIFT[13] network for interbank transactions. Apparently believing they could remain under the regulatory radar by distributing transactions onto another financial network, and wanting to distribute transactions through another part of Europe, the RoFx Operators activated Front Company **Brass Marker**.

147.    Brass Marker, based in the Czech Republic, could establish a bank account taking advantage of the Eurozone's SEPA[14] financial network. Brass Marker did so, via its officer **Sergiy Prokopenko**, and at the direction of the RoFx Operators.

148.    Between November 2018 and January 2019, the RoFx Operators directed some customers to send contributions to Brass Marker. *See* Ex. 6 at 2. Sergiy, using Brass Marker's bank account, sent the funds onward as directed by the RoFx Operators.

***Profit Media Group***

149.    The RoFx Operators activated yet another United Kingdom Front Company to handle the transaction load: **Profit Media Group**. Profit Media created a bank account to use for RoFx transactions.

150.    Between January and July 2019, the RoFx Operators directed some customers to send funds to Profit Media. *See id.* at 2–3. Profit Media, using its bank account, sent the funds onward as directed by the RoFx Operators.

---

[13] Society for Worldwide Interbank Financial Telecommunication.
[14] Single Euro Payments Area.

### *VDD-Trading, Dmytro Fokin (again), and Manuchar Daraselia*

151.    Also, in early 2019, the RoFx Operators activated Front Company **VDD-Trading**. VDD's directors **Dmytro Fokin**[15] and **Manuchar Daraselia** created a bank account to use for RoFx transactions.

152.    Between February and November 2019, the RoFx Operators directed some customers to send funds to VDD. *See id.* at 3–4. Dmytro and Manuchar, using VDD's bank account, sent the funds onward as directed by the RoFx Operators.

153.    Afterward, the RoFx Operators directed Dmytro and Manuchar to dissolve VDD to conceal their wrongdoing. Dmytro and Manuchar did so on October 13, 2020.

### *Money Flow in the United States*

154.    In or around July 2019—approximately 18 months after the genesis of the RoFx Scheme—the RoFx Operators decided to create Front Companies in the United States. RoFx customers were increasingly reluctant to wire money overseas; providing the lucrative United States market with Front Companies and domestic bank accounts for receiving funds would encourage doubtful customers.

155.    The RoFx Operators sought to acquire or control clean Front Companies with an existing history in the United States. Their first stop was **Auro Advantages, LLC**.

### *Auro Advantages, LLC*

156.    On May 16, 2019, the RoFx Operators acquired—directly, or via an agent—the entity Auro Advantages, purchasing the entity from an unidentified Ukrainian. The purchase included at least one existing United States bank account under a business name previously used by the newly-purchased entity: Paydo Financial Services, LLC.

---

[15] Dmytro is also associated with Front Company Aware Choice. *See supra* ¶ 142.

157.    Between June 2019 and September 2021, the RoFx Operators instructed customers to send funds to Auro Advantages. RoFx customers sent Auro at least $436,000. *See id.* at 3–4, 19.

158.    The RoFx Operators, acting through Auro Advantages, then sent funds onward to other RoFx-affiliated companies to obscure the illicit asset trail, including at least one payment of €3,000 on July 15, 2019 to Layering Company ePayments. *See* Ex. 9 at 2.

159.    Auro Advantages had a prior existing relationship with nonparty James Palasota, who is in the business of assisting persons in establishing companies in the United States.

160.    The RoFx Operators sought to exploit the relationship with Mr. Palasota to create additional Front Companies in the United States. The RoFx Operators, or their agent, told Mr. Palasota they were in the business of "chartering expensive yachts." Mr. Palasota was suspicious and refused to provide services to the RoFx Operators.

### *Company Organizers Borys Konovalenko and Mayon Solutions*

161.    Denied by Mr. Palasota, the RoFx Operators contacted a Ukrainian law firm for assistance in setting up Front Companies in the United States. The law firm directed the RoFx Operators to **Borys Konovalenko** and the Mayon Solutions group of companies:   **Mayon Solutions, LLC**; **Mayon Solutions Ltd**; and **Mayon Holding Ltd** (collectively, "Mayon")[16].

162.    Konovalenko, both individually and through Mayon, is in the business of forming companies for others and providing "post-incorporation" "resident director services", among other services. Konovalenko played a pivotal role in either forming or directing the formation of Front

---

[16] For the purposes of this section, the Mayon entities will individually be referred to as: (1) Mayon Solutions, LLC ("Mayon USA"), (2) Mayon Solutions Ltd ("Mayon UK"); and Mayon Holding Ltd ("Mayon HK").

Company Defendants Notus, Shopostar, Easy Com, and Global E-Advantages—all based in the United States.

163.    **Alex Doe**, one of the RoFx Operators, met Konovalenko sometime in late July or early August 2019. During the meeting, Alex informed Konovalenko that he wanted Mayon to form or acquire companies in the United States for certain projects.

164.    Before entering into a service agreement with Mayon, Konovalenko requested certain KYC and AML documents from Alex. In response, Alex described his project as providing online marketing and video production services relating to two websites: trainingacademy.network (now defunct) and corvid.productions.[17]

165.    On August 19, 2019, **Mayon UK** entered into the service agreement with Alex (the "RoFx Services Agreement"), who appointed Company Organizer Defendant **Vsevolod Tovstun** to act as Alex's representative in signing the Agreement. Under the Agreement, Mayon and Konovalenko would acquire and service Front Companies for the RoFx Operators.

166.    Tovstun, acting as Alex's agent, and **Olga Tielly**, Director of Mayon UK, executed the RoFx Services Agreement in London.

167.    Pursuant to the RoFx Services Agreement, **Tovstun**, **Konovalenko**, **Tielly**, and **Mayon** were RoFx Company Organizers laying the foundations for most of the Money Laundering Enterprise based in the United States.

168.    Pursuant to the RoFx Services Agreement, Mayon sent invoices to the RoFx Operators for Mayon's services. At the insistence of the RoFx Operators, they paid Konovalenko

---

[17]The domain for https://corvid.productions/ is registered to Front Company Defendant Notus. It now inexplicably displays a website for Paesano's Café, a "casual fine dining restaurant" with three Texas locations.

personally for some services rendered; the RoFx Operators directed the remainder of the payments to **Mayon USA**.[18]

169.    Konovalenko maintained communication with Alex through Telegram messenger and email. Sometime between September and October 2019, Konovalenko noticed that Alex deleted his Telegram account and, with it, their communication history.

170.    Between most of August 2019 and September 2021—the time period relevant to Mayon's involvement in the Money Laundering Enterprise—Konovalenko utilized the various Mayon entities to distance himself from the tortious conduct. Specifically, Konovalenko utilized this complex company framework to facilitate the formation or acquisition of several Front Companies for the RoFx Operators and conceal his involvement in doing so. Several of the Mayon agents or employees contributed to this aspect of the Money Laundering Enterprise:

    a.    <u>Marina Garda</u>

        i.    From April 2019 to October 15, 2019, **Marina Garda** was the sole member of Mayon USA and authorized signatory for the company. *See* Figure 6.

        ii.    During the same period, Garda was the sole shareholder of Mayon HK—and Mayon HK delegated signature authority to Garda. *See* Figure 5.

        iii.    Garda used her authority over Mayon UK and Mayon USA to direct Mayon agents and employees at the behest of the RoFx Operators and Konovalenko—the real authority behind Mayon HK. In this capacity, Garda helped acquire and service Front Companies for the RoFx Money Laundering Enterprise, understanding their true purpose.

        iv.    After eight months of playing her part in the RoFx Money Laundering Enterprise, Garda abruptly sold her interests in Mayon USA and Mayon HK on October 15, 2019 and July 16, 2020, respectively. *See id.*; Figure 6. Garda sold her interest in Mayon USA to Mayon HK; and sold her interest in Mayon HK to Konovalenko. *See id.*

    b.    <u>Daria Eckert</u>

---

[18] This was contrary to the terms of the RoFx Services Agreement, which was executed by Mayon UK—not Mayon USA.

      i.      On October 10, 2019—weeks after executing the RoFx Services Agreement—Maria Garda, acting as Mayon HK's agent, appointed **Daria Eckert** as manager of Mayon USA. *See* Figure 6.

      ii.     In this capacity, Eckert helped acquire and service Front Companies for the RoFx Money Laundering Enterprise, understanding their true purpose.

     iii.    She remained manager of Mayon USA until September 22, 2020, at which point Konovalenko became manager of Mayon USA. *See id.*

  c.     <u>Olga Tielly</u>

      i.      On March 9, 2018, **Olga Tielly** became sole owner and director of Mayon UK. *See* Figure 4.

      ii.     On behalf of Mayon UK, Tielly executed the RoFx Services Agreement with Alex Doe and Vsevolod Tovstun.

     iii.    Tielly had an ownership interest in Mayon UK until April 19, 2019, at which point she transferred that interest to Mayon HK—retaining the title of Director. *See* Figure 4.

  d.     <u>Mayon HK</u>

      i.      Mayon HK was formed on April 17, 2019. Marina Garda initially owned 70% of the company; Borys Konovalenko purchased her interest in July of 2020. *See* Figure 5.

      ii.     From April 2019 to present, Mayon HK has been the sole owner of Mayon UK. Figure 4.

     iii.    Similarly, since October of 2019, Mayon HK has been the sole member of Mayon USA. *See* Figure 6.

     iv.    The RoFx Services Agreement was executed and performed during this period, beginning on August 19, 2019. *See id.*

  e.     <u>Borys Konovalenko</u>

      i.      Konovalenko is the connective tissue between all Mayon persons and entities.

      ii.     Konovalenko was either an owner, member, director, or manager of each of the Mayon entities at some point between August 2019 to present. *See* Figure 4–Figure 6.



*Figure 4: Mayon UK Timeline*



*Figure 5: Mayon HK Timeline*



*Figure 6: Mayon USA Timeline*

### Notus and Alla Skala

171.    Facilitated by Konovalenko and Mayon and its agents, on August 19, 2019,[19] **Alla Skala**—acting as agent of either Mayon, Konovalenko, or the RoFx Operators—acquired all shares in Front Company **Notus** from another Ukrainian citizen.

172.    Skala then established, or took control of, bank accounts for Notus and used them as directed by the RoFx Operators. Notus and Skala fulfilled several roles for the RoFx Operators:

    a.    As a Front Company, between about October 2019 and July 2021, the RoFx Operators instructed customers to send funds to Notus— customers sent well over $2.7 million during this period, *see* Ex. 6, at 4–8, 10, 18;

    b.    Between at least May 2020 and October 2020, other U.S. Front Companies sent large amounts—at least $1.8 million—to Notus for onward integration into the RoFx money laundering network, *see* Ex. 8, Transfers from Front Companies to Notus, at 2;

    c.    To facilitate the use of funds abroad, between September 2019 and October 2020, the RoFx Operators directed Skala to send over $5.3 million of collected customer funds to U.K. Front Company **Aware Choice**, Bulgarian Front

---

[19] This is the same day Mayon UK and Tovstun executed the RoFx Services Agreement.

Company **Trans-Konsalt**, and Thai Layering Company **Boonruk Ruamkit**, *see* Ex. 7, at 2–4;

d. Finally, Notus, using RoFx customer funds, was used as a channel to funnel hundreds of thousands of dollars to Konovalenko, Mayon, Mayon's agents and principals, and Skala for their roles in the Scheme.

### *Shopostar and Nataliya Los*

173. Prior to January 2020, Mayon and Konovalenko arranged for the RoFx Operators to have operational control over Front Company **Shopostar** and its banking accounts via its owner, **Nataliya Los**.

174. Between January 2020 and September 2021, the RoFx Operators directed customers to send over $3.2 million to Shopostar. Ex. 6 at 5, 9–11, 13–14, 16–19.

175. Shopostar, via Nataliya, sent these funds, as directed by the RoFx Operators, to Thai Layering Company **Boonruk Ruamkit**, between approximately October 2020 and September 2021.

### *Global E-Advantages, Alla Skala (again), and Olga Arbykosova*

176. In February 2020, payment processor Transferwise informed **Skala** that her Notus account was frozen pending an AML investigation. This caused the RoFx Operators, Konovalenko, and Mayon concern; additional Front Companies were sought to distribute the transaction volume and reduce the risk of incurring further unwanted regulatory oversight. One of those companies was **Global E-Advantages**.

177. Prior to April 28, 2020, Mayon and Konovalenko facilitated Skala's control over Front Company Global E-Advantages—specifically, over a bank account in that entity's name. The RoFx Operators directed Skala to use her authority over the Global E-Advantages account to serve several purposes:

a. As a Front Company, between about April 2020 and January 2021, the RoFx Operators instructed customers to send funds to Global E-Advantages—customers sent well over $890,000 during this period; Ex. 6 at 6–10.

b. The RoFx Operators used Global E-Advantages to send funds outside the United States; first, by sending RoFx funds to **Notus** between May 2020 and October 2020; then by sending funds to Thai Layering Company **Boonruk Ruamkit**; *Id.* at 6–8; Ex. 7 at 2–4.

c. The RoFx Operators also used Global E-Advantages to pay Mayon Solutions $862,000 between October 2020 and February 2021 for their part in the Money Laundering Enterprise. Ex. 7 at 4–5.

178.   The RoFx Operators hired Mayon's previous financial manager, **Olga Arbykosova**, as an operational and financial manager. Arbykosova, directed by the RoFx Operators and Skala, processed both **Notus'** and **Global E-Advantages'** transactions through online banking.

### *Easy Com, Jase Victor Davis, and Company Organizer Anna Shmyko*

179.   The RoFx Operators sought still further Front Companies. On September 22, 2020, Mayon or Konovalenko instructed Company Organizer **Anna Shymko** to register Front Company **Easy Com** for the purpose of satisfying the RoFx Operators' needs.

180.   On December 3, 2020, Mayon facilitated the transfer of Easy Com to **Jase Victor Davis**, who acted as agent for the RoFx Operators. Davis opened two bank accounts for Easy Com around January 2021 and was the sole signatory on these accounts. From that point forward, the RoFx Operators directed RoFx customers to deposit at least $3.4 million into Easy Com's accounts, which Davis sent onward as directed by the RoFx Operators. *See* Ex. 6 at 10–17.

181.   By early 2021, either Konovalenko or the RoFx Operators decided to wind up Notus—perhaps owing to the earlier 2020 Transferwise AML investigation, which put the RoFx Operators on notice that their transactions were attracting scrutiny. Konovalenko facilitated the transfer of Notus from Skala to Shymko on April 14, 2021. Konovalenko then instructed Shymko

to dissolve Notus, which she did on September 16, 2021, a mere day before the RoFx.net website went permanently offline.

### *Grovee, Timothy Stubbs, and Jared Goodyear*

182.     The RoFx Operators made use of at least two other Front Companies in the United States: **Grovee, LLC** and a person named **Jared Goodyear**—both towards the end of the Money Laundering Enterprise.

183.     Prior to November 18, 2020, **Timothy Stubbs** had business or personal relationships with **Notus**, **Shopostar**, **Borys Konovalenko**, **Nataliya Los**, **Anna Shymko**, and **Alla Skala**—all of whom are associated with Mayon's activities in the United States. At the direction of Konovalenko and Mayon, Stubbs managed different United States shell companies used by Konovalenko and Mayon, creating bank accounts for those companies and receiving and forwarding mail for these companies from Stubbs' personal residential addresses.

184.     Stubbs took an active role in the RoFx Money Laundering Enterprise when, on November 18, 2020, Stubbs opened a bank account at Bank of America in the name of **Grovee**, designating himself as the sole account signatory. In the account opening documents, Stubbs identified himself as "Manager" of Grovee.

185.     Several months later, a "Member" of Grovee opened a second account at Bank of America to accept RoFx customer funds and dilute transaction volume to evade regulatory scrutiny.

186.     Between November 2020 and May 2021, the RoFx Operators directed customers to send at least $250,000 to Grovee through two Bank of America accounts. Stubbs then directed the funds onward as instructed by the RoFx Operators. *See id.* at 10–14, 16.

187.    In February 2021, the RoFx Operators instructed at least one customer to send funds to an account in the name of Jared Goodyear. *See id.* at 11. The person controlling the Jared Goodyear account then sent the funds onward, as instructed by the RoFx Operators.

### *The RoFx Operators Get Spooked by Anti-Money Laundering Investigations*

188.    Two events occurred in February 2020, startling the RoFx Operators:

   a.    The United Kingdom Financial Control Authority suspended **ePayments**, a company used by the RoFx Operators, following a review of ePayments's AML systems and controls; and

   b.    Transferwise conducted an AML investigation of **Notus**.

189.    In reaction to these events, the RoFx Operators began looking for financial avenues outside the United States and United Kingdom. They pursued opportunities in Bulgaria, Thailand, and South Korea.

### *Bulgarian Front Company Trans-Konsalt MR*

190.    On or about January 2020, the RoFx Operators acquired control over **Trans-Konsalt MR**, or its accounts, in Bulgaria.

191.    Between January 2020 and March 2020, the RoFx Operators directed customers to send at least $370,000 in funds to Trans-Konsalt. *See id.* at 5-6, 8.

192.    In March 2020, the RoFx Operators also sent to Trans-Konsalt, from **Notus**, an additional $279,780 in customer funds. *See* Ex. 7 at 2.

193.    The RoFx Operators then caused Trans-Konsalt to move all customer funds according to the RoFx Operators' needs.

### *Thai Companies Boonruk Ruamkit and IT Outsourcing*

194.    In mid-March 2020, the RoFx Operators, through at least two intermediaries, contacted Thai Layering Company **Boonruk Ruamkit** via managing director **Nattpemol**

**Krinara**. Boonruk Ruamkit had an existing IT support and computer graphics business, including numerous international financial transactions.

195.    The RoFx Operators sought to use Boonruk as a Layering Company, using its legitimate business transactions to disguise illicit RoFx transactions. By April 2020, they had an agreement to do so: the RoFx Operators would send monies to Boonruk; Boonruk would direct the funds according to the RoFx Operators' instructions; and, in return, Boonruk could deduct 2% from all incoming funds as their service fee.

196.    The RoFx Operators directed Layering Company Boonruk, via its director Nattpemol, to use Boonruk's account for several purposes:

a.    Between April 2020 and July 2021, the RoFx Operators instructed customers to send at least $3.1 million directly to Boonruk, *see* Ex. 6 at 6–18;

b.    Between October 2020 and September 2021, the RoFx Operators moved at least $5.1 million in customer funds from the United States to Boonruk, *see* Ex. 7 at 2–5; and

c.    The RoFx Operators instructed Boonruk to send some small amounts as "withdrawals" back to customers to maintain the illusion of a legitimate enterprise and encourage continued contributions.

197.    By March 2021, the substantial transaction volume through Boonruk alarmed Krinara and the RoFx Operators. Krinara, in conjunction with shareholder Papahratsorn Raviratporn, incorporated Front Company IT Outsourcing.

198.    Nattpemol caused IT Outsourcing to open its own bank account to help bear the transaction load from the RoFx customer transactions. The RoFx Operators used the IT Outsourcing account almost exclusively to receive RoFx customer transactions. Between April 2021 and September 2021, the RoFx Operators instructed customers to send over $270,000 to IT Outsourcing. *See* Ex. 6 at 7, 15–19. Nattpemol then sent these funds onward as directed by the RoFx Operators.

### *South Korean Front Company Art Sea Group*

199.    On or about August 2020, the RoFx Operators acquired control over **Art Sea Group**, or its accounts, in South Korea.

200.    Between August 2020 and December 2020, the RoFx Operators directed customers to send at least $310,000 in funds to Art Sea Group. *See id.* at 8–10.

201.    The RoFx Operators then caused Art Sea Group to move all customer funds according to the RoFx Operators' needs. Specifically, the RoFx Operators returned small amounts to customers to satisfy requests for "withdrawals" in furtherance of the Scheme, or sent funds to Cash-Out Companies for money mules to withdraw and move as needed.

### *Money Laundering Summary*

202.    The RoFx Operators established an international web of companies in an effort to conceal the illicit gains of the RoFx Scheme. The following chart, based on available data, shows the involvement of different Defendants in the Money Laundering Enterprise over time:



*Figure 7: The Money Laundering Enterprise Over Time*

***Front Companies***

203.    In summary, with respect to Front Companies or Layering Companies directly receiving RoFx customer funds, existing data from Exhibit 6 shows:[20]

   a.    Wealthy Developments received funds from RoFx customers totaling at least €29,600 and $47,200 among 12 transactions.

   b.    ePayments received funds from RoFx customers totaling at least €34,997 and $7,500 among 11 transactions.

   c.    Aware Choice received funds from RoFx customers totaling at least €43,600 and $815,991 among 39 transactions.

   d.    Brass Marker received funds from RoFx customers totaling at least €14,400 and $398,000 among 11 transactions.

   e.    Profit Media received funds from RoFx customers totaling at least €2,000 and $84,999 among 3 transactions.

   f.    VDD received funds from RoFx customers totaling at least €31,500 and $186,650.98 among 33 transactions.

   g.    Auro Advantages received funds from RoFx customers totaling at least $436,021 among 18 transactions.

   h.    Notus received funds from RoFx customers totaling at least $2,705,714.36 among 117 transactions.

   i.    Shopostar received funds from RoFx customers totaling at least $3,269,680.60 among 112 transactions.

   j.    Global E-Advantages received funds from RoFx customers totaling at least $896,509 among 75 transactions.

   k.    Easy Com received funds from RoFx customers totaling at least $3,476,350.65 among 154 transactions.

   l.    Grovee received funds from RoFx customers totaling at least $229,788 among 27 transactions.

   m.    Trans-Konsalt received funds from RoFx customers totaling at least €187,000 and $157,800 among 20 transactions.

---

[20] As previously explained, Plaintiffs are relying on an incomplete dataset and expect to uncover more transactions during the course of litigation.

n.  Boonruk received funds from RoFx customers totaling at least €306,610  and $3,168,450.01 among 129 transactions.

o.  IT Outsourcing received funds from RoFx customers totaling at least €116,360 and $144,858.76 among 56 transactions.

p.  Art Sea Group received funds from RoFx customers totaling at least €50,000 and $258,452 among 5 transactions.

204.  From 2018 to 2021, Plaintiffs have analyzed 824 transactions sent from RoFx Customers to RoFx Front or Layering Companies totaling €816,067 and $15,914,842.36. *See id.* Plaintiffs estimate this represents only a fourth of the total investments received by the RoFx Front and Layering Companies. Total amounts sent to each Defendant are listed below:





***Layering Companies***

205.    The RoFx Operators used the Layering Companies to receive funds from the Front Companies in an attempt to obscure their Scheme. Plaintiffs have thus far identified Layering Companies ePayments and Boonruk.[21]

206.    In 2018, Wealthy Developments sent at least two transactions to ePayments for a total of $33,450. Ex. 9 at 2.

207.    From 2020 to 2021, Boonruk received at least 132 transactions totaling $7,994,730. *Id.* Specifically, the following Front Companies transferred funds to Boonruk:

---

[21] Plaintiffs expect that many more transactions to Layering Companies exist and can be discovered through future discovery and investigation.

a.      Notus sent at least 66 transactions totaling $3,057,330 between April 3, 2020 and October 8, 2020. *Id.*

b.      Shopostar sent 43 transactions totaling $3,657,730 between October 15, 2020 and September 17, 2021. *Id.*

c.      Global E-Advantages sent at least 14 transactions totaling $834,270 between October 13, 2020 and December 30, 2020. *Id.*

d.      Grovee sent 9 transactions for a total of $445,400 between December 14, 2020 and March 30, 2021. *Id.*

### *Cash-Out Companies*

208.    The **Cash-Out Companies** are the final step in the money laundering operation. These currently unknown entities received customer funds from the Layering Companies and ultimately distributed the funds to the RoFx Operators.

209.    Upon information and belief, there are at least four Cash-Out Companies located in Europe and Asia.

## IV. Named Plaintiffs' Allegations

### A. Plaintiff Ryan Birmingham

210.    Birmingham learned about RoFx between 2017 and 2018 through different forex trading review sites, Google searches, and Trustpilot. *See* Ex. 2; Ex. 4. Therein, the following false representations were made to him and other similarly situated customers:

a.      "this is the best robot/company to invest in, especially for beginners";

b.      "utilized a robotic trading platform to make trade decisions on customers' behalf";

c.      "customers would receive a return on investment in the form of RoFx daily trading profits";

d.      "a no loss guarantee, where RoFx would cover all daily losses";

e.      "the principal was guaranteed or insured"; and

f.      "was partnered with Warren Buffet and Berkshire Hathaway."

211.    Persuaded by these misrepresentations, Birmingham created his RoFx account on June 3, 2018.

212.    From June 2018 to mid-2021, Birmingham relied on RoFx's false representations and contributed approximately $100,000 to the RoFx Scheme.

213.    Relying on the RoFx promise of a 2% referral fee, Birmingham recruited his wife (Jill Birmingham), father (Kerry Birmingham), and grandmother (Phyllis Herington). Together with Birmingham, they contributed approximately $400,000 to the RoFx Scheme—sending wire transfers to the following entities:

      a.    Aware Choice (from 2018 to 2019);

      b.    Brass Marker (in 2019);

      c.    Auro Advantages (in 2019);

      d.    Notus (in 2019);

      e.    Easy Com (in 2021); and

      f.    Shopostar (in 2021).

214.    After Birmingham's family made the deposits, he noticed that his account was successfully credited the 2% referral fee.

215.    In September 2021 the RoFx website went offline. Birmingham lost access to his funds. Realizing he had lost his contributions, and those of his family members, he decided to pursue this action.

**B.  Plaintiff Roman Leonov**

216.    Leonov first learned of RoFx in November of 2019 through promotions on Facebook and Reddit and via Trustpilot reviews. Leonov specifically remembers the following false representations about the RoFx Scheme:

      a.    "the best automated forex trading robot in the world";

     b.     they "guarantee coverage of losses";

     c.     "daily average win rate of approximately 0.0035%"; and

     d.     customers could withdraw their funds at their discretion with "no-lock packages."

217.    To confirm the platform's features, Leonov researched RoFx on MyFxBook.com and Trustpilot, where he read the false representations regarding RoFx published on those platforms. *See supra* ¶¶ 81, 84.

218.    Leonov also researched RoFx by searching for relevant terms, including: "rofx review"; "rofx performance"; "guaranteed forex robot"; "proven expert advisor bot"; and "best robot forex trading." This led Leonov to review the many press releases and related content containing misrepresentations about RoFx, deliberately seeded into the public domain by The Investing Online and the RoFx Operators. *See supra* ¶¶ 79–82.

219.    Leonov registered for a RoFx account in May 2020 after reviewing these false representations.

220.    Once he had his account, Leonov encountered further false information about RoFx's alleged trading profits the RoFx Operators caused to be published on MyFxBook.com.

221.    Relying on RoFx's misrepresentations, Leonov made his first contribution to the Scheme in September of 2020.

222.    Leonov felt more comfortable with his decision after seeing his funds and supposed profits displayed on the RoFx data dashboard on RoFx.net—unaware this was an instrument of pure fiction. The RoFx data dashboard consistently reflected his subsequent contributions as well.

223.    Around October 2020, the RoFx Operators published false information ultimately distributed to both Yahoo Finance and the Associated Press discussing RoFx's unique trading

approach and a fallacious assertion that Warren Buffet was interested in investing in, or acquiring, the RoFx.net platform.

224.    Sometime in 2020, Leonov recalls RoFx promoting "Version 2"—an update to the RoFx platform that would allegedly increase the daily return from 0.0035% to 0.9%. As part of the updated RoFx platform, the Rofx Organizers touted a fabricated 2021 ICO together with the false promise of an in-person VIP customer conference in London, United Kingdom, sometime in 2022.

225.    Leonov, reassured by the RoFx Operators' deceit and their apparent plans for improving their services, contributed more money to the RoFx Scheme and purchased some BRKROFX tokens during the ICO pre-sale.

226.    Between December 2020 and April 2021, believing the elaborate illusion RoFx had created, Leonov transferred a total of $202,100 via 9 wire transfers. For each transfer, the RoFx Operators directed him to send funds to different Front Companies:

a.    Global E-Advantages (in 2020);

b.    Easy Com (in 2021);

c.    Grovee (in 2021); and

d.    Shopostar (in 2021).

227.    Leonov also contributed approximately $23,400 in bitcoin to the Scheme.

228.    Throughout his relationship with the RoFx Scheme, Leonov received numerous invoices from:

a.    Grovee;

b.    Easy Com;

c.    Aware Choice;

d.    Shopostar;

e.      Notus; and

f.      Global E-Advantages.

229.    In an email exchange, the RoFx Operators sent Leonov further fabrications, such as, "rofx is a group of companies, the owner of AI and neural networks, registered in the United Kingdom. ePayments Systems Ltd, the RoFx brokerage subdivision, subject to the jurisdiction of UK, regulated by FCA #900172."

230.    Leonov was permitted to withdraw small amounts from the RoFx Scheme. From December 2020 to September 2021, Leonov succeeded in withdrawing approximately $11,200 in USD and Bitcoin. The withdrawals were sent by two Thai entities:

a.      Boonruk Ruamkit Co., and

b.      IT Outsourcing, Ltd.

231.    On or about September 17, 2021, RoFx.net was non-functional.

232.    Realizing he was scammed, Leonov decided to pursue this action.

**C.  Plaintiff Steven Hansen**

233.    Hansen first heard about the RoFx Scheme in late December 2018. Through Google searches, Hansen encountered the misrepresentations the RoFx Operators seeded into the public domain to persuade people to invest. Specifically, that ROFX:

a.      "utilized a robotic trading platform to make trade decisions on customers' behalf";

b.      "customers would receive a return on investment in the form of RoFx daily trading profits";

c.      had "a no loss guarantee, where RoFx would cover all daily losses":

d.      contributions were safe because "the principal was guaranteed or insured"; and

e.      "was partnered with Warren Buffet and Berkshire Hathaway."

234.    In 2019, RoFx's fraudulent statements induced Hansen to contribute to the Scheme. Between 2019 to 2021, Steve contributed $1,325,000 to the RoFx platform. Specifically, through his company Colton Capital Partners, Hansen sent RoFx eight wire transfers, directed to the following entities per the instructions provided by the RoFx Operators:

      a.    Aware Choice (in 2019);

      b.    Notus (in 2020); and

      c.    Shopostar (from 2020 to 2021).

235.    On or about September 17, 2021, Hansen realized he could not access the RoFx website. From that point on, he was no longer able to access his account.

236.    Realizing he had been lured into a scam, Hansen decided to pursue this action.

**D.  Plaintiff Jonathan Zarley**

237.    Zarley first heard about RoFx in January 2020 after he saw a series of fraudulent advertisements the RoFx Operators caused to be displayed on Facebook. He was intrigued by RoFx because it was purportedly totally automated and passive.

238.    Specifically, Zarley was deceived by misleading information about RoFx's specific features from Facebook ads, Google searches, and RoFx's website, all of which were designed to persuade people to contribute to the Scheme. Such deliberate misrepresentations include that:

      a.    "RoFx was an automated trading platform";

      b.    "the investment was safe and guaranteed, with loss coverage";

      c.    "up to 12% monthly profit";

      d.    "no lock period, allowing him to make withdrawals at any time";

      e.    "profits were reliable, averaging 0.37%/day dating back to 2009, with an increase to .97%/day in version 2.0"; and

      f.    "Berkshire Hathaway was interested in the RoFx ICO."

239.     Manipulated by these fraudulent statements—about secure, guaranteed, passive profits—Zarley created an account on January 27, 2020. Right around this time, he also remembers reading a Readers' Digest article promoting RoFx.

240.     The illusion of authenticity lulled Zarley into making his first contribution to RoFx on January 28, 2020. Through May 26, 2021 he contributed $2,042,000 to the RoFx Scheme through 27 wires—sent to various beneficiaries as directed by the RoFx Operators:

a.     Aware Choice (in 2020);

b.     Notus (in 2020);

c.     Global E-Advantages (from 2020 to 2021); and

d.     Shopostar (in 2021).

241.     On July 9, 2020, Zarley, and other RoFx customers, received an email from the RoFx Operators introducing a new element to the RoFx façade—a profit calculator for customers to estimate their earnings based on the size of their accounts, program type, and time period. Zarley confirmed these purported projected profits with false trading information Ester posted on MyFxBook.com.

242.     Between 2020 and 2021, Zarley was able to withdraw a relatively small portion of his funds from his RoFx account. All wire transfers sent to Zarley originated from Boonruk Ruamkit.

243.     On September 17, 2021, Zarley realized that the RoFx.net website was unavailable, he could not access his account, RoFx phone numbers were disconnected, and emails to RoFx.net were going unanswered. He has not had contact with anyone from RoFx since.

244.     Realizing he had been defrauded of his substantial contributions, Zarley decided to pursue this action.

### E. Plaintiff Mitchell Parent

245.    Parent first heard about RoFx through a series of Facebook ads sowing false information that he saw between March and April 2020. The ads stated:

    a.    "that RoFx was a robot that traded on the client's behalf";

    b.    "an average daily profit of .38%";

    c.    "that your investment would be safe"; and

    d.    "that RoFx was the only place that covered your losses with its reserve fund."

246.    The RoFx advertisements intrigued Parent and caused him to visit the RoFx.net website, where he reviewed the many misrepresentations published there. *See supra* ¶¶ 63–76.

247.    Parent conducted a Google search looking for anything he could find about "rofx" and was exposed to numerous misrepresentations planted by the RoFx Operators on third-party websites—including the fake trading information on MyFxBook.com, the fake TrustPilot reviews, and stories about the fake Warren Buffet-RoFx relationship. *See supra* ¶¶ 79–90.

248.    Relying on these numerous misrepresentations, in early 2020 Parent signed up for an account with the longest lock-in period because it charged a lower fee. Parent made his first contribution in April 2020. Through May 2021, Parent contributed $491,000 to the RoFx Scheme through eight wire transfers, directed to different entities as instructed by the RoFx Operators:

    a.    Notus (in 2020);

    b.    Shopostar (from 2020 to 2021); and

    c.    Easy Com (in 2021).

249.    Throughout the period, he tracked the performance, made some limited withdrawals, and was manipulated into making larger contributions over time on account of the Scheme's veneer of legitimacy. The RoFx Operators successfully bolstered their illusion of

authenticity by allowing Parent to withdraw $8,880 from his account—sent via IT Outsourcing—along with a certain amount of bitcoin.

250.     Influenced by the RoFx illusion and the promise of a referral fee, Parent persuaded his friends and family to contribute to the Scheme.

251.     In September 2021 Parent realized RoFx.net was no long accessible; he was unable to access his account and now fears his contributed funds are gone.

252.     Parent realized he had been defrauded and decided to pursue this action.

## V. CLASS ACTION ALLEGATIONS

253.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(a) and (b)(3).

254.     Plaintiffs bring this action on behalf of a Class consisting of:

**All persons who contributed funds to the RoFx foreign exchange trading scheme and all persons purchasing BRKROFX tokens.**

Excluded from the Class are:

a.     persons meeting the class definition but who were able to withdraw funds or realize income from the sale of BRKROFX tokens exceeding the person's aggregate consideration;

b.     Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, agents, assigns, and successors;

c.     anyone employed by counsel for Plaintiffs in this action; and

d.     the judge to whom this case is assigned and the judge's staff.

### A.  This Action Satisfies Rule 23(a)

255.     This action meets the requirements of Rule 23(a) as follows:

a.     <u>Numerosity</u>. The proposed Class is so numerous and geographically dispersed that individual joinder of all members is impracticable. Already, Plaintiffs have received preliminary claim information from approximately 750 potential Class Members. This number is likely to increase.

b.      <u>Commonality</u>. There are questions of law and fact common to all Class Members. Such questions include, generally, whether Defendants, by their operation of the RoFx.net Scheme and subsequent Money Laundering Enterprise, violated the Racketeer Influenced and Corrupt Organizations Act; defrauded the Class Members; converted Class Members' property; and retained Class Members' monies unjustly.

c.      <u>Typicality</u>. Plaintiffs' claims are typical of Class members' claims because Plaintiffs and the Class all sustained injury from Defendants' wrongful conduct in a similar fashion. Plaintiffs and Class Members all contributed to the RoFx Scheme because they were falsely promised passive and automatic profits based on RoFx's nonexistent trading robot. Plaintiffs and Class Members were then further injured by the RoFx Money Laundering Enterprise, rendering return of their funds impossible without substantial additional expense and litigation. At bottom, Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class and are based on the same legal theories.

d.      <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. Indeed, Plaintiffs each have lost substantial sums to Defendants' misconduct and have spent considerable time and effort independently investigating Defendants and the RoFx Scheme, demonstrating their resolve to bring this matter to a satisfying resolution. Finally, Plaintiffs have engaged the undersigned counsel. Plaintiffs' counsel has considerable experience in class actions, cross-border asset recovery matters, and complex frauds; and has already invested substantial attorney time and its own funds in investigating and litigating this action—and is committed to continuing to do so. Plaintiffs' counsel is aware of its fiduciary duties to the Class and will continue to discharge those duties by seeking the maximum possible recovery for the Class Members. Neither Plaintiffs nor their counsel have interests antagonistic to the Class.

**B. This Action Satisfies Rule 23(b)(3).**

***Predominance under Rule 23(b)(3)***

256.    Rule 23(b)(3)'s predominance requirement is satisfied because questions of law and fact common to the Class predominate over questions that may affect individual members and include, inter alia:

a.      Whether the RoFx Operators and Promoter Defendants made misrepresentations regarding the RoFx Scheme, via RoFx.net, mass emails to Plaintiffs and the Class, and third-party websites;

b.      Whether the RoFx Operators, Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, Layering Companies and

Principals, and Cash-Out Companies agreed to participate in the RoFx Scheme or the Money Laundering Enterprise;

c. Whether the RoFx Operators, Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals performed overt acts in furtherance of the RoFx Scheme or the Money Laundering Enterprise;

d. Whether the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals assisted in or helped conceal the RoFx Scheme or the Money Laundering Enterprise;

e. Whether the Facilitator and Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals knew of the RoFx Scheme when they participated in or concealed the Scheme through the Money Laundering Enterprise, or did so recklessly knowing the predictable results of their actions would further or conceal the Scheme; and

f. Whether the RoFx Operators' disappearance and shutdown of the RoFx.net website rendered Plaintiffs and Class members' assets inaccessible, causing them damage.

257. Additionally, the common law state claims are similar enough across different jurisdictions—sharing common elements—that the common questions of law will predominate over questions that may affect individual members of the Class.

### *Superiority under Rule 23(b)(3)*

258. A class action is superior to any other available means for the fair and efficient adjudication of this controversy for the following reasons:

a. Many Class Members lack interest in individually controlling the prosecution of separate actions, because the claims of the majority of individual Class Members are small in relation to the expenses of litigation, making a class action the only procedure in which the majority of Class members can, as a practical matter, recover for the damages done to them by the Defendants;

b. Plaintiffs are unaware of any other actions relating to this controversy having been brought by any Class Members, making the present action an efficient vehicle for resolving Class Members' claims;

c. Plaintiffs' prosecution of the present action has already begun to bear fruit, rendering parallel individual actions duplicative and an inefficient use of judicial resources; and

    d.    A class action would be superior to and more efficient than adjudicating a thousand or more potential individual lawsuits.

**CLAIMS FOR RELIEF**

---

**Count I: Violation of the RICO Act, 18 U.S.C. § 1962(c)**
**Against the RoFx Operators, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals[22]**

---

259.    Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

260.    Plaintiffs and Defendants are "persons" within the meaning of 18 U.S.C. § 1962(c).

---

*The RICO Enterprise*

---

261.    The RoFx Operators, and the Company Organizer Defendants, Front Companies and Principals, Layering Companies and Principals, and Cash-Out Companies (collectively, the "Laundering Defendants") are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise—the Money Laundering Enterprise described in paragraphs 128 to 209, *supra*—to hide, launder, and otherwise wrongfully retain the proceeds of the RoFx Scheme. After acquiring the funds from the RoFx Scheme, the RoFx Operators, together with the Laundering Defendants, laundered the money across the globe through a variety of international banks, shell companies, and cryptocurrency exchanges.

262.    The RoFx Operators and the Laundering Defendants engaged in a coordinated campaign of money laundering and wire fraud, employing numerous unlawful interstate and international financial transactions involving laundered funds.

263.    In this manner, RoFx Operators and the Laundering Defendants conspired to and did form an association-in-fact to misappropriate and launder Plaintiffs' funds through a pattern of criminal activity for a common purpose within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

---

[22] As identified in Part II.

264.    The RoFx Operators and the Laundering Defendants are associated with the Money Laundering Enterprise within the meaning of 18 U.S.C. § 1962(c). Each of their roles and acts is detailed in paragraphs 128 to 209, *supra*.

265.    Beginning on or around January 2018 to present, the Money Laundering Enterprise was in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

### *Pattern of Racketeering Activity*

266.    The RoFx Operators and the Laundering Defendants participated, directly and indirectly, in the conduct, management, or operation of the Money Laundering Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 8 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), as follows:

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(B)(i)*

267.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

268.    The RoFx Operators and the Laundering Defendants knowingly conducted financial transactions identified in paragraphs 203 to 209, and as shown in Exhibits 6 and 9.

269.    At the time the RoFx Operators directed those transactions and the Laundering Defendants executed them, each of the Defendants knew the property involved represented the proceeds of some form of unlawful activity.

270.    The property involved in those financial transactions was in fact derived from specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127, *supra*.

271.    The RoFx Operators and the Laundering Defendants knew the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or

control of the proceeds of specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127.

272.    These financial transactions identified in paragraphs 203 to 209 affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; (b) moving funds by wire or other means that affected interstate or foreign commerce, or (c) using financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(A)(i)*

273.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

274.    The RoFx Operators and the Laundering Defendants knowingly conducted the financial transactions identified in paragraphs 203 to 209, and as shown in Exhibits 6 and 9.

275.    At the same time the RoFx Operators directed those transactions and the Laundering Defendants executed them, each of the Defendants knew the property involved represented the proceeds of some form of unlawful activity.

276.    The property involved in those financial transactions was in fact derived from specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127.

277.    The RoFx Operators and the Laundering Defendants had the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(A)(i) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127.

278.    These financial transactions identified in paragraphs 203 to 209 affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; (b) moving funds by wire or other means that affected

interstate or foreign commerce, or (c) using financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

**_Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)_**

279.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

280.    The RoFx Operators and the Laundering Defendants knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraphs 203 to 209.

281.    The RoFx Operators and the Laundering Defendants did so with the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(A) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127.

**_Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(B)(i)_**

282.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

283.    The RoFx Operators and the Laundering Defendants knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraphs 203 to 209.

284.    The RoFx Operators and the Laundering Defendants did so knowing the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity—namely, the RoFx Scheme described in paragraphs 61 to 127—and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(B)(i) and (c)(7); specifically, the RoFx Scheme described in paragraphs 61 to 127.

*__Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C.__*
*__§ 1957__*

285.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1957.

286.    The RoFx Operators and the Laundering Defendants engaged in monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3)—namely, the RoFx Scheme described in paragraphs 61 to 127. These monetary transactions are detailed in paragraphs 203 to 209.

287.    These financial transactions affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; or (b) involving the use of financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

288.    Each such monetary transaction either (a) took place in the United States, or (b) took place outside of the United States, and at least one Defendant is a "United States person" within the meaning of 18 U.S.C. § 1957(d)(2) and § 3077.

*__Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in__*
*__Violation of 18 U.S.C. § 2314__*

289.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 2314.

290.    The RoFx Operators and the Laundering Defendants transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more—namely, the RoFx Scheme described in paragraphs 61 to 127—in interstate or foreign commerce. These transactions are identified in paragraphs 203 to 209.

291.    The RoFx Operators and the Laundering Defendants did so knowing the money was stolen, converted, or taken by the RoFx Scheme's fraud or artifice.

### *Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315*

292.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 2315.

293.    The RoFx Operators and the Laundering Defendants received, possessed, concealed, sold, or disposed of goods, securities, or money that is of a value of $5,000 or more and that crossed a State or United States boundary after being stolen, unlawfully converted, or taken— namely, the RoFx Scheme described in paragraphs 61 to 127. These transactions are identified in paragraphs 203 to 209.

294.    The RoFx Operators and the Laundering Defendants did so knowing the money had been stolen, unlawfully converted, or taken via the RoFx Scheme.

### *Wire Fraud in Violation of 18 U.S.C. § 1343*

295.    The RoFx Operators and the Laundering Defendants committed acts of money laundering in violation of 18 U.S.C. § 1343.

296.    With specific intent to defraud, the RoFx Operators and the Laundering Defendants knowingly devised or participated in a scheme to defraud the Plaintiffs by means of material misstatements and omissions, specifically that Plaintiffs' contributions:

      a.     would be utilized by RoFx's forex robot trading platform to make trade decisions on behalf of Plaintiffs and for Plaintiffs' benefit, as set forth in paragraphs 61 to 70 and 102 to 127;

      b.     would be committed to foreign exchange trading so that Plaintiffs could receive a return on investment in the form of a percentage of RoFx's daily trading profit, as set forth in paragraphs 65 to 67 and 102 to 127;

      c.     could be withdrawn by Plaintiffs at their discretion, as set forth in paragraphs 81 to 91 and 110;

    d.    would remain in each respective Plaintiffs' accounts for their own use, as set forth in paragraph 111; and

    e.    would increase in value because the RoFx Scheme would be partnering with Warren Buffet and Berkshire Hathaway, as set forth in paragraph 87 to 90 and 114.

297.    The objective of the scheme to defraud was to preserve and misappropriate the ill-gotten funds for the RoFx Operators and the Laundering Defendants, and to continue to deprive the Plaintiffs of the money that was wrongfully taken from them by means of the RoFx Scheme. Through the scheme to defraud, the RoFx Operators were able to conceal their identities and their possession and control over the RoFx Scheme's proceeds.

298.    In furtherance of the scheme to defraud, the RoFx Operators and the Laundering Defendants transmitted or caused to be transmitted communications by means of wire in interstate or foreign commerce as set forth in paragraphs 203 to 209.

### Nature of Pattern of Racketeering

299.    The RoFx Operators and the Laundering Defendants committed a substantial number of related predicate acts over an extended period of time: the predicate acts enumerated at paragraphs 267 to 298, *supra*. Their commission of these predicate acts is part of a general course of business and will continue unless and until they are prevented from committing such acts.

### Injuries to the Plaintiffs

300.    The Plaintiffs were, and continue to be, injured by reason of the RoFx Operators' and the Laundering Defendants' violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated in paragraphs 267 to 298, *supra*.

301.    The injuries to the Plaintiffs include the continued deprivation of money taken from the Plaintiffs by means of the RoFx Scheme and by significant legal fees and related costs in attempting to address the unlawful conduct and recover what rightfully belongs to Plaintiffs.

302.     Despite their diligence and efforts, the Plaintiffs' discovery of these ongoing injuries was delayed by the RoFx Operators' and the Laundering Defendants' fraudulent concealment activity as set forth in paragraphs 128 to 209, *supra*.

303.     The injuries to the Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated at Paragraphs 267 to 298, *supra*. The Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

304.     Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RoFx Operators and the Laundering Defendants.

---

**Count II: RICO Conspiracy, 18 U.S.C. § 1962(d)**
**Against the RoFx Operators, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals[23]**

---

305.     Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252, 267 to 298, and 300 to 304.

306.     The RoFx Operators and Laundering Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

307.     In connection with the Money Laundering Enterprise, the RoFx Operators and Laundering Defendants agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity—as detailed in Count I, *supra*.

308.     The RoFx Operators and Laundering Defendants agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of racketeering, specifically the predicate acts enumerated in paragraphs 267 to 298, *supra*.

---

[23] As identified in Part II.

309. As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, the Plaintiffs have been injured in their business or property as set forth in paragraphs 300 to 304, *supra*.

310. Despite their diligence and efforts, the Plaintiffs' discovery of these ongoing injuries was delayed by the RoFx Operators' and the Laundering Defendants' fraudulent concealment activity as set forth in paragraphs 128 to 209, *supra*.

311. Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RoFx Operators and the Laundering Defendants.

**Count III: Common Law Fraud
Against the RoFx Operators, Peter Mohylny, and Promoter Defendants[24]**

312. Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

313. The RoFx Operators, Ester Holdings, and The Investing Online each made false statements of material fact regarding the RoFx Scheme. Specifically:

    a.    Alex Doe and John Does 1–3 made the misrepresentations detailed in paragraphs 61 to 125, *supra*.

    b.    Peter Mohylny published, or caused to be published, the RoFx.net misrepresentations detailed in paragraphs 63–76, *supra*.

    c.    Ester Holdings published false foreign exchange trading data, as detailed in paragraphs 81 and 124, *supra*.

    d.    The Investing Online made and published—or caused to be published—the misrepresentations detailed in paragraphs 82, 87, and 125, *supra*.

314. The RoFx Operators, Peter Mohylny, Ester Holdings, and The Investing Online made each misrepresentation in paragraph 313 with knowledge that the statements were false and intent that others would be induced to contribute to the RoFx Scheme.

---

[24] As identified in Part II.

315.    Plaintiffs and the Class relied on the misrepresentations in paragraph 313 and contributed $75 million or more into the illusory RoFx Scheme, including amounts spent on BRKROFX tokens.

316.    Plaintiffs' and the Class's contributions to the Scheme actually and proximately caused Plaintiffs and the Class damage when the RoFx Scheme collapsed, rendering Plaintiffs' funds inaccessible to Plaintiffs and the Class. *See supra* ¶¶ 126–127.

---

**Count IV: Conspiracy to Commit Fraud**
**Against Peter Mohylny and the Promoter Defendants, Company Organizer Defendants,**
**Front Companies and Principals, and Layering Companies and Principals[25]**

---

317.    Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

318.    This Count is pleaded in the alternative to Count III, *supra*, as against Peter Mohylny and the Promoter Defendants, Ester Holdings and The Investing Online.

319.    Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals agreed to participate with one or more of the RoFx Operators to commit the fraud detailed in Count III, *supra*, doing so knowing they were furthering or concealing the fraud or, alternatively, doing so recklessly knowing the predictable result of their actions would further or conceal the fraud.

320.    Each of Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals executed overt acts pursuant to the conspiracy:

      a.    Peter Mohylny published, or caused to be published, the RoFx.net misrepresentations detailed in paragraphs 63–76, *supra*.

      b.    Ester Holdings published false foreign exchange trading data, as detailed in paragraphs 81 and 124, *supra*, enabling the RoFx Operators to provide

---

[25] As identified in Part II.

customers with the illusion that RoFx was actually performing foreign exchange trades.

c.  The Investing Online made and published, or caused to be published, the misrepresentations detailed in paragraphs 82, 87, and 125, *supra*, enabling the RoFx Operators to create the illusion that RoFx was a popular, credible, and reliable foreign exchange trading service using a successful trading algorithm.

d.  Wealthy Developments used its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the conspiracy. *See supra* ¶¶ 132–136, 140.

e.  Anton Bilous used his control of Wealthy Developments and its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the conspiracy, and to establish a relationship with ePayments to use for the benefit of the RoFx Operators. *See supra* ¶¶ 132–136, 140.

f.  ePayments used its accounts and financial services to receive and move RoFx customer funds, concealing the illicit flow of funds to, ultimately, the RoFx Operators. *See supra* ¶¶ 133–139.

g.  Aware Choice used its bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 142–145.

h.  VDD used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 151–153.

i.  Dmytro Fokin used his control of Aware Choice and VDD's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145, 151–153.

j.  Ivan Hrechaniuk used his control of Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145.

k.  Manuchar Daraselia used his control of VDD's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 151–153.

l.      Brass Marker used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

m.      Sergiy Prokopenko used his control of Brass Marker's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

n.      Profit Media used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 149–150.

o.      Auro Advantages used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including a payment to ePayments; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 156–160.

p.      Borys Konovalenko, directly or through agents, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; Konovalenko also directed that Notus be dissolved to help cover the financial tracks of the RoFx funds through Notus. *See supra* ¶¶ 162–181.

q.      Mayon Holding Ltd, directly or via its agent Marina Garda, wholly-controlled subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, and Konovalenko provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

r.      Marina Garda, directly or through her signatory authority over Mayon Holding and, in turn, her control over subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

s.      Mayon Solutions Ltd, directly or via Konovalenko and Director Olga Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

t.      Olga Tielly, as Director of Mayon Solutions Ltd, executed the RoFX Services Agreement which provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

u.      Mayon Solutions, LLC, directly or via Konovalenko and Manager Daria Eckert, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in

collecting and moving RoFx customer funds; and Mayon Solutions, LLC, received some of the proceeds of the RoFx Service Agreement. *See supra* ¶¶ 162–181.

v.     Daria Eckert, as manager of Mayon Solutions, LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

w.     Notus used its bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and Alla Skala for their roles in the RoFx conspiracy. *See supra* ¶¶ 171–172.

x.     Global E-Advantages used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including sending funds to Notus and Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶ 177.

y.     Alla Skala used her access to Notus and Global E-Advantages's bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and herself for their roles in the RoFx conspiracy. *See supra* ¶¶ 171–172, 177.

z.     Olga Abrykosova managed the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various other entities as directed by Alex Doe and the other RoFx Operators—including funds sent to Aware Choice, Trans-Konsalt, Boonruk, Borys, Mayon, and Alla Skala. *See supra* ¶¶ 172, 177–178.

aa.     Anna Shymko formed Easy Com to provide the RoFx Operators a Front Company for creating a bank account and integrating customer funds into the financial system; and also dissolved Notus to conceal the RoFx Operators' wrongdoing. *See supra* ¶¶ 179–181.

bb.     Timothy Stubbs agreed to use his authority as manager for Grovee to provide the RoFx Operators a Front Company for creating bank accounts and integrating customer funds into the financial system; Stubbs then transferred the funds as directed by the RoFx Operators. *See supra* ¶¶ 182–186.

cc.     Easy Com used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

dd.  Jase Victor Davis used his access to Easy Com's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

ee.  Shopostar used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

ff.  Nataliya Los used her access to Shopostar and its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

gg.  Grovee used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 183.

hh.  Jared Goodyear used its (or his) bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 187.

ii.  Trans-Konsalt used its bank accounts to receive and move RoFx customer funds, including bulk amounts from Notus, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 190–193.

jj.  Boonruk Ruamkit used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including bulk amounts from U.S. Front Companies, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 194–196.

kk.  IT Outsourcing used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 197–198.

ll.  Nattpemol Krinara created IT Outsourcing and its bank accounts to use for transferring RoFx customer funds and used her control over Boonruk and IT Outsourcing's bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including receiving bulk amounts from U.S. Front Companies; and, ultimately transferred those monies to the RoFx Operators themselves. *See supra* ¶¶ 194–198.

mm.  Papahratsorn Raviratporn created IT Outsourcing to transfer RoFx customer funds and help conceal the Money Laundering Enterprise by distributing transactions into IT Outsourcing. *See supra* ¶¶ 197–198.

nn.   Art Sea Group used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 199–201.

321.   Defendants' acts, detailed in paragraph 320, facilitated, promoted, or concealed the fraud, actually and proximately causing damage to Plaintiffs and the Class for the amounts contributed to the RoFx Scheme. *See supra* ¶ 316.

---

**Count V: Aiding and Abetting Fraud**
**Against Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals[26]**

---

322.   Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

323.   This Count is pleaded in the alternative to Count IV, *supra*, as against Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals.

324.   Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals aided the RoFx Operators to commit or conceal the fraud detailed in Count III, *supra*, doing so knowing they were assisting the RoFx Operators commit or conceal the fraud or, alternatively, doing so recklessly, knowing the predictable result of their actions would assist the RoFx Operators to commit or conceal the fraud.

325.   Each of Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals substantially assisted the RoFx Operators to commit or conceal the fraud:

a.   Peter Mohylny published, or caused to be published, the RoFx.net misrepresentations detailed in paragraphs 63–76, *supra*.

---

[26] As identified in Part II.

b.   Ester Holdings published false foreign exchange trading data, as detailed in paragraphs 81 and 124, *supra*, enabling the RoFx Operators provide customers with the illusion that RoFx was actually performing foreign exchange trades.

c.   The Investing Online made and published, or caused to be published, the misrepresentations detailed in paragraphs 82, 87, and 125, *supra*, enabling the RoFx Operators to create the illusion that RoFx was a popular, credible, and reliable foreign exchange trading service using a successful trading algorithm.

d.   Wealthy Developments used its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in assisting the RoFx Operators in committing or concealing the fraud. *See supra* ¶¶ 132–136, 140.

e.   Anton Bilous used his control of Wealthy Developments and its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in assisting the RoFx Operators in committing or concealing the fraud, and to establish a relationship with ePayments to use for the benefit of the RoFx Operators. *See supra* ¶¶ 132–136, 140.

f.   ePayments used its accounts and financial services to receive and move RoFx customer funds, concealing the illicit flow of funds to, ultimately, the RoFx Operators. *See supra* ¶¶ 133–139.

g.   Aware Choice used its bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 142–145.

h.   VDD used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators *See supra* ¶¶ 151–153.

i.   Dmytro Fokin used his control of Aware Choice and VDD's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145, 151–153.

j.   Ivan Hrechaniuk used his control of Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145.

k.   Manuchar Daraselia used his control of VDD's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 151–153.

l.     Brass Marker used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

m.    Sergiy Prokopenko used his control of Brass Marker's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

n.     Profit Media used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 149–150.

o.     Auro Advantages used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including a payment to ePayments; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 156–160.

p.     Borys Konovalenko, directly or through agents, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; Konovalenko also directed that Notus be dissolved to help cover the financial tracks of the RoFx funds through Notus. *See supra* ¶¶ 162–181.

q.     Mayon Holding Ltd, directly or via its agents Marina Garda, wholly-controlled subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, and Konovalenko provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

r.     Marina Garda, directly or through her signatory authority over Mayon Holding and, in turn, her control over subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

s.     Mayon Solutions Ltd, directly or via Konovalenko and Director Olga Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

t.     Olga Tielly, as Director of Mayon Solutions Ltd, executed the RoFX Services Agreement which provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

u.     Mayon Solutions, LLC, directly or via Konovalenko and Manager Daria Eckert, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in

collecting and moving RoFx customer funds; and Mayon Solutions, LLC, received some of the proceeds of the RoFx Service Agreement. *See supra* ¶¶ 162–181.

v.    Daria Eckert, as manager of Mayon Solutions, LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

w.    Notus used its bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and Alla Skala for their roles in assisting the RoFx Operators in committing or concealing the fraud. *See supra* ¶¶ 171–172.

x.    Global E-Advantages used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including sending funds to Notus and Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶ 177.

y.    Alla Skala used her access to Notus and Global E-Advantages's bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and herself for their roles in assisting the RoFx Operators in committing or concealing the fraud. *See supra* ¶¶ 171–172, 177.

z.    Olga Abrykosova managed the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various other entities as directed by Alex Doe and the other RoFx Operators—including funds sent to Aware Choice, Trans-Konsalt, Boonruk, Borys, Mayon, and Alla Skala. *See supra* ¶¶ 172, 177–178.

aa.    Anna Shymko formed Easy Com to provide the RoFx Operators a Front Company for creating a bank account and integrating customer funds into the financial system; and also dissolved Notus to conceal the RoFx Operators' wrongdoing. *See supra* ¶¶ 179–181.

bb.    Timothy Stubbs used his authority as manager for Grovee to provide the RoFx Operators a Front Company for creating bank accounts and integrating customer funds into the financial system; Stubbs then transferred the funds as directed by the RoFx Operators. *See supra* ¶¶ 182–186.

cc.    Easy Com used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

dd.  Jase Victor Davis used his access to Easy Com's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

ee.  Shopostar used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

ff.  Nataliya Los used her access to Shopostar and its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

gg.  Grovee used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 183.

hh.  Jared Goodyear used its (or his) bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 187.

ii.  Trans-Konsalt used its bank accounts to receive and move RoFx customer funds, including bulk amounts from Notus, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 190–193.

jj.  Boonruk Ruamkit used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including bulk amounts from U.S. Front Companies, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 194–196.

kk.  IT Outsourcing used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 197–198.

ll.  Nattpemol Krinara created IT Outsourcing and its bank accounts to use for transferring RoFx customer funds and used her control over Boonruk and IT Outsourcing's bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including receiving bulk amounts from U.S. Front Companies; and, ultimately transferred those monies to the RoFx Operators themselves. *See supra* ¶¶ 194–198.

mm.  Papahratsorn Raviratporn created IT Outsourcing to use for transferring RoFx customer funds and help conceal the Money Laundering Enterprise by distributing transactions into IT Outsourcing. *See supra* ¶¶ 197–198.

nn.     Art Sea Group used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 199–201.

326.    Defendants' acts, detailed in paragraph 325, facilitated, promoted, or concealed the fraud, actually and proximately causing damage to Plaintiffs and the Class for the amounts contributed to the RoFx Scheme. *See supra* ¶ 316.

---

**Count VI: Conversion**
**Against the RoFx Operators**

---

327.    Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

328.    After accepting $50 million or more in funds from Plaintiffs and the Class, on or about September 17, 2021, the RoFx Operators ceased operating the illusory RoFx Scheme without any authority to do so, intending to deprive Plaintiffs and the Class of their contributed funds.

329.    The funds Plaintiffs and the Class contributed to the RoFx Scheme were described and identified by the RoFx Operators using periodically-generated account statements sent to each Plaintiff and Class Member, which funds the RoFx Operators were obligated to treat in a specific manner—for automated foreign exchange trading to be performed by brokers—by the RoFx Operators' representations and the consideration provided by Plaintiffs and the Class

330.    Inconsistent with Plaintiffs' and the Class's ownership interest in their RoFx contributions, the RoFx Operators' unauthorized shutdown of the RoFx Scheme deprived Plaintiffs and the Class their funds contributed to the RoFx Scheme.

331.    The ROFX Operators' improper acts or practices of refusing to return Plaintiffs' funds is the actual and proximate cause of the damages sustained by Plaintiffs and the Class.

332.    The RoFx Operators' unauthorized deprivation of the contributed funds was the actual and proximate cause of damage to Plaintiffs and the Class for the amounts contributed to the RoFx Scheme—$75 million or more. *See supra* ¶¶ 126–127.

**Count VII: Conspiracy to Commit Conversion**
**Against Peter Mohylny and the Company Organizer Defendants, Front Companies and**
**Principals, and Layering Companies and Principals**

333.    Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

334.    Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals, agreed to participate with the RoFx Operators to commit conversion as detailed in Count VI, *supra*, doing so knowing they were furthering or concealing conversion of the RoFx customers' funds or, alternatively, doing so recklessly knowing the predictable result of their actions would further or conceal conversion of the RoFx customers' funds.

335.    Each of Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals executed overt acts pursuant to the conspiracy:

    a.    Peter Mohylny caused the RoFx.net to cease operating or deliberately allowed the RoFx.net domain to lapse, preventing Plaintiffs and the Class Members from accessing their RoFx.net accounts.

    b.    Wealthy Developments used its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the conspiracy. *See supra* ¶¶ 132–136, 140.

    c.    Anton Bilous used his control of Wealthy Developments and its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the conspiracy, and to establish a relationship with ePayments to use for the benefit of the RoFx Operators. *See supra* ¶¶ 132–136, 140.

    d.    ePayments used its accounts and financial services to receive and move RoFx customer funds, concealing the illicit flow of funds to, ultimately, the RoFx Operators. *See supra* ¶¶ 133–139.

    e.    Aware Choice used its bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 142–145.

f.    VDD used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators *See supra* ¶¶ 151–153.

g.    Dmytro Fokin used his control of Aware Choice and VDD's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145, 151–153.

h.    Ivan Hrechaniuk used his control of Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145.

i.    Manuchar Daraselia used his control of VDD's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 151–153.

j.    Brass Marker used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

k.    Sergiy Prokopenko used his control of Brass Marker's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

l.    Profit Media used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 149–150.

m.    Auro Advantages used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including a payment to ePayments; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 156–160.

n.    Borys Konovalenko, directly or through agents, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; Konovalenko also directed that Notus be dissolved to help cover the financial tracks of the RoFx funds through Notus. *See supra* ¶¶ 162–181.

o.    Mayon Holding Ltd, directly or via its agent Marina Garda, wholly-controlled subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, and Konovalenko provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

p.      Marina Garda, directly or through her signatory authority over Mayon Holding and, in turn, her control over subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

q.      Mayon Solutions Ltd, directly or via Konovalenko and Director Olga Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

r.      Olga Tielly, as Director of Mayon Solutions Ltd, executed the RoFx Services Agreement which provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

s.      Mayon Solutions, LLC, directly or via Konovalenko and Manager Daria Eckert, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; and Mayon Solutions, LLC, received some of the proceeds of the RoFx Service Agreement. *See supra* ¶¶ 162–181.

t.      Daria Eckert, as manager of Mayon Solutions, LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

u.      Notus used its bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and Alla Skala for their roles in the RoFx conspiracy. *See supra* ¶¶ 171–172.

v.      Global E-Advantages used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including sending funds to Notus and Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶ 177.

w.      Alla Skala used her access to Notus and Global E-Advantages's bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and herself for their roles in the RoFx conspiracy. *See supra* ¶¶ 171–172, 177.

x.      Olga Abrykosova managed the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various

other entities as directed by Alex Doe and the other RoFx Operators—including funds sent to Aware Choice, Trans-Konsalt, Boonruk, Borys, Mayon, and Alla Skala. *See supra* ¶¶ 172, 177–178.

y.     Anna Shymko formed Easy Com to provide the RoFx Operators a Front Company for creating a bank account and integrating customer funds into the financial system; and also dissolved Notus to conceal the RoFx Operators' wrongdoing. *See supra* ¶¶ 179–181.

z.     Timothy Stubbs agreed to use his authority as manager for Grovee to provide the RoFx Operators a Front Company for creating bank accounts and integrating customer funds into the financial system; Stubbs then transferred the funds as directed by the RoFx Operators. *See supra* ¶¶ 182–186.

aa.     Easy Com used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

bb.     Jase Victor Davis used his access to Easy Com's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

cc.     Shopostar used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

dd.     Nataliya Los used her access to Shopostar and its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

ee.     Grovee used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 183.

ff.     Jared Goodyear used its (or his) bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 187.

gg.     Trans-Konsalt used its bank accounts to receive and move RoFx customer funds, including bulk amounts from Notus, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 190–193.

hh.     Boonruk Ruamkit used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including bulk amounts from U.S. Front Companies, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 194–196.

ii.     IT Outsourcing used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 197–198.

jj.     Nattpemol Krinara created IT Outsourcing and its bank accounts to use for transferring RoFx customer funds and used her control over Boonruk and IT Outsourcing's bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including receiving bulk amounts from U.S. Front Companies; and, ultimately, transferred those monies to the RoFx Operators themselves. *See supra* ¶¶ 194–198.

kk.     Papahratsorn Raviratporn created IT Outsourcing to use for transferring RoFx customer funds and help conceal the Money Laundering Enterprise by distributing transactions into IT Outsourcing. *See supra* ¶¶ 197–198.

ll.     Art Sea Group used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 199–201.

336.    Defendants' acts, detailed in paragraph 335, facilitated or concealed the conversion of the RoFx customers' funds which damaged Plaintiffs and the Class for the amounts contributed to the RoFx Scheme. *See supra* ¶ 332.

---

**Count VIII: Aiding and Abetting Conversion**
**Against Peter Mohylny  and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals**

---

337.    Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

338.    This Count is pleaded in the alternative to Count VII, *supra*, as against Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals.

339.    Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals, aided the RoFx Operators to commit or conceal the conversion detailed in Count VI, *supra*, doing so knowing they were assisting the RoFx Operators to commit or conceal the conversion or, alternatively, doing so recklessly knowing the

predictable result of their actions would assist the RoFx Operators to commit or conceal the conversion.

340.    Each of Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals substantially assisted the RoFx Operators to commit or conceal the conversion:

a.    Peter Mohylny caused the RoFx.net to cease operating or deliberately allowed the RoFx.net domain to lapse, preventing Plaintiffs and the Class Members from accessing their RoFx.net accounts.

b.    Wealthy Developments used its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the assisting the RoFx Operators in committing or concealing the conversion. *See supra* ¶¶ 132–136, 140.

c.    Anton Bilous used his control of Wealthy Developments and its bank accounts to receive and move RoFx customer funds, including paying ePayments for its role in the assisting the RoFx Operators in committing or concealing the conversion, and to establish a relationship with ePayments to use for the benefit of the RoFx Operators. *See supra* ¶¶ 132–136, 140.

d.    ePayments used its accounts and financial services to receive and move RoFx customer funds, concealing the illicit flow of funds to, ultimately, the RoFx Operators. *See supra* ¶¶ 133–139.

e.    Aware Choice used its bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 142–145.

f.    VDD used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators *See supra* ¶¶ 151–153.

g.    Dmytro Fokin used his control of Aware Choice and VDD's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to, ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145, 151–153.

h.    Ivan Hrechaniuk used his control of Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States; transferred these monies to,

ultimately, the RoFx Operators; and ultimately dissolved Aware Choice to conceal the Money Laundering Enterprise. *See supra* ¶¶ 142–145.

i.    Manuchar Daraselia used his control of VDD's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 151–153.

j.    Brass Marker used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

k.    Sergiy Prokopenko used his control of Brass Marker's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 146–148.

l.    Profit Media used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 149–150.

m.    Auro Advantages used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including a payment to ePayments; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 156–160.

n.    Borys Konovalenko, directly or through agents, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; Konovalenko also directed that Notus be dissolved to help cover the financial tracks of the RoFx funds through Notus. *See supra* ¶¶ 162–181.

o.    Mayon Holding Ltd, directly or via its agent Marina Garda, wholly-controlled subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, and Konovalenko provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

p.    Marina Garda, directly or through her signatory authority over Mayon Holding and, in turn, her control over subsidiaries Mayon Solutions Ltd and Mayon Solutions LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

q.    Mayon Solutions Ltd, directly or via Konovalenko and Director Olga Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

r.   Olga Tielly, as Director of Mayon Solutions Ltd, executed the RoFx Services Agreement which provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

s.   Mayon Solutions, LLC, directly or via Konovalenko and Manager Daria Eckert, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds; and Mayon Solutions, LLC, received some of the proceeds of the RoFx Service Agreement. *See supra* ¶¶ 162–181.

t.   Daria Eckert, as manager of Mayon Solutions, LLC, provided the RoFx Operators with Front Companies Easy Com, Notus, Shopostar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *See supra* ¶¶ 162–181.

u.   Notus used its bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and Alla Skala for their roles in assisting the RoFx Operators in committing or concealing the conversion. *See supra* ¶¶ 171–172.

v.   Global E-Advantages used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including sending funds to Notus and Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶ 177.

w.   Alla Skala used her access to Notus and Global E-Advantages's bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from U.S. Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk Ruamkit; and to pay Borys, Mayon Solutions Ltd, Mayon Solutions, LLC, and herself for their roles in assisting the RoFx Operators in committing or concealing the conversion. *See supra* ¶¶ 171–172, 177.

x.   Olga Abrykosova managed the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various other entities as directed by Alex Doe and the other RoFx Operators—including funds sent to Aware Choice, Trans-Konsalt, Boonruk, Borys, Mayon, and Alla Skala. *See supra* ¶¶ 172, 177–178.

y.   Anna Shymko formed Easy Com to provide the RoFx Operators a Front Company for creating a bank account and integrating customer funds into the financial system; and also dissolved Notus to conceal the RoFx wrongdoing. *See supra* ¶¶ 179–181.

z.    Timothy Stubbs used his authority as manager for Grovee to provide the RoFx Operators a Front Company for creating bank accounts and integrating customer funds into the financial system; Stubbs then transferred the funds as directed by the RoFx Operators. *See supra* ¶¶ 182–186.

aa.   Easy Com used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

bb.   Jase Victor Davis used his access to Easy Com's bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 180.

cc.   Shopostar used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

dd.   Nataliya Los used her access to Shopostar and its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *See supra* ¶¶ 173–175.

ee.   Grovee used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 183.

ff.   Jared Goodyear used its (or his) bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶ 187.

gg.   Trans-Konsalt used its bank accounts to receive and move RoFx customer funds, including bulk amounts from Notus, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 190–193.

hh.   Boonruk Ruamkit used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including bulk amounts from U.S. Front Companies, and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 194–196.

ii.   IT Outsourcing used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 197–198.

jj.   Nattpemol Krinara created IT Outsourcing and its bank accounts to use for transferring RoFx customer funds and used her control over Boonruk and IT Outsourcing's bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including receiving bulk amounts from U.S.

Front Companies; and, ultimately transferred those monies to the RoFx Operators themselves. *See supra* ¶¶ 194–198.

kk.  Papahratsorn Raviratporn created IT Outsourcing to use for transferring RoFx customer funds and help conceal the Money Laundering Enterprise by distributing transactions into IT Outsourcing. *See supra* ¶¶ 197–198.

ll.  Art Sea Group used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *See supra* ¶¶ 199–201.

341.  Defendants' acts, detailed in paragraph 340, facilitated or concealed the conversion of the RoFx customers' funds which damaged Plaintiffs and the Class for the amounts contributed to the RoFx Scheme. *See supra* ¶ 332.

---

**Count IX: Unjust Enrichment**
**Against the RoFx Operators, Front Companies and Principals, and Layering Companies and Principals**

---

342.  Plaintiffs incorporate into this Count the allegations in paragraphs 1 to 252.

343.  Plaintiffs and the Class conferred benefits—more than $75 million in funds—upon the RoFx Operators, Front Companies and Principals, and Layering Companies and Principals, as identified in Part II. *See supra* ¶¶ 126–127.

344.  The RoFx Operators, Front Companies and Principals, and Layering Companies and Principals voluntarily accepted and retained the funds provided by Plaintiffs and the Class, as detailed in paragraphs 131 to 207.

345.  Plaintiffs and the Class conferred the benefit of their funds to be used by the RoFx Operators to engage in profitable foreign exchange trading using the illusory RoFx trading robot.

346.  The RoFx Operators did no such trading.

347.  In such circumstances, it would be inequitable for the RoFx Operators, Front Companies and Principals, and Layering Companies and Principals to retain the benefit of any of the funds conferred upon them by Plaintiffs and the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of each of them and the Class pray for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class's representatives and their counsel as Class Counsel;

B.      Declaring that Defendants are liable to Plaintiffs and the Class for monetary damages under the claims set forth herein;

C.      Requiring Defendants pay damages for injuries sustained by Plaintiffs and the Class by reason of the acts and transactions set forth herein;

D.      Awarding Plaintiffs and the Class treble damages for Defendants' violations of the RICO Act, as permitted under 18 U.S.C. 1964(c);

E.      Awarding Plaintiffs punitive damages for Defendants' intentional misconduct, as permitted by applicable law;

F.      Requiring Defendants to return inequitably retained consideration conferred on them by Plaintiffs and Class Members;

G.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

H.      Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees;

I.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: January 31, 2022.                Respectfully submitted,


                                        **Jose A. Casal**
                                        Jose A. Casal (Fla. Bar No. 767522)
                                        Jose.Casal@hklaw.com
                                        Andrew W. Balthazor (Fla. Bar No. 1019544)
                                        Andrew.Balthazor@hklaw.com
                                        Sydney B. Alexander (Fla. Bar. No. 1019569)
                                        Sydney.Alexander@hklaw.com
                                        HOLLAND & KNIGHT LLP
                                        701 Brickell Avenue, Suite 3300
                                        Miami, Florida 33131
                                        Telephone: 305-374-8500

                                        Warren E. Gluck (N.Y. Bar No. 4701421)
                                        Warren.Gluck@hklaw.com
                                        Matthew R. DiBlasi (N.Y. Bar No. 4237475)
                                        Matthew.DiBlasi@hklaw.com
                                        Ruarri M. Rogan (N.Y. Bar No. 5800107)
                                        Ruarri.Rogan@hklaw.com
                                        HOLLAND & KNIGHT LLP
                                        31 West 52nd Street
                                        New York, New York 10019

                                        *Attorneys for Plaintiffs*