**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:21-cv-23472-RNS

Ryan Birmingham, Roman Leonov, Steven Hansen,
Mitchell Parent, and Jonathan Zarley, individually
and on behalf of all others similarly situated,

      Plaintiffs,

v.

Alex Doe, *et al.*,

      Defendants.

_____ /

## PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO LIABILITY

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Ryan Birmingham, Roman Leonov, Steven Hansen, Mitchell Parent, Jonathan Zarley, and others similarly situated persons (collectively "Plaintiffs") respectfully move this Court for entry of default judgment as to liability only against the following Defendants (collectively "Defaulting Defendants"):

- Peter Mohylny ("Mohylny")
- The Investing Online
- Ester Holdings, Inc. ("Ester Holdings")
- Wealthy Developments LP ("Wealthy Developments")
- VDD-Trading, Ltd. ("VDD")
- Dmytro Fokin ("Fokin")
- Ivan Hrechaniuk ("Hrechaniuk")
- Manuchar Daraselia ("Daraselia")
- Brass Marker s.r.o. ("Brass Marker")
- Sergiy Prokopenko ("Prokopenko")
- Profit Media Group LP ("Profit Media Group")
- Auro Advantages, LLC ("Auro Advantages")
- Borys Konovalenko ("Konovalenko")
- Mayon Holding Ltd. ("Mayon Holding")
- Marina Garda ("Garda")
- Mayon Solutions Ltd. ("Mayon UK")
- Olga Tielly ("Tielly")

- Notus, LLC ("Notus")
- Global E-Advantages, LLC ("Global E-Advantages")
- Alla Skala ("Skala")[1]
- Olga Abrykosova ("Abrykosova")
- Easy Com, LLC ("Easy Com")
- ShopoStar, LLC ("ShopoStar")
- Grovee, LLC ("Grovee")
- Trans-Konsalt MR Ltd. ("Trans-Konsalt")
- Art Sea Group Ltd. ("Art Sea Group").

## **RELEVANT FACTUAL BACKGROUND**

Between 2018 and 2021, an informal association of Ukrainians (the "RoFx Operators") operated a phony foreign exchange trading service via RoFx.net—a website hosted in Jacksonville, Florida. Am. Compl. ¶¶ 1, 3–4, 17–18, 121. The RoFx Operators claimed to have artificially intelligent software that could conduct foreign exchange trading on behalf of customers; the customers needed only to send funds to the RoFx Operators and, in return, the customers were promised passive income. *Id.* ¶ 2. The RoFx Operators perpetrated this years-long fraud (the "RoFx Scheme") using a sophisticated website, active customer service team, invoices, account statements, foreign exchange activity reported on third-party websites, and promotions via advertisements and sponsored articles—and even allowed some customers to withdraw limited funds. *Id.* ¶¶ 2, 61–125. As explained in the Amended Complaint, all of this was elaborate stage dressing: the RoFx Operators never conducted foreign exchange trading and, instead, pocketed the customers' funds. *Id.* ¶¶ 102–27. By the time the RoFx.net website went dark in September 2021— and the RoFx Operators stopped responding to customers—the RoFx Operators had stolen at least $75 million from customers. *Id.* ¶¶ 126–27.

Such a large amount of stolen money does not disappear without help. The RoFx Operators created an intricate and international network of shell companies and relationships with financial intermediaries to launder the illicit funds (the "Money Laundering Enterprise"). *Id.* ¶¶ 128–29.

---

[1] On June 27, 2022 (the date of this filing), attorney David Alan Frankel filed a simultaneous notice of appearance (ECF No. 176) and motion to set aside the Clerk's default (ECF No. 177) on behalf of Defendant Skala. Because the Court has not yet had an opportunity to rule on Skala's motion and pursuant to the Court's Order (ECF No. 133), Plaintiffs have kept Skala in the Motion.

The Money Laundering Enterprise consists of a set of companies directly receiving customer funds ("Front Companies"); another set of companies with existing cross-border transaction volume that would obfuscate the flow of funds between RoFx customers, Front Companies, and ultimately to the RoFx Operators ("Layering Companies"); and the final level of companies acting as the exit point for the laundered funds ("Cash-Out Companies"). *Id.* To distance themselves from the various sets of companies, the RoFx Operators collaborated with a set of individuals and entities ("Company Organizers") who were tasked with creating, acquiring, and managing Front Companies and transferring funds throughout the Money Laundering Enterprise. *Id.* The Money Laundering Enterprise began operating as early as January 2018 and continues to this day, with Defendants opening and closing entities and shifting transaction volume as needed to evade regulatory scrutiny. *See id.* ¶¶ 128–30, 130–208, 261, 265.

### RELEVANT PROCEDURAL HISTORY

Plaintiffs filed the present class action on September 29, 2021, after the RoFx Operators disappeared with their ill-gotten gains. Plaintiffs amended their complaint on February 14, 2022, with the Court's leave, bringing several claims against the Defaulting Defendants: Violation of the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) (Count I); RICO Conspiracy, 18 U.S.C. § 1962(d) (Count II); Common Law Fraud (Count III); Conspiracy to Commit Fraud (Count IV); Aiding and Abetting Fraud (Count V); Conversion (Count VI); Conspiracy to Commit Conversion (Count VII); and Aiding and Abetting Conversion (Count VIII). *See generally id.* After the Defaulting Defendants failed to appear, answer, or otherwise plead to the Amended Complaint, the Clerk entered defaults against them on May 27, 2022 [ECF No. 145] and May 31, 2022 [ECF Nos. 154–55]. Additionally, pursuant to 50 U.S.C. § 3931 and in support of their Motion for Default Judgment, Plaintiffs' counsel Dennis A. González submits a declaration attesting to the Defendants' military service status—attached hereto as **Exhibit A**.

### MEMORANDUM OF LAW

**I.     Standard for Effecting Default Judgment**

Pursuant to Federal Rule of Civil Procedure 55(b)(2), the Court is authorized to enter a default judgment against a properly-served defendant who fails to plead in response to a complaint or otherwise appear. *Burger King Corp. v. Huynh*, No. 11-22602-CIV, 2011 WL 6190163, at \*3 (S.D. Fla. Dec. 5, 2011). Although the mere entry of a default by the Clerk does not, in itself, warrant the entry of a default judgment, the Court may do so if it finds sufficient legal basis in the

pleadings. *See Tyco Fire & Sec. LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). A "defendant, by his default, admits the plaintiff's well-pleaded allegations of fact," as set forth in the operative complaint. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009). However, the defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. *See Goldman v. HSBC Bank USA, Nat'l Ass'n*, No. 13-81271-CIV, 2015 WL 1782241, at *1 (S.D. Fla. Mar. 24, 2015). "[B]efore entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint . . . actually state a substantive cause of action and there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Hayes v. Asset Acceptance*, No. 13-81143-CIV, 2014 WL 1767106, at *1 (S.D. Fla. May 2, 2014) (internal quotation marks omitted) (quoting *Tyco Fire & Sec., LLC*, 218 F. App'x at 863).

**II.    Count I: RICO Claim**

To establish a civil RICO claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property." *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1315 (S.D. Fla. 2009) (internal citation omitted).

A.   RICO Enterprise

1.   Common Purpose

Civil RICO liability requires that a plaintiff demonstrate the existence of a RICO enterprise that "has a common goal." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1283 (11th Cir. 2006); *see also Allstate Ins. Co.*, 653 F. Supp. 2d at 1315. An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has interpreted the term "enterprise" broadly in the civil RICO context, providing that it encompasses both legal entities and "illegitimate associations-in-fact." *Rusello v. U.S.*, 464 U.S. 16, 24 (1983); *see U.S. v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (explaining that an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."). Whether an "association of individual entities" constitutes a "RICO enterprise" turns on whether "the association of individual entities, however loose or informal . . . furnishes a vehicle for the commission of two or more predicate crimes."

*Goldin Indus., Inc.*, 219 F.3d at 1275; *see, e.g.*, *Fagan v. Central Bank of Cyprus*, No. 19-80239-CIV, 2021 WL 2845034, at *3 (S.D. Fla. June 28, 2021), *report and recommendation adopted*, NO. 9:19-CV-80239, 2021 WL 2915109 (S.D. Fla. July 12, 2021) (finding that a RICO enterprise was alleged in motion for default judgment where defendants had common purpose of laundering money and retaining, withholding, converting, stealing, and refusing to account for money given by defrauded plaintiffs).

In the Amended Complaint, the Plaintiffs alleged the Defaulting Defendants constituted an enterprise with a common purpose "to hide, launder, or otherwise wrongfully retain the proceeds of the RoFx Scheme." Am. Compl. ¶ 261. The Plaintiffs alleged that the Laundering Defendants consisted of three types of entities—Front Companies, Layering Companies, and Cash-Out Companies—working in tandem to accept payments from the defrauded Plaintiffs, obscure the RoFx Scheme, and ultimately distribute the funds to the RoFx Operators after channeling them through a global network of international banks, shell companies, and cryptocurrency exchanges. *Id.* ¶¶ 261–65. Together, these entities, the agents behind them, and the RoFx Operators formed an "illegitimate association-in-fact" dedicated to the common enterprise of laundering money given by the defrauded Plaintiffs. *Id.* ¶ 263; *Rusello*, 464 U.S. at 24 (explaining how the RICO statute's definition of the term "enterprise" includes both legal entities and "illegitimate associations-in fact"). As detailed below, each of the Defaulting Defendants is, or has some relationship with, a Front Company which agreed to participate in the Money Laundering Enterprise's common purpose.

The following entities served as Front Companies in the common Money Laundering Enterprise:

- **Notus**. Am. Compl. ¶ 42.
- **ShopoStar**. *Id.* ¶ 44.
- **Auro Advantages**. *Id.* ¶ 41.
- **Global E-Advantages**. *Id.* ¶ 46.
- **Grovee**. *Id.* ¶ 49.
- **Easy Com**. *Id.* ¶ 47.
- **Art Sea Group**. *Id.* ¶ 56.
- **Brass Marker**. *Id.* ¶ 52.
- **Profit Media Group**. *Id.* ¶ 36.

- **Trans-Konsalt**. *Id.* ¶ 54.

- **VDD**. *Id.* ¶ 37.

- **Wealthy Developments**. *Id.* ¶ 32.

The following individuals and entities helmed or facilitated the establishment of the Front

Companies:

- **Konovalenko** formed and directed the formation of Front Companies Notus, ShopoStar, Easy Com, and Global E-Advantages. *Id.* ¶ 23.

- **Abrykosova** managed the flow of RoFx customer funds through the bank accounts of Front Companies Notus and Global E-Advantages. *Id.* ¶ 40.

- **Daraselia** was the director of Front Company VDD. *Id.* ¶ 39.

- **Hrechaniuk** was the director of Front Company Aware Choice Ltd. ("Aware Choice"). *Id.* ¶ 35.

- **Prokopenko** was an officer of Front Company Brass Marker. *Id.* ¶ 53.

- **Skala** was a member of Front Company Notus. *Id.* ¶ 43.

- **Tielly** was the sole owner and director of Front Company acquisition entity Mayon UK. *Id.* ¶ 29.

- **Mayon Holding** was the parent company of Mayon Solutions, LLC and Mayon Solutions Ltd., which provided RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages. *Id.* ¶ 24.

- **Mayon UK** facilitated RoFx Operators' acquisition of Front Companies. *Id.* ¶ 26.

- **Fokin** served as director of both Aware Choice and VDD, for which he created bank accounts used to receive RoFx customer funds. *Id.* ¶¶ 38, 142.

- **Garda** was an owner of Mayon Holding who helped acquire and service Front Companies for the RoFx Money Laundering Enterprise. *Id.* ¶¶ 27, 170(a).

2. <u>Operation or Management</u>

Civil RICO liability requires that the defendant "must participate in the operation or management of the enterprise itself" and "'must have some part in directing' the affairs of the enterprise." *Williams*, 465 F.3d at 1284–85 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). A defendant with only a tenuous connection to the enterprise may nonetheless satisfy the operation or management test. *U.S. v. Sterrett*, 55 F.3d 1525, 1542, 1548 (11th Cir. 1995) ("Because the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise, even lower-rung participants or virtual outsiders may, by virtue of their conduct, find themselves ensnared."). With respect to the enterprise, the defendant may be an

insider or an outsider—one who is "merely associated with an enterprise—who participate[s] directly and indirectly in the enterprise's affairs." *U.S. v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir. 1985).

The RoFx Operators and the Defaulting Defendants participated in a coordinated campaign of money laundering and wire fraud. Am. Compl. ¶¶ 261–65. As outlined below, each individual and entity involved in the enterprise had a distinct and important role, ranging from receiving funds from RoFx customers, moving those funds along to other points in the Scheme, and creating the requisite structures to launder and hide the RoFx Operators' illicit gains. *Id.*

- **Notus**. Between at least October 2019 and July 2021, Notus served as a Front Company into which defrauded RoFx customers and other RoFx-affiliated Front Companies poured millions of dollars for transfer to the RoFx Operators. *Id.* ¶ 172.

- **ShopoStar**. At the direction of the RoFx Operators, Front Company ShopoStar received funds from RoFx customers and then transferred the funds to Thai Layering Company Boonruk Ruamkit ("Boonruk"). *Id.* ¶ 175.

- **Auro Advantages**. At the instruction of the RoFx Operators, Auro Advantages received funds from RoFx customers totaling $186,021 among 18 transactions and moved those funds forward in the RoFx Scheme. *Id.* ¶¶ 156–60, 203.

- **Global E-Advantages**. Following the RoFx Operators' direction, Front Company Global E-Advantages received well over $890,000 from RoFx customers and transferred these funds to other parts of the Money Laundering Enterprise's web—first to Notus between May 2020 and October 2020 and then to Thai Layering Company Boonruk. *Id.* ¶ 177. Further, the RoFx operators used Global E-Advantages as a vehicle to compensate Mayon Solutions $862,000 for its part in the Money Laundering Enterprise. *Id.*

- **Grovee**. Between November 2020 and May 2021, RoFx Operators instructed RoFx customers to deposit at least $250,000 in two Bank of America accounts opened by Defendant Timothy Stubbs in the name of Front Company Grovee. *Id.* ¶¶ 177, 186. The role of the two Grovee accounts was three-fold: (1) to accept the RoFx customer funds, (2) to dilute the transaction volume to evade regulatory scrutiny, and (3) to transfer the funds onward as instructed by RoFx Customers. *Id.* ¶ 177.

- **Easy Com**. The RoFx Operators directed RoFx customers to transfer funds in excess of $3.4 million into Front Company Easy Com's two bank accounts opened around January 2021. *Id.* ¶ 185–86. These funds were then transferred onward to other parts of the Money Laundering Enterprise to launder and hide the funds at the behest of the RoFx Operators. *Id.*

- **Art Sea Group**. Between August 2020 and December 2020, Front Company Art Sea Group received at least $310,000 from RoFx Customers. *Id.* ¶ 200. At

the RoFx Operators' instruction, Art Sea Group returned some small amounts of money to RoFx customers as withdrawals to perpetuate the illusion of the RoFx Scheme's legitimacy, and it sent funds to Cash-Out Companies. *Id.* ¶ 201.

- **Brass Marker**. Front Company Brass Marker received well over $400,000 from RoFx customers before moving these funds onward in the Scheme and distributing them to the RoFx Operators. *Id.* ¶¶ 148, 203. The RoFx Operators strategically activated Brass Marker, based in the Czech Republic, to take advantage of the Eurozone's SEPA financial network, as opposed to the SWIFT network which the RoFx Operators apparently believed exposed the RoFx Scheme to more intense scrutiny. *Id.* ¶¶ 146–47.

- **Profit Media Group**. Front Company Profit Media Group LP received at least $84,999 and €2,000 from RoFx customers. *Id.* ¶¶ 149–50. Using its bank account, Profit Media Group sent the funds onward as directed by the RoFx Operators. *Id.* ¶ 150.

- **Trans-Konsalt**. Bulgarian Front Company Trans-Konsalt received at least $370,000 in RoFx customer funds between January 2020 and March 2020. *Id.* ¶ 191. In March 2020, the RoFx Operators transferred to Trans-Konsalt, from Front Company Notus, an additional $279,780 in customer funds. *Id.* ¶ 192. The RoFx Operators then initiated the transfer of all customer funds in Trans-Konsalt according to RoFx Operators' needs. *Id.* ¶ 193.

- **VDD**. Between February and November 2019, at the direction of the RoFx Operators, RoFx customers sent at least $186,650.98 and €31,500 to Front Company VDD. *Id.* ¶¶ 151–53. VDD's directors, Dmytro Fokin and Manuchar Daraselia, used VDD's bank account to send the funds onward as directed by the RoFx Operators before dissolving VDD at the direction of the RoFx Operators. *Id.*

- **Wealthy Developments**. Front Company Wealthy Developments received at least $47,200 and €29,600 from RoFx customers before moving the funds onward, including to Layering Company ePayments. *Id.* ¶¶ 136, 203.

- **Konovalenko**. Konovalenko is the connective tissue between the various Mayon companies, which served as both Front Companies and vehicles for Front Company acquisition. *Id.* ¶ 170. In various capacities, including owner, member, director, or manager of each of the Mayon entities at some point between August 2019 and the present, Konovalenko facilitated the acquisition and operation of Front Companies on behalf of the RoFx Operators. *Id.* ¶¶ 161, 170. Konovalenko had direct communications with RoFx Operators including but perhaps not limited to Alex Doe. *Id.* ¶ 169. Konovalenko also directed that Front Company Notus be dissolved in an effort to obscure its transaction history. *Id.* ¶ 181.

- **Abrykosova**. Abrykosova managed the flow of RoFx customer funds through Notus' and Global E-Advantages' bank accounts, sending those funds to various other entities—including Front Companies Aware Choice, Trans-

Konsalt, Mayon, Skala, and Layering Company Boonruk—as directed by the RoFx Operators. *Id.* ¶¶ 172, 177–78.

- **Daraselia**. Daraselia served as a director of VDD, a role in which he received funds from RoFx customers and sent those funds in that account onward per the RoFx Operators' direction. *Id.* ¶¶ 39, 151–52.

- **Hrechaniuk**. As a director of Aware Choice, Hrechaniuk a bank account for Aware Choice to receive RoFx customer funds and send them onward per the RoFx Operators' direction. *Id.* ¶¶ 35, 142–43. Hrechaniuk also participated in turning Aware Choice into a Cash-Out Company for the benefit of the RoFx Operators before dissolving Aware Choice at the instruction of the RoFx Operators. *Id.* ¶¶ 144–45.

- **Prokopenko**. Prokopenko was the officer of Brass Marker, a role in which he received and moved RoFx customer funds for the ultimate benefit of the RoFx Operators. *Id.* ¶¶ 144–45.

- **Skala**. Skala served as a member of Notus. *Id.* ¶ 43. Skala used her position to receive and move RoFx customer funds, receiving transfers of funds from Front Companies and sending those funds to Aware Choice, Trans-Konsalt, and Boonruk. *Id.* ¶ 172. Further, Skala used her access to the illicit funds to compensate Konovalenko, Mayon UK, Mayon Solutions, LLC, and herself for their participation in the RoFx Scheme. *Id.* ¶ 172.

- **Tielly**. Tielly was the sole owner of Mayon UK between March 9, 2018 and April 19, 2019. *Id.* ¶ 170. After relinquishing ownership, Tielly retained the title of as Director of Mayon UK. *Id.* ¶ 170. In that role, Tielly executed the RoFx Services Agreement, which provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 162–71.

- **Mayon Holding**. Mayon Holding was the parent company of various Mayon companies that facilitated the acquisition of Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages for the RoFx Operators. *Id.* ¶¶ 162–81.

- **Mayon UK**. Mayon UK, directly or via Konovalenko and Director Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in laundering and hiding RoFx customer funds. *Id.* ¶¶ 162–81.

- **Fokin.** As a director of Aware Choice, Fokin opened and operated a bank account for Aware Choice to receive RoFx customer funds and send them onward per the RoFx Operators' direction. *Id.* ¶¶ 38, 142–43. Fokin also participated in turning Aware Choice into a Cash-Out Company for the benefit of the RoFx Operators before dissolving Aware Choice at the instruction of the RoFx Operators. *Id.* ¶¶ 144–45. Additionally, he worked alongside Daraselia as a director of VDD, a role in which he received funds from RoFx customers and

sent those funds in that account onward per the RoFx Operators' direction. *Id.* ¶¶ 38, 151–52.

- **Garda.** Garda was the sole member and authorized signatory for Defendant Mayon Solutions LLC and shareholder of Mayon Holding, through which she helped create and service several of the Front Companies. *See id.* ¶¶ 161–170.

B. Predicate Acts

To succeed, a civil RICO claim "must allege facts sufficient to support each of the statutory elements for at least two of the pleaded predicate acts." *Republic of Pan. V. BCCI Holdings (Lux) S.A.*, 119 F.3d 1935, 1949 (11th Cir. 1997). A civil RICO claim predicated on fraud generally must accord with Rule 9(b)'s heightened pleading standard. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007). Such a claim must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the [d]efendants gained by the alleged fraud." *Id.* at 1316–17. In a case with multiple defendants, the plaintiff must "plead fraud with the requisite specificity as to each of the [defendants]." *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997).

1. Predicate Acts: Money Laundering

Money laundering in violation of 18 U.S.C. § 1956 "may properly be charged as a predicate act under a Section 1962(d) enterprise conspiracy." *U.S. v. Battle*, 473 F. Supp. 2d 1185, 1196 (S.D. Fla. 2006); *see Liquidation of Com'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355–56 (11th Cir. 2008) (holding money laundering allegations in a civil RICO claim need not satisfy the heightened particularity requirement of Federal Rule of Civil Procedure Rule 9(b)).

a. 18 U.S.C. § 1956(a)(1)

"When a plaintiff alleges money laundering under 18 U.S.C. § 1956(a)(1) as a predicate act for a civil RICO claim, the plaintiff must first set forth facts showing (1) that the defendant(s) conducted or attempted to conduct a financial transaction; (2) that the transaction involved the proceeds of 'specified unlawful activity'; and (3) that the defendant(s) knew the proceeds were from some form of unlawful activity. The allegations must then satisfy either § 1956(a)(1)(A) or (a)(1)(B)." *Bryan v. Countrywide Home Loans*, No. 8:08-cv-794-T-23EAJ, 2008 WL 4790660, at *3 (M.D. Fla. Oct. 27, 2008) (quoting 18 U.S.C. § 1956). A plaintiff may satisfy § 1956(a)(1)(A)(i)

by showing that the defendant acted "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). A plaintiff may satisfy § 1956(a)(1)(B)(i) by showing that the defendant engaged in the activity knowing that the transaction was wholly or partially designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

In the Amended Complaint, the Plaintiffs sufficiently alleged that the Defaulting Defendants violated both 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(1)(B)(i). The Defendants knowingly conducted financial transactions identified in paragraphs 203 to 209 of the Amended Complaint and listed below. Am. Compl. ¶ 268. The proceeds involved in the transactions were in fact derived from some form of unlawful activity—namely the RoFx Scheme described in paragraphs 61 to 127 of the Amended Complaint. *Id.* ¶ 270. Each of the Defendants knew that the proceeds were from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7). *Id.* ¶ 269. Each of the Defendants acted with the intent to promote the carrying on of the RoFx Scheme in violation of 18 U.S.C. § 1956(a)(1)(A)(i). *Id.* ¶ 277. Additionally, each of the Defendants engaged in the activity knowing that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. *Id.* ¶ 271; 18 U.S.C. § 1956(a)(1)(B)(i).

- **Wealthy Developments** conducted 12 transactions. Am. Compl. ¶ 203(a).
- **Brass Marker** conducted 3 transactions. *Id.* ¶ 203(d).
- **Profit Media Group** conducted 3 transactions. *Id.* ¶ 203(e).
- **VDD** conducted 3 transactions. *Id.* ¶ 203(f).
- **Auro Advantages** conducted 18 transactions. *Id.* ¶ 203(g).
- **Notus** conducted 117 transactions. *Id.* ¶ 203(h).
- **ShopoStar** conducted 3 transactions. *Id.* ¶ 203(i).
- **Global E-Advantages** conducted 75 transactions. *Id.* ¶ 203(j).
- **Easy Com** conducted 154 transactions. *Id.* ¶ 203(k).
- **Grovee** conducted 27 transactions. *Id.* ¶ 203(l).
- **Trans-Konsalt** conducted 20 transactions. *Id.* ¶ 203(m).
- **Art Sea Group** conducted 5 transactions. *Id.* ¶ 203(p).
- **Mayon UK** conducted transactions through the Front Companies it provided and serviced on behalf of the RoFx Operators in which they collectively sent

hundreds of thousands of dollars of RoFx customer funds to promote and perpetuate the RoFx Scheme. *Id.* ¶ 172(d); *see id.* Part II.

- **Mayon Holding** conducted transactions through the Front Companies it provided and serviced on behalf of the RoFx Operators in which they collectively sent hundreds of thousands of dollars of RoFx customer funds to promote and perpetuate the RoFx Scheme. *Id.* ¶ 172(d); *see id.* Part II.

- **Prokopenko**, as officer of Brass Marker, conducted 3 transactions. *Id.* ¶ 203(p).

- **Skala**, as a member of Notus and Global E-Advantages, conducted 117 of transactions.  *Id.* ¶ 203(p).

- **Fokin**, as director of Aware Choice, conducted 11 of transactions. *Id.* ¶ 203(p).

- **Daraselia**, as director of VDD, conducted 3 of transactions.  *Id.* ¶ 203(p).

- **Hrechaniuk**, as director of Aware Choice, conducted 3 of transactions.  *Id.* ¶ 203(p).

- **Tielly**, as director and temporary owner of Mayon UK, conducted transactions through the Front Companies she provided and serviced on behalf of the RoFx Operators in which they collectively sent hundreds of thousands of dollars of RoFx customer funds to promote and perpetuate the RoFx Scheme. *Id.* ¶ 170(c).

- **Konovalenko**, as director of Mayon HK, manager of Mayon USA, and architect of the Mayon laundering companies, conducted transactions through the Front Companies she provided and serviced on behalf of the RoFx Operators in which they collectively sent hundreds of thousands of dollars of RoFx customer funds to promote and perpetuate the RoFx Scheme. *Id.* ¶¶ 168, 170(b), 172(d); *see id.* Part II.

- **Abrykosova** managed transactions involving RoFx customer funds to various other entities, including Aware Choice, Trans-Konsalt, Boonruk, Konovalenko, Mayon, and Skala. *Id.* ¶¶ 172, 178–79, 320(z).

- **Garda** was the sole member and authorized signatory for Defendant Mayon Solutions LLC and shareholder of Mayon Holding, conducting transactions through the Front Companies she provided and serviced on behalf of the RoFx Operators in which they collectively sent hundreds of thousands of dollars of RoFx customer funds to promote and perpetuate the RoFx Scheme. *Id.* ¶ 170; *see id.* Part II.

Therefore, the Plaintiffs established that the Defendants satisfied each of the required elements of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(a)(1)(B)(i).

    b.  <u>18 U.S.C. § 1956(a)(2)</u>

A person violates 18 U.S.C. § 1956(a)(2)(A) by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument internationally with the intent to promote money laundering. 18 U.S.C. § 1956(a)(2)(A). A person violates 18 U.S.C. §

1956(a)(2)(B)(i) by knowing that the monetary instrument or funds involved are "the proceeds of some unlawful activity and knowing that such transportation, transmission, or transfer" is wholly or partially designed to launder money or to avoid a transaction reporting requirement under state or federal law. 18 U.S.C. § 1956(a)(2)(B)(i).

- **Notus**, incorporated in Colorado, sent at least 66 transactions to Thailand-based Layering Company Boonruk, as well as to Konovalenko, U.K.-based Aware Choice, and Bulgaria-based Trans-Konsalt. Am. Compl. ¶ 207(a). Notus knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Notus knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **ShopoStar**, incorporated in Colorado, sent 43 transactions to Thailand-based Layering Company Boonruk. *Id.* ¶ 207(b). ShopoStar knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as ShopoStar knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Global E-Advantages**, incorporated in Delaware, sent at least 14 transactions to Thailand-based Layering Company Boonruk. *Id.* ¶¶ 177, 207(c). Global E-Advantages knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Global E-Advantages knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Grovee**, based in Delaware, sent 9 transactions to Thailand-based Layering Company Boonruk. Grovee knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Grovee knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Wealthy Developments**, organized and with a principal place of business in Scotland, sent at least two transactions to U.K.-based ePayments. *Id.* ¶ 206. Wealthy Developments knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Wealthy Developments knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Fokin**, as director of Aware Choice, transferred funds internationally. *Id.* ¶ 144. Fokin knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Fokin knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Hrechaniuk**, as director of Aware Choice, transferred funds internationally. *Id.* ¶ 144. Hrechaniuk knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Hrechaniuk knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

- **Skala**, as director of Notus, sent over $5.3 million dollars from U.S.-based Notus to U.K. Front Company Aware Choice, Bulgarian Front Company Trans-Konsalt, and Thai Layering Company Boonruk. *Id.* ¶ 172. Skala knowingly conducted each of these transactions to further the RoFx Scheme by laundering unlawfully converted funds and compensating the orchestrators of the RoFx Scheme in violation of § 1956(a)(2)(A). *Id.* ¶¶ 280–81. Further, these transactions violated § 1956(a)(2)(B)(i), as Skala knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* ¶¶ 283–84.

Therefore, the Plaintiffs established that the Defendants satisfied each of the required elements of 18 U.S.C. § 1956(a)(2).

    c.  <u>18 U.S.C. § 1957</u>

Section 1957 makes it an offense for a person to "knowingly engage[] or attempt to engage[] in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity . . . ." 18 U.S.C. § 1957(a). Such transaction must

take place either in the United States or outside of the United States with the participation of a United States person as defined in 18 U.S.C. § 3077. 18 U.S.C. § 1957(d).

In the Complaint, the Plaintiffs sufficiently alleged that the following Defaulting Defendants engaged in monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3)—namely, the RoFx Scheme described in paragraphs 61 to 127 of the Amended Complaint. Am. Comp. ¶ 286. These transactions affected interstate and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; or (b) involving the use of financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce. *Id.* ¶ 287. Each monetary transaction either (a) took place in the United States, or (b) took place outside of the United States and at least one Defendant is a "United States" person within the meaning of 18 U.S.C. § 1957(d)(2) and § 3077. *Id.* ¶ 288.

- **Notus**, a Colorado corporation, knowingly engaged in 117 monetary transactions in property derived from the RoFx Scheme totaling $2,705,714.36. *Id.* ¶ 203(h).

- **ShopoStar**, a Colorado corporation, knowingly engaged in 112 monetary transactions in property derived from the RoFx Scheme totaling $3,369,680.60. *Id.* ¶ 203(i).

- **Auro Advantages**, a Delaware corporation, knowingly engaged in 18 monetary transactions in property derived from the RoFx Scheme totaling $436,021. *Id.* ¶ 203(g).

- **Global E-Advantages** knowingly engaged in 75 monetary transactions in property derived from the RoFx Scheme totaling $896,509. *Id.* ¶ 203(j).

- **Grovee**, a Delaware corporation, knowingly engaged in 27 monetary transactions in property derived from the RoFx Scheme totaling $229,788. *Id.* ¶ 203(l).

- **Easy Com**, a citizen of Missouri, knowingly engaged in 154 monetary transactions in property derived from the RoFx Scheme totaling $3,476,350.65. *Id.* ¶ 203(k).

- **Art Sea Group**, a citizen of South Korea, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. Ex. 7.

- **Profit Media**, a citizen of the United Kingdom, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. *Id.*

- **Trans-Konsalt**, a citizen of Bulgaria, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. *Id.*

- **VDD**, a citizen of the United Kingdom, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. *Id.*

- **Brass Marker**, a citizen of the Czech Republic, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. *Id.*

- **Wealthy Developments**, a citizen of the United Kingdom, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as it received payments from U.S. RoFx customers. *Id.*

- **Mayon UK**, a U.K. citizen, engaged in a transaction with Colorado-incorporated Notus. Am. Compl. ¶ 172(d). Notus, using RoFx customer funds, sent hundreds of thousands of dollars to organizations and people perpetuating the RoFx Scheme, including Mayon UK. *Id.*

- **Manuchar Daraelia,** as director of VDD, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as VDD received payments from U.S. RoFx customers. Am. Compl. ¶¶ 151–53; Ex. 7.

- **Ivan Hrechaniuk**, as director of Aware Choice, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as Aware Choice received payments from U.S. RoFx customers. Am. Compl. ¶¶ 151–53; Ex. 7.

- **Sergiy Prokopenko**, as officer of Brass Marker, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as Brass Marker received payments from U.S. RoFx customers. Am. Compl. ¶¶ 146–48; Ex. 7.

- **Dmytro Fokin**, as director of Aware Choice and VDD, knowingly engaged in numerous monetary transactions exceeding $10,000 in value that took place in the United States, as Aware Choice and VDD received payments from U.S. RoFx customers. Am. Compl. ¶¶ 142–45, 151–53; Ex. 7.

- **Alla Skala**, as member of U.S.-based Notus, knowingly engaged in numerous monetary transactions exceeding $2,705,714.36 in value that took place in the United States. Am. Compl. ¶¶ 171–72, 177; Ex. 7.

- **Olga Tielly,** as director and temporary owner of Mayon UK, knowingly engaged in monetary transactions exceeding $10,000 in value that took place in the United States, namely through Notus. Am. Compl. ¶ 172(d).

Therefore, the Plaintiffs established that the Defendants satisfied each of the required elements of 18 U.S.C. § 1957.

2.  Predicate Acts: Interstate Transportation of Stolen Property

Acts indictable under 18 U.S.C. § 2314 or 18 U.S.C. § 2315 may be predicate acts for RICO purposes. 18 U.S.C. § 1961(1)(B). Section 2314 makes it a crime to transport stolen, unlawfully converted, or fraudulently-taken goods, securities, or money across state lines. 18 U.S.C. § 2314. "A critical element of a Section 2314 violation is proof of scienter, namely, that the defendant knew that the property converted or taken by fraud at the time of the transport." *Omnipol, a.S. v. Worrell*, 421 F. Supp. 3d 1321, 1352 (M.D. Fla. 2019). However, a RICO plaintiff need not produce direct evidence of scienter. *Wolff v. Leadenhall Bank & Tr.*, No. 03-22778-CIV, 2005 WL 8165194, at *3 (S.D. Fla. Apr. 1, 2005); *see also U.S. v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998) (permitting circumstantial evidence of scienter in a criminal RICO context). The following Defaulting Defendants transported unlawfully converted proceeds across state lines with the requisite knowledge that the proceeds were in fact converted or taken by fraud at the time of transport. Am. Compl. ¶ 291.

- **Global E-Advantages**, incorporated in Delaware, transported funds to Notus (based in Colorado) and Mayon Solutions LLC (based in New Hampshire). Ex. 7.

- **Notus**, incorporated in Colorado, transported funds to Mayon Solutions LLC, which is based in New Hampshire. Ex. 7.

Relatedly, Section 2315 makes it a crime for a person to knowingly receive, possess, conceal, sell, or dispose of any unlawfully converted or taken goods, wares, merchandise, securities, or money greater than or equal to $5,000 in value. 18 U.S.C. § 2315. Each of the Defaulting Defendants received, possessed, concealed, sold, or disposed of funds unlawfully derived from RoFx customers who fell victim to the RoFx Scheme. Am. Compl. ¶ 293. The following Defendants knew that the proceeds were the products of illicit activity. *Id.* ¶ 294.

- **Wealthy Developments** received at least €29,600 and $47,000 from RoFx customers among 12 transactions. *Id.* ¶ 203(a).

- **Brass Marker** received at least €14,400 and $398,000 from RoFx customers among 11 transactions. *Id.* ¶ 203(d).

- **Profit Media Group** received at least €2,000 and $84,999 from RoFx customers among 3 transactions. *Id.* ¶ 203(e).

- **VDD** received at least €31,500 and $186,650.98 from RoFx customers among 33 transactions. *Id.* ¶ 203(f).

- **Auro Advantages** received at least $436,000 from RoFx customers among 18 transactions. *Id.* ¶ 203(g).

- **Notus** received at least $2,705,714.36 from RoFx customers among 117 transactions. *Id.* ¶ 203(h).

- **ShopoStar** received at least $3,269,680.60 from RoFx customers among 112 transactions. *Id.* ¶ 203(i).

- **Global E-Advantages** received at least $896,509 from RoFx customers among 75 transactions. *Id.* ¶ 203(j).

- **Easy Com** received at least $3,476,350.65 from RoFx customers among 154 transactions. *Id.* ¶ 203(k).

- **Grovee** received at least $229,000 from RoFx customers among 27 transactions. *Id.* ¶ 203(m).

- **Trans-Konsalt** received at least €187,000 and $157,800 from RoFx customers among 12 transactions. *Id.* ¶ 203(m).

- **Art Sea Group** received at least €50,000 and $258,452 from RoFx customers among 5 transactions. *Id.* ¶ 203(p).

- **Skala**, as member of Notus, received and moved RoFx customer funds. *Id.* ¶ 172. Skala personally received $7,600 from Notus on July 8, 2020. Ex. 7. Skala disposed of the illicit funds by compensating Konovalenko, Mayon UK, Mayon Solutions, LLC, and herself for their participation in the RoFx Scheme. *Id.* ¶ 172.

- **Tielly**, as  director of Mayon UK, knowingly facilitated the concealment of funds unlawfully derived from the RoFx Scheme by providing the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages, which collectively received and possessed millions of dollars of unlawful funds. *Id.* ¶¶ 162–81, 203.

- **Fokin** used his control of Aware Choice and VDD's bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 142–45, 151–53.

- **Prokopenko** used his control of Brass Marker's bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 146–48.

- **Daraselia** used his control of VDD's bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 151–53.

- **Hrechaniuk** used his control of Aware Choice's bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 142–45.

- **Abrykosova** concealed illicit funds by managing the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various other entities as directed by the RoFx Operators. *Id.* ¶¶ 172, 177–78.

- **Konovalenko** received illicit funds in the form of direct payment from the RoFx Operators and concealed illicit funds by directing that Notus be dissolved

to cover the financial tracks of the RoFx funds through Notus. *Id.* ¶¶ 142–45, 168.

Therefore, the Plaintiffs established that the Defendants satisfied each of the required elements of sections 2314 and 2315.

### 3. Predicate Acts: Wire Fraud

Wire fraud, indictable under 18 U.S.C. § 1343, suffices as a predicate act for RICO purposes. 18 U.S.C. § 1961(1)(B). A plaintiff bringing a RICO claim predicated on wire fraud must comply with Rule 9(b)'s particularity standard. *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1361 (S.D. Fla. 2015). "In order to bring a RICO claim where mail or wire fraud serves as the predicate activity, it is necessary to show that (1) the defendant intentionally participated in a scheme to defraud another of money or property, (2) the defendant used the mails or wires in furtherance of that scheme, and (3) the plaintiff relied to his detriment on the defendant's misrepresentations." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004).

In the Amended Complaint, the Plaintiffs sufficiently alleged that the Laundering Defendants committed acts of wire fraud in violation of 18 U.S.C. § 1343. Am. Compl. ¶ 295. With specific intent to defraud, each of the Defaulting Defendants knowingly devised or participated in a scheme to defraud the RoFx customers of money by means of material misstatements and omissions. *Id.* ¶ 296. These material misstatements and omissions provided that the Plaintiffs' contributions would (1) be utilized by RoFx' s forex robot trading platform to make trades on behalf of Plaintiffs and for their benefit, (2) be committed to foreign exchange trading so Plaintiffs could receive a return on investment in the form of a percentage of RoFx's daily trading profit, (3) remain in each respective Plaintiffs' accounts for their own use, (4) increase in value because the RoFx Scheme would be partnering with Warren Buffett and Berkshire Hathaway, and (5) be withdrawable by Plaintiffs at their discretion. *Id.* ¶ 296(a)–(e). The Defaulting Defendants transmitted, or caused to be transmitted, communications by means of wire in interstate or foreign commerce, as outlined below. *Id.* ¶¶ 203–09, 298.

- **Notus** conducted 117 illicit transactions via wire. *Id.* ¶ 203.
- **ShopoStar** conducted 112 illicit transactions via wire. *Id.*
- **Auro Advantages** conducted 18 illicit transactions via wire. *Id.*
- **Global E-Advantages** conducted 75 illicit transactions via wire. *Id.*

- **Grovee** conducted 27 illicit transactions via wire. *Id.*

- **Easy Com** conducted 154 illicit transactions via wire. *Id.*

- **Art Sea Group** conducted 5 illicit transactions via wire *Id.*

- **Brass Marker** conducted 11 illicit transactions via wire. *Id.*

- **Profit Media Group** conducted 3 illicit transactions via wire. *Id.*

- **Trans-Konsalt** conducted 20 illicit transactions via wire. *Id.*

- **VDD** conducted 33 illicit transactions via wire. *Id.*

- **Wealthy Developments** conducted 12 illicit transactions via wire. *Id.*

- **Abrykosova** processed Notus' and Global E-Advantages' transactions through online banking. *Id.* ¶ 178.

- **Daraselia** used VDD's bank account to send RoFx customers' funds onward in the Scheme. *Id.* ¶ 152.

- **Hrechaniuk** used Aware Choice's bank account to send RoFx customers' funds onward in the Scheme. *Id.* ¶¶ 142–44.

- **Prokopenko** used Brass Marker's bank account to send RoFx customers' funds onward in the Scheme. *Id.* ¶ 148.

- **Skala** used Notus' and Global E-Advantages' bank accounts to send RoFx customers' funds onward in the Scheme. *Id.* ¶¶ 172, 177.

- **Fokin** used Aware Choice's bank account to send RoFx customers' funds onward in the Scheme. *Id.* ¶¶ 142–44.

Therefore, the Plaintiffs established that the Defendants satisfied each of the required elements of 18 U.S.C. § 1343.

C. Pattern of Racketeering

To state claim under § 1962(c), a plaintiff must allege that the defendant engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). To successfully allege such a pattern, a plaintiff must show: "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original). The "continuity" required for a pattern of racketeering can be either close-ended or open-ended. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). A RICO plaintiff establishes "open-ended continuity" by showing "either (a) that there is a specific threat of repetition of the racketeering acts extending indefinitely into the future or (b) that the racketeering acts are part of the defendant's regular way of doing business." *Fagan*, 2021

WL 2845034, at *4 (citing *H.J. Inc.*, 492 U.S. at 241–42)*. A RICO plaintiff establishes "close-ended continuity" by showing that a defendant committed "repeated predicate acts over a closed but substantial period of time that demonstrates a defendant's long-term criminal activity." *Id.* "There is no bright-line rule that defines exactly how long or over what period the predicate acts must occur in order for them to be considered substantial." *Fernandez de Cordoba v. Flores*, 2018 WL 1830805, No. 17-20122-CV, at *4 (S.D. Fla. Jan. 10, 2018) (finding that a motion for default judgment failed to allege close-ended continuity where predicate acts, including money laundering, occurred over a one-month period); *Jackson*, 372 F.3d at 1267 (finding that RICO schemes with lifespans of nine months or less fail to establish close-ended continuity). Rather, whether the requisite continuity exists is a case-specific inquiry, and courts may "consider the number of victims, number of racketeering acts, variety of racketeering acts, whether the injuries were distinct, complexity and size of the scheme, and nature or character of the enterprise or unlawful activity." *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011) (internal quotation omitted) (finding an 18-month period sufficient to establish closed-ended continuity).

In the Amended Complaint, the Plaintiffs sufficiently alleged that the Defaulting Defendants participated in a pattern of racketeering within the definition of § 1962(c). Am. Compl. ¶ 299. As outlined above, *supra* Section II.B, each of the Defaulting Defendants committed at least two of the following seven predicate acts: (1) money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (2) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (3) money laundering in violation of 18 U.S.C. § 1956(a)(2)(A); (4) money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i); monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957; transportation of stolen, converted, or fraudulently-taken goods, securities or money in violation of 18 U.S.C. § 2314; (6) receipt, possession, concealment, sale, or disposal of stolen, converted, or taken goods in violation of 18 U.S.C. § 2315; and (7) wire fraud in violation of 18 U.S.C. § 1343. *Id.* ¶¶ 267–98. These predicate acts were interrelated: each furthered the receipt, laundering, and hiding of funds criminally derived from the defrauded RoFx customers. *Id.* ¶¶ 267–99. The Plaintiffs established that each of these Defendants committed the predicate acts as part of their regular course of business and will continue unless and until they are prevented from committing such acts, thereby satisfying open-ended continuity. *Id.* ¶ 299; *Fagan*, 2021 WL 2845034, at *4*. The following Defendants satisfy close-ended continuity in addition to the already-established open-ended continuity:

- **Notus**. The RoFx Operators repeatedly directed customers to send funds to Notus between about October 2019 and July 2021—a period of 21 months—which is sufficient to establish close-ended continuity. Am. Compl. ¶ 172(a).

- **ShopoStar**. The RoFx Operators repeatedly directed customers to send funds to ShopoStar between about January 2020 and September 2021—a period of 20 months—which is sufficient to establish close-ended continuity. *Id.* ¶ 173.

- **Auro Advantages**. The RoFx Operators repeatedly directed customers to send funds to Auro Advantages between about April 2019 and September 2021—a period of 29 months—which is sufficient to establish close-ended continuity. *Id.* ¶ 157.

- **VDD**. The RoFx Operators repeatedly directed customers to send funds to VDD between about February 2019 and November 2019 before dissolving it in October 2020—a total period of 20 months—which is sufficient to establish close-ended continuity. *Id.* ¶¶ 152–53.

- **Fokin** served as director of Front Companies VDD and Aware Choice—creating and managing their bank account transactions from 2018 to 2021.

- **Konovalenko** served as either owner, member, director, or manager of each of the Mayon entities at some point between August 2019 to present. *Id.* ¶ 170(e).

- **Daraselia** served as director of VDD between early 2019 and its dissolution on October 13, 2020, a period sufficient to establish close-ended continuity. *Id.* ¶¶ 151–53.

- **Hrechaniuk** served as director of Aware Choice between at least June 2018 and its dissolution on March 23, 2021, a period sufficient to establish close-ended continuity. *Id.* ¶¶ 146–48.

- **Skala** served as a member of Notus between at least August 2019 and its dissolution on September 16, 2021, a period sufficient to establish close-ended continuity. *Id.*

- **Tielly** served as either owner or director during the period between March 2018 and present, a period sufficient to establish close-ended continuity. *Id.* ¶ 170(c).

- **Garda** served as member and shareholder of Defendants Mayon Solutions LLC and Mayon Holding between April 2019 and July 2020, a period sufficient to establish close-ended continuity. *Id.* ¶ 170(a).

- **Mayon UK** served as a tool to buy Front Companies for use in the RoFx Scheme between August 2019 and September 2021—a total period of 23 months—which is sufficient to establish close-ended continuity. *Id.* ¶¶ 165, 170.

D. <u>Causation</u>

"[P]leading a civil RICO claim requires that plaintiffs plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for and proximate

cause of the plaintiffs' injuries." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). The injurious conduct need not be the sole cause of the plaintiffs' injuries, but there must be "some direct relation" between the conduct and the injury to sustain a claim. *Williams*, 465 F.3d at 1287–88; *see, e.g.*, *Hpc US Fund 1 v. Wood*, No. 0:13-CV-61825-UU, 2014 WL 12496558, at *5 (S.D. Fla. June 11, 2014) (holding that allegations were sufficient to establish proximate cause because the "alleged RICO conduct, fraudulently transferring Plaintiffs' real property investments and misrepresenting these transfers to Plaintiffs, led directly to Plaintiffs' alleged injury, the loss of Plaintiffs' real property investments.").

The Amended Complaint alleged that the Plaintiffs were, and continue to be, injured by reason of the Defaulting Defendants' violations of 18 U.S.C. § 1962(c) and the aforementioned predicate acts. Am. Compl. ¶ 300. The injuries suffered by the Plaintiffs include continued deprivation of money taken by means of the RoFx Scheme and by significant legal fees and related costs in attempting to address the unlawful conduct and recover what rightfully belongs to the Plaintiffs. *Id.* ¶ 301. The Plaintiffs alleged that their injuries were the direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the aforementioned predicate acts. *Id.* ¶ 303. Given that the Plaintiffs established that the Defendants satisfied each of the requirements of a civil RICO claim, this Court should grant default judgment against them.

## III.    Count II: RICO Conspiracy

Per Section 1962(d) of the RICO statutes, it is "unlawful for any person to conspire to violate" any of the substantive provisions of RICO. 18 U.S.C. § 1962(d); *see Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).  "An agreement to participate in a RICO conspiracy can be proved in one of two ways: (1) by showing an 'agreement on an overall objective,' or (2) in the absence of such an agreement, by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in the 'single objective' conspiracy." *Fernandez de Cordoba*, 2018 WL 1830805, at *5 (quoting *U.S. v. Church*, 955 F.2d 688, 694 (11th Cir. 1992)). A plaintiff may show the existence of an agreement between the alleged conspirators "from circumstantial evidence of the scheme." *Cont'l Cas. Co. v. Cura Grp.*, No. 03-61846-CIV, 2005 WL 8155321, at *23 (S.D. Fla. Apr. 6, 2005) ("Because one cannot know another's subjective intent, circumstantial evidence must be relied upon to indicate intent"); *see*

*id.* at *24 ("Rule 9(b) permits [m]alice, intent, knowledge, and other condition of mind to be averred generally) (internal quotation omitted); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (explaining that direct evidence of a RICO agreement is not required; rather, the existence of a conspiracy "may be inferred from the conduct of the participants.").

In the Amended Complaint, the Plaintiffs sufficiently alleged that the Defendants unlawfully conspired to violate 18 U.S.C. § 1962(c), which itself is a violation of 18 U.S.C. § 1962(d). Am. Compl. ¶ 306. To promulgate and perpetuate the RoFx Scheme, the RoFx Operators and the Defaulting Defendants agreed to accomplish an unlawful plan to engage in the pattern of racketeering described in Count I, *supra* Section II.B. *Id.* ¶ 307. The RoFx Operators and the Defaulting Defendants agreed to the overall objective of the conspiracy or to commit personally at least two predicate acts of racketeering, as detailed above, *supra* Section II.B. *Id.* ¶ 308. The Plaintiffs suffered monetary injuries as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy. *Id.* ¶ 309. Given that the Plaintiffs established that the Defendants satisfied each of the requirements of a civil RICO conspiracy claim, this Court should grant default judgment against them.

## IV.   **Count III: Common Law Fraud**

To successfully establish a claim for fraud under Florida law, the plaintiff must show that (1) the defendant made a false statement or misrepresentation of material fact; (2) the defendant knew the statement or misrepresentation was false; (3) the statement or misrepresentation was intended to induce another to act; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff suffered resulting damage or injury. *Allstate Ins. Co.*, 653 F. Supp. 2d at 1322–23 (S.D. Fla. 2009). Although common law fraud claims are generally duplicative of RICO claims premised on acts of fraud, the most significant difference between the two is that to state a claim for common law fraud, the plaintiff must show that it *actually* relied on a misrepresentation. *Id.* at 1323 (explaining that RICO fraud differs from common law fraud because RICO fraud is satisfied so long as it was reasonable for some person to rely on the misrepresentation and the plaintiff was directly or indirectly harmed as a result).

Claims involving fraud generally "must state with particularity the circumstances constituting the fraud . . . ." Fed. R. Civ. P. 9(b). Under this heightened standard, the plaintiff must allege with particularity (1) the precise statements, documents, or misrepresentations made; (2) the

time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. *Brooks*, 116 F.3d at 1371 (11th Cir. 1997). However, "allegations of malice, intent, knowledge, and other conditions of a person's mind are not subject to the same particularity requirement. *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citing Fed. R. Civ. P. 9(b)). Plaintiffs who plead fraud must reasonably notify the defendants of their alleged role in the scheme. *Brooks*, 116 F.3d at 1381. Where multiple defendants are involved, Rule 9(b) cannot be satisfied by "lumping" defendants together in allegations of fraud. *Emess Cap., LLC v. Rothstein*, No. 10-60882-CIV, 2011 WL 13214302, at *3 (S.D. Fla. Mar. 9, 2011), *report and recommendation adopted*, No. 10-60882-CIV, 2011 WL 13214308 (S.D. Fla. Dec. 21, 2011). Rather, the complaint must distinguish among defendants and specify their respective roles in the alleged fraud. *First Am. Bank & Tr. by Levitt v. Frogel*, 726 F. Supp. 1292, 1295 (S.D. Fla. 1989).

In the context of fraud, Rule 9(b)'s heightened pleading requirements are relaxed where "factual information [about the fraud] is peculiarly within the defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003); *see also Medalie v. FSC Sec. Corp.*, 87 F. Supp. 2d 1295, 1306–07 (S.D. Fla. 2000) ("This relaxed requirement is applied where 'strict application of Rule 9(b) could result in substantial unfairness to private litigants who could not possibly have detailed knowledge of all the circumstances surrounding the alleged fraud.'" (citations omitted)). Moreover, courts are also more lenient in applying Rule 9(b) when the fraud involves prolonged, multi-act schemes. *Hill*, 2003 WL 22019936, at *3 n.6 (explaining that in such circumstances "the complaint must set forth a representative sample detailing the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them . . . .").

In the present case, the Plaintiffs sufficiently allege that Peter Mohylny, Ester Holdings, and The Investing Online committed fraud under Florida common law. As outlined below, each of these Defaulting Defendants knowingly made false statements of material fact that detrimentally affected the Plaintiffs. Am. Compl. ¶¶ 312–15.

- **Mohylny** is a Ukrainian resident who served as an agent of the RoFx Operators. *Id.* ¶ 19. Mohylny managed, paid for, and published, or caused to be published, the RoFx.net domain from which the RoFx Scheme emanated. *Id.* ¶¶ 19, 313(b). On RoFx.net, Mohylny published numerous misrepresentations to encourage

customers to contribute money to the Scheme. *Id.* ¶ 63. The Amended Complaint properly alleges that Mohylny published these misrepresentations with knowledge of their falsity and intent to induce the Plaintiffs to act. *Id.* ¶ 314.

- **Ester Holdings** was a corporation designed to promote the RoFx Scheme, by publishing false foreign exchange trading data. Am. Compl. ¶¶ 20, 313(c). The Amended Complaint properly alleges that Ester Holdings published these misrepresentations with knowledge of their falsity and intent to induce the Plaintiffs to act. *Id.* ¶ 314.

- **The Investing Online** is an entity of unknown citizenship that played a role in promotion of the RoFx Scheme. Am. Compl. ¶ 21. During the Scheme, The Investing Online authored, published, and distributed several articles emphasizing the innovative nature of the RoFx trading robot—a design that never actually existed—and its widespread adoption by tens of thousands customers who were also fictitious. *Id.* ¶ 82. Additionally, The Investing Online authored, published, and distributed a press release regarding RoFx's fraudulent initial public offering. *Id.* ¶ 87. The Amended Complaint properly alleges that The Investing Online published these misrepresentations with knowledge of their falsity and intent to induce the Plaintiffs to act. *Id.* ¶ 314.

Regarding the last two elements of common law fraud, the Amended Complaint sufficiently alleges that the Plaintiffs, to their detriment, relied on the misrepresentations of Mohylny, Ester Holdings, and The Investing Online. Am. Compl. ¶ 315. Persuaded by these misrepresentations, the Plaintiffs contributed $75 million or more into the illusory RoFx Scheme. *Id.* ¶ 315; *see id.* ¶¶ 210–52. These contributions actually and proximately caused the Plaintiffs damage because the contributed funds were rendered inaccessible to the Plaintiffs when the RoFx Scheme collapsed. *Id.* ¶ 316. Therefore, this Court should find that Mohylny, Ester Holdings, and The Investing Online committed common law fraud.

## V.    <u>Count IV: Conspiracy to Commit Fraud</u>

Under Florida law, succeeding on a civil conspiracy claim requires proof of an agreement between two or more parties to do an unlawful act. *Tippens v. Round Island Plantation L.L.C.*, No. 09-CV-14036, 2009 WL 2365347, at *4 (S.D. Fla. July 31, 2009). The well-pleaded allegations must also show the performance of some overt act in pursuance of the conspiracy which caused injury to the plaintiff. *Id.* However, "[e]ach coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all acts of his coconspirators.'" *Charles v. Fla. Foreclosure Placement Ctr.*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (finding it unnecessary for each defendant charged with conspiracy to be accused of

making misrepresentations as long as at least one coconspirator committed such an overt act). Any conspiracy claim relies on the presence of an actionable claim underlying the conspiracy. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (explaining that proof of an underlying fraud is a prerequisite to a claim of conspiracy to commit fraud).

In the present case, the Complaint sufficiently alleges that Mohylny and the Promotor Defendants, Company Organizer Defendants, and Front Companies and Principals, committed conspiracy to commit fraud under Florida common law. Am. Compl. ¶ 319. As outlined below, each of the Defaulting Defendants agreed to participate with one or more of the RoFx Operators to commit the fraud detailed in Count III of the Amended Complaint, doing so knowing they were furthering or concealing the fraud or, alternatively, recklessly knowing the predictable result of their actions would further or conceal the fraud. *Id.* The following are overt acts undertaken by the Defaulting Defendants pursuant to the conspiracy which caused significant monetary damages to the Plaintiffs:

- **Mohylny** managed, paid for, and published, or caused to be published, the RoFx.net domain which was designed to encourage customers to contribute money to the fraudulent RoFx Scheme. *Id.* ¶¶ 19, 63, 320(a). Once the RoFx Scheme had acquired a significant amount of money from the customers, Mohylny caused the RoFx.net to cease operating or deliberately allowed the RoFx.net domain to lapse, preventing Plaintiffs from accessing their RoFx.net accounts. *Id.* ¶¶ 335(a).

- **Ester Holdings** published false foreign exchange trading data on MyFxBook.com, enabling the RoFx Operators to provide customers with the illusion that RoFx was actually performing exchange trades. *Id.* ¶¶ 81, 320(b).

- **The Investing Online** created and published, or caused to be published several articles authored to give credibility and traction to the RoFx scheme, enabling the RoFx Operators to create the illusion that RoFx was a popular and reliable foreign exchange trading service using a successful trading algorithm. *Id.* ¶¶ 82, 320(c).

- **Wealthy Developments** is a limited partnership located in the United Kingdom that acted as a Front Company for the RoFx Scheme. *Id.* ¶¶ 32, 132. Specifically, Wealthy Developments used its bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 140, 320(d). In addition, Wealthy Development transferred "affiliate fee" payments to ePayments, another entity involved in the Scheme, as compensation for its role in the Scheme. *Id.* ¶¶ 135–136, 320(d).

- **Konovalenko** was a RoFx Company Organizer who laid the foundation the foundation for most of RoFx's Money Laundering Enterprise in the United States. *Id.* ¶ 167. Konovalenko, directly or through agents, provided RoFx

Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 162, 320(p). Konovalenko also directed that Notus be dissolved to help cover the financial tracks of the RoFx funds through Notus. *Id.* ¶¶ 181, 320(p).

- **Mayon Holding** is a limited company that acted as a Company Organizer for the RoFx Scheme. *Id.* ¶ 24. Mayon Holding, directly or via its agent Garda, wholly-controlled subsidiaries Mayon UK and Mayon Solutions, LLC, and Konovalenko provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 162–181, 320(q).

- **Garda** was an owner of Mayon Holding who acted as a Company Organizer for the RoFx Scheme. *Id.* ¶ 27. Garda, directly or through her signatory authority over Mayon Holding, provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 170(a), 320(r).

- **Mayon UK** is a private limited company that acted as a Company Organizer for the RoFx Scheme. *Id.* ¶ 26. Mayon UK, directly or via Konovalenko and Director Tielly, provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 162–181, 320(s).

- **Tielly** was a director of Mayon UK who acted as a Company Organizer for the RoFx Scheme. *Id.* ¶ 29. She executed the RoFx Services Agreement which provided the RoFx Operators with Front Companies Easy Com, Notus, ShopoStar, and Global E-Advantages and their bank accounts for use in collecting and moving RoFx customer funds. *Id.* ¶¶ 170(c), 320(t).

- **Notus** was a Colorado limited liability company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 42. Notus used its bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from Front Companies in the United States and sending those funds to other Front Companies and Layering Companies. *Id.* ¶¶ 171–172, 320(w). Notus also used customer funds to pay Konovalenko, Mayon UK, Mayon Solutions, LLC, and Skala for their roles in the RoFx Scheme. *Id.* ¶¶ 171–172, 320(w).

- **Global E-Advantages** is a Delaware limited liability company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 46. Global E-Advantages used its bank accounts to receive and move RoFx customer funds as directed by the RoFx Operators, including sending funds to Notus and Boonruk, a Layering Company in the Scheme. *Id.* ¶¶ 177, 320(x). Those funds ultimately went to the RoFx Operators themselves. *Id.* ¶¶ 177, 320(x).

- **Skala** is a member of Notus who used her access to Notus and Global E-Advantages' bank accounts to receive and move RoFx customer funds, receiving bulk transfers of funds from Front Companies in the United States

and sending those funds to other Front Companies and Layering Companies. *Id.* ¶¶ 43, 171–172, 177, 320(y). Skala also used those funds to pay Konovalenko, Mayon UK, Mayon Solutions, LLC, and herself for their roles in the RoFx Scheme. *Id.* ¶¶ 43, 171–172, 177, 320(y).

- **Abrykosova** was an agent of Alex Doe, one of the RoFx Operators, responsible for working on RoFx's Money Laundering Enterprise and United States-based Front Companies. *Id.* ¶ 40. Abrykosova managed the flow of RoFx customer funds through the bank accounts of Notus and Global E-Advantages, sending those funds to various other Front Companies and Layering Companies as directed by the RoFx Operators. *Id.* ¶¶ 177–178, 320(z).

- **Easy Com** is a limited liability company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 47. Easy Com used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *Id.* ¶¶ 180, 320(cc).

- **ShopoStar** is a limited liability company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 44. ShopoStar used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including to Boonruk Ruamkit; and, ultimately, to the RoFx Operators themselves. *Id.* ¶¶ 173–175, 320(ee).

- **Grovee** is a Delaware limited liability company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 49. Grovee used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *Id.* ¶¶ 184–186, 320(gg).

- **Trans-Konsalt** is a limited company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 54. Trans-Konsalt used its bank accounts to receive and move RoFx customer funds, including bulk amounts from Notus, and then transferred these monies to, ultimately, the RoFx Operators. *Id.* ¶¶ 190–193, 320(ii).

- **Art Sea Group** is a limited company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 56. Art Sea Group used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately, the RoFx Operators. *Id.* ¶¶ 200–201, 320(nn).

- **VDD** was a United Kingdom limited company that acted as a Front Company for the RoFx Scheme. *Id.* ¶ 37. VDD used its bank accounts to receive and move customer funds and then transferred these monies to, ultimately, the RoFx Operators. *Id.* ¶ 320(h).

- **Fokin** was the director of VDD and Aware Choice, another Front Company involved in the RoFx Scheme. *Id.* ¶ 38. Fokin created bank accounts at VDD and Aware Choice to use for RoFx transactions. *Id.* ¶¶ 142, 151. Fokin used his control of VDD and Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States. *Id.* ¶ 320(i). Ultimately, Fokin transferred these

monies to the RoFx Operators and then dissolved VDD and Aware Choice to conceal RoFx's Money Laundering Enterprise. *Id.* ¶¶ 145, 153, 320(i).

- **Hrechaniuk** was another director of Aware Choice who used his control of Aware Choice's bank accounts to receive and move RoFx customer funds, including receiving bulk transfers of funds from Front Companies in the United States. *Id.* ¶¶ 142–145, 320(j). Ultimately, Hrechaniuk transferred these monies to the RoFx Operators and then dissolved Aware Choice to conceal RoFx's Money Laundering Enterprise. *Id.* ¶¶ 145, 320(j).

- **Daraselia** was another director of VDD who used his control of VDD's bank accounts to receive and move RoFx customer funds. *Id.* ¶¶ 39, 151–152, 320(k). Ultimately, Daraselia transferred these monies to the RoFx Operators and then dissolved Aware Choice to conceal RoFx's Money Laundering Enterprise. *Id.* ¶¶ 153, 320(k).

- **Brass Marker** is a limited liability company that acted as a Front Company in the RoFx Scheme. *Id.* ¶ 52. Brass Marker also used its bank accounts to receive and move RoFx customer funds and then transferred these monies to, ultimately the RoFx Operators. *Id.* ¶¶ 146, 148, 320(l).

- **Prokopenko** was the officer of Brass Marker who used his control of Brass Marker's bank accounts to receive and move customer funds and then transferred these monies to the RoFx Operators. *Id.* ¶¶ 147–148, 320(m).

- **Profit Media Group** is a limited partnership in the United Kingdom that acted as a Front Company in the RoFx Scheme. *Id.* ¶ 36. Profit Media used its bank accounts to receive and move RoFx customer funds and then transferred monies to, ultimately, to the RoFx Operators. *Id.* ¶¶ 150, 320(n).

- **Auro Advantages** is a Delaware limited liability company that acted as a Front Company in the RoFx Scheme. *Id.* ¶ 41. Auro Advantages used its bank accounts to receive and move RoFx customer funds and then transferred these monies as directed by the RoFx Operators, including a payment to ePayments; and, ultimately, to the RoFx Operators themselves. *Id.* ¶¶ 156–160, 320(o).

Therefore, this Court should find all the Defaulting Defendants liable for conspiracy to commit fraud because each agreed to participate with one or more of the RoFx Operators to commit the fraud and took overt acts pursuant to the conspiracy which, in summation, actually and proximately caused over $75 million in damages to the Plaintiffs. *Id.* ¶ 316.

## VI.   <u>Count V: Aiding and Abetting Fraud</u>

Although none has explicitly recognized a cause of action for aiding and abetting fraud, many Florida courts have assumed that the cause of action exists. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017). To prevail on a claim of aiding and abetting fraud, the well-pleaded allegations must prove (1) the existence of an underlying fraud; (2) that the defendant

had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud. *Id.* at 1097-98. Circumstantial evidence is sufficient to prove actual knowledge of the underlying fraud. *See Wiand v. Wells Fargo Bank*, 938 F. Supp. 2d 1238, 1245 (M.D. Fla. 2013). The Eleventh Circuit explained that a defendant provides "substantial assistance" when he or she "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud] to occur." *Chang*, 845 F.3d at 1097–98.

In the present case, the Amended Complaint sufficiently alleges that Mohylny and the Promotor Defendants, Company Organizer Defendants, and Front Companies and Principals committed aiding and abetting fraud under Florida common law. Am. Compl. ¶ 323, 325. Each of the Defaulting Defendants aided the RoFx Operators to commit or conceal the fraud to commit the fraud detailed in Count III of the Amended Complaint, doing so knowing they were assisting the RoFx Operators to commit or conceal the fraud. *Id.* ¶¶ 312–16, 319–20. This Court should find that the overt acts taken by the Defaulting Defendants pursuant to the conspiracy to commit the fraud also show that each Defaulting Defendant substantially assisted the RoFx Operators to commit or conceal the fraud. *See supra* Section V. Therefore, this Court should find all the Defaulting Defendants liable for aiding and abetting fraud because the Defendants' acts facilitated, promoted, or concealed the fraud, actually and proximately causing over $75 million in damages to the Plaintiffs. Am. Compl. ¶ 316.

## VII.   Count VII: Conspiracy to Commit Conversion

A conspiracy to commit conversion claim is much like any other conspiracy claim, the only difference being the underlying tort in question. *See supra* Sections III and V. To prevail on this claim, the well-pleaded allegations must prove, as a prerequisite, that conversion occurred, meaning that the defendant engaged in an unauthorized act which deprived the plaintiff of his or her property permanently or for an indefinite amount of time. *Fagan*, 2021 WL 2845034, at *13. Money may be the object of conversion, but there must be an obligation to keep intact or deliver the specific money in question. *Id.* at *14 (explaining that this obligation is generally established if the alleged wrongdoer is obligated to hold the funds in a trust or escrow account). Once conversion has been established, a court should find that a conspiracy existed if the well-pleaded allegations show a meeting of the minds between two or more persons to accomplish a common and unlawful plan to commit the conversion. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

In the present case, the Amended Complaint sufficiently alleges that Mohylny and the defaulting Company Organizer Defendants and Front Companies and Principals knowingly agreed to help the RoFx Operators commit conversion and took substantial steps in furtherance of this goal. Am. Compl. ¶ 334. Each of the Defaulting Defendants agreed to participate with the RoFx Operators in a conspiracy to commit conversion, as sufficiently pled in Count VI of the Complaint, doing so knowing they were furthering or concealing conversion of the RoFx customers' funds or, alternatively, doing so recklessly knowing the predictable result of their actions would further or conceal conversion of the RoFx customers' funds. *Id.* ¶¶ 327–32, 334. The overt acts outlined in Section V of this Motion are also sufficient to show that the Defaulting Defendants are liable for conspiracy to commit conversion. *See supra* Section V. Therefore, this Court should find all the Defaulting Defendants liable on this Count because their acts facilitated or concealed the conversion of the RoFx customers' funds which damaged the Plaintiffs for the near $75 million contributed to the RoFx Scheme. Am. Compl. ¶¶ 316, 336.

## VIII.   <u>Count VIII: Aiding and Abetting Conversion</u>

The difference between a claim of aiding and abetting conversion and another aiding and abetting claim is the underlying tort in question. *See supra* Section VI. To prevail on this claim, the well-pleaded allegations must prove, as a prerequisite, that conversion occurred. *See supra* Section VI. The "actual knowledge" and "substantial assistance" elements of an aiding and abetting claim must pertain to the conversion. *See supra* Section VI. As previously stated, a defendant substantially assists in converting property when he or she "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [conversion] to occur." *Chang*, 845 F.3d at 1097–98.

In the present case, the Amended Complaint sufficiently alleges that Mohylny and the defaulting Company Organizer Defendants and Front Companies and Principals committed aiding and abetting conversion under Florida common law. Am. Compl. ¶¶ 337–38. Each of the Defaulting Defendants aided the RoFx Operators to commit or conceal the conversion, as detailed in Count IV of the Complaint, doing so knowing they were assisting the RoFx Operators to commit or conceal conversion or, alternatively, recklessly knowing the predictable result of their actions would assist the RoFx Operators to commit or conceal conversion. *Id.* ¶¶ 339–40. This Court should find that the overt acts taken by the Defaulting Defendants pursuant to the conspiracy to commit the fraud, outlined in Section V, also show that each Defaulting Defendant substantially

assisted the RoFx Operators to commit or conceal conversion. *See supra* Section V. Therefore, this Court should find all the Defaulting Defendants liable for aiding and abetting conversion because the Defendants' acts facilitated or concealed the conversion of the RoFx customers' funds which damaged the Plaintiffs for the near $75 million contributed to the RoFx Scheme. Am. Compl. ¶¶ 316, 341.

## IX.    <u>Count IX: Unjust Enrichment</u>

A cause of action for unjust enrichment arises where the plaintiff has directly conferred a benefit on the defendant, who has knowledge of the benefit and voluntarily accepted and retained the benefit. *Fagan*, 2021 WL 2845034, at *15 (explaining that Florida courts have not specifically defined the term "benefit" for purposes of an unjust enrichment claim, thereby deeming it an ambiguous term left to judicial interpretation). To hold for the plaintiffs on this claim, a court must find that the circumstances are such that it would be inequitable for the defendant to retain the benefit conferred without paying the value thereof. *Pupke v. McCabe*, No. 13-80860-CIV, 2014 WL 12621479, at *4 (S.D. Fla. Jan. 30, 2014). Retention of a benefit is inequitable when there is no value given in exchange for the benefit. *Pincus v. Am. Traffic Sols., Inc.*, 25 F.4th 1339, 1341 (11th Cir. 2022).

In the present case, the allegations state that the Plaintiffs conferred benefits—more than $75 million in funds—upon the Front Companies and Principals, as identified in Part II of the Amended Complaint. Am. Compl. ¶¶ 17–60, 126, 343. Additionally, as outlined below, all the Defaulting Defendants voluntarily accepted and retained the funds provided by the Plaintiffs to the RoFx Scheme. *Id.* ¶ 344.

- **Wealthy Developments** voluntarily accepted and retained the funds provided by the Plaintiffs when Anton Bilous ("Bilous") created a bank account under the guise of Wealthy Developments in which he deposited customer funds provided by the RoFx Operators. *Id.* ¶ 132.

- **Notus** was a Front Company with bank accounts created to receive funds from RoFx customers and subsequently channel some of those funds to pay other entities involved in the RoFx Scheme. *Id.* ¶¶ 171–72. Between October 2019 and July 2021, Notus received well over $2.7 million from RoFx customers. *Id.* ¶ 172(b).

- **Global E-Advantages** was a Front Company that received well over $890,000 from RoFx customers between April 2020 and January 2021. *Id.* ¶ 177(a).

- **Skala** acquired all shares in Front Company Notus and then established, or took control of, bank accounts for Notus and used them to receive at least $1.8

million from RoFx customers between May 2020 and October 2020. *Id.* ¶¶ 171–72. Skala also controlled Global E-Advantages, another Front Company that received customer funds. *Id.* ¶ 177.

- **Abrykosova** was hired and paid by the RoFx Operators as an operational and financial manager charged with processing both Notus' and Global E-Advantages' transactions through online banking. *Id.* ¶ 178.

- **Easy Com** was a Front Company that received at least $3.4 million from RoFx customers beginning on December 3, 2020. *Id.* ¶ 180.

- **ShopoStar** was another Front Company that received $3.2 million in RoFx customer funds between January 2020 and September 2021. *Id.* ¶ 173.

- **Grovee** was a Front Company that Timothy Stubbs ("Stubbs") oversaw as "Manager." *Id.* ¶¶ 183–84. After Stubbs opened two bank accounts for Grovee, Grovee received at least $250,000 from RoFx customers between November 2020 and May 2021. *Id.* ¶ 186.

- **Trans-Konsalt** was a Bulgarian Front Company that received at least $370,000 from RoFx customers between January 2020 and March 2020. *Id.* ¶ 191. In March 2020, Trans-Konsalt also received an additional $279,780 in customer funds from Notus. *Id.* ¶ 192.

- **Art Sea Group** was a South Korean Front Company that received at least $310,000 from RoFx customers between August 2020 and December 2020. *Id.* ¶ 200.

- **VDD** was a Front Company that received in its bank account some funds from RoFx customers between February and November 2019. *Id.* ¶ 152.

- **Fokin** was a director of Front Companies Aware Choice and VDD who created multiple bank accounts which received substantial RoFx customer monies from the RoFx Operators. *Id.* ¶¶ 142–45.

- **Hrechaniuk** was another director of Front Company Aware Choice who created a bank account which received substantial RoFx customer monies from the RoFx Operators. *Id.* ¶¶ 142–45.

- **Daraselia** was another director of Front Company VDD who created a bank account to use for RoFx transactions and receipt of funds from RoFx customers between February and November 2019. *Id.* ¶¶ 151–52.

- **Brass Marker** was a Front Company that established a bank account taking advantage of the Eurozone's SEPA financial network. *Id.* ¶ 147. Brass Marker received some funds from RoFx customers between November 2018 and January 2019. *Id.* ¶ 148.

- **Prokopenko** was the officer of Brass Marker who facilitated the establishment of the bank account to receive funds from RoFx customers between November 2018 and January 2019. *Id.* ¶¶ 147–48.

- **Profit Media Group** was a Front Company that created a bank account to use for RoFx transactions and receipt of funds from RoFx customers. *Id.* ¶¶ 149–50.

- **Auro Advantages** was a Front Company acquired by the RoFx Operators on May 16, 2019, that received at least $436,000 from RoFx customers between June 2019 and September 2021. *Id.* ¶¶ 156–57.

Regarding the final element of unjust enrichment, it would be inequitable for the Defaulting Defendants to retain the benefit of any funds conferred upon them by the Plaintiffs. *Id.* ¶ 347. The Plaintiffs conferred the benefit of their funds to be used by the RoFx Operators to engage in profitable foreign exchange trading using the illusory RoFx trading robot. *Id.* ¶ 345. However, the RoFx Operators did no such trading. *Id.* ¶ 346. Under such circumstances, this Court should find that it would be inequitable for the Defaulting Defendants to retain the benefit of any of the funds. *Id.* ¶ 347. Therefore, the Defaulting Defendants were unjustly enriched at the expense of the Plaintiffs.

## X.   Damages

Pursuant to 18 U.S.C. § 1964(c), a civil RICO plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the Defendants. 18 U.S.C. § 1964(c). Plaintiffs are entitled to recover actual and punitive damages in any action for fraud, including conspiracy to commit and aiding and abetting fraud claims. *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1372 (Fla. 4th DCA 1981). Likewise, plaintiffs can recover both compensatory and punitive or exemplary damages in any action for conversion, including conspiracy to commit and aiding and abetting conversion claims. *Goodrich v. Malowney*, 157 So. 2d 829, 834 (Fla. 2d DCA 1963). In unjust enrichment actions, however, plaintiffs can usually recover compensatory damages, incidental damages, and equitable relief. *Circle Fin. Co. v. Peacock*, 399 So. 2d 81, 83–4 (Fla. 1st DCA 1981).

Plaintiffs are still navigating motions to dismiss and have yet to begin discovery or move for class certification. Until the Court has an opportunity to consider whether Plaintiffs' action is appropriate for class treatment—which it is—damages cannot reasonably be calculated for purposes of entering final judgment. Accordingly, Plaintiffs respectfully request the Court enter default judgment against the Defaulting Defendants solely as to liability and defer judgment as to damages. *See, e.g.*, *Trull v. Plaza Assocs.*, 1998 WL 578173, at *1, 4 (N.D. Ill. Sept. 3, 1998) (considering the question of class certification after it had entered default judgment against

one of the defendants as to liability only); *Leider v. Ralfe*, No. 01-CV-3137, 2003 WL 24571746, at *10 (S.D.N.Y. Mar. 4, 2003) (same), *report and recommendation adopted in part,* No. 01 CIV. 3137, 2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003); *also Kron v. Grand Bahama Cruise Line, LLC*, No. 15-CIV-23807 (S.D. Fla. Sept. 22, 2017) [ECF No. 60].

<u>**CONCLUSION**</u>

The Court should enter default judgment against the Defaulting Defendants on liability only, and should determine damages after the Plaintiffs' class certification motion has been filed and resolved. If class certification is granted, Plaintiffs will conduct discovery to identify the class members and determine their damages on a class-wide basis.

Dated: June 27, 2022.                Respectfully submitted,

/s/  *Dennis A. González*

**Dennis A. González** (Fla. Bar No. 1032050)
Dennis.gonzalez@hklaw.com
Jose A. Casal (Fla. Bar No. 767522)
Jose.Casal@hklaw.com
Andrew W. Balthazor (Fla. Bar No. 1019544)
Andrew.Balthazor@hklaw.com
Sydney B. Alexander (Fla. Bar. No. 1019569)
Sydney.Alexander@hklaw.com
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: 305-374-8500

Warren E. Gluck (N.Y. Bar No. 4701421)
*Pro hac vice*
Warren.Gluck@hklaw.com
Matthew R. DiBlasi (N.Y. Bar No. 4237475)
*Pro hac vice*
Matthew.DiBlasi@hklaw.com
Ruarri M. Rogan (N.Y. Bar No. 5800107)
*Pro hac vice*
Ruarri.Rogan@hklaw.com
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on or about June 27, 2022, true and accurate copies of

Plaintiffs' Motion for Default Judgment, [Proposed] Order, and Declaration Exhibit A were

served on counsel of record via the CM/ECF system. The undersigned further certifies that a

copy of the foregoing documents was served upon Defendants at the addresses listed below via

mail or as otherwise indicated:

| | |
|---|---|
| **Notus LLC**<br>c/o Registered Agent<br>Colorado Registered Agent LLC<br>1942 Broadway Street, Suite 314C,<br>Boulder, CO 80302 | **Brass Marker s.r.o.**<br>Via email to mazzone@bk.ru |
| **Shopostar LLC**<br>c/o Registered Agent<br>Colorado Registered Agent LLC<br>1942 Broadway Street, Suite 314C,<br>Boulder, CO 80302 | **Ester Holdings, Inc.**<br>Via email to finance@esterholdings.com |
| **Auro Advantages LLC**<br>Via publication on Plaintiffs' website. | **The Investing Online**<br>c/o John Pruglos<br>Via email to john@theinvesting.online |
| **Global E-Advantages LLC**<br>c/o Registered Agent<br>North West Registered Agent LLC<br>8 The Green, Suite B,<br>Dover, DE 19901 | **Ivan Hrechaniuk**<br>Via direct message to his LinkedIn profile |
| **Grovee LLC**<br>c/o Registered Agent<br>Delaware Business Incorporators<br>3422 Old Capitol Trail, Suite 700<br>Wilmington, DE 19808 | **Manuchar Daraselia**<br>Via direct message to his LinkedIn profile |
| **Easy Com LLC**<br>c/o Registered Agent<br>159 Main Street, Unit 100,<br>Nashua, NH 03060 | **Mayon Holding Ltd.**<br>Via email to<br>mayonsolutionshkltd@gmail.com |
| **Borys Konovalenko**<br>Via email to<br>borys.konovalenko@gmail.com | **Mayon Solutions, Ltd.**<br>Via email to info@mayon.solutions and<br>sales@mayon.solutions |
| **Alla Skala**<br>Via email to supernotususa@gmail.com | **Olga Abrikosova**<br>Via email to olga.abrikosova@gmail.com |
| **Olga Tielly**<br>3rd Floor 207 Regent Street,<br>London, United Kingdom W1B3HH | **Marina Garda**<br>Via publication on Plaintiffs' website. |

| | |
|---|---|
| **Peter Mohylny**<br>Via email to peter.mohylnyi@outlook.com | **Trans-Konsalt MR**<br>Via publication on Plaintiffs' website. |
| **Profit Media Group LP**<br>4 Queen Street, Suite 1,<br>Edinburgh, GB, EH21JE | **VDD-Trading, Ltd**<br>Via publication on Plaintiffs' website. |
| **Sergiy Prokopenko**<br>c/o Brass Marker s.r.o.<br>Via email to mazzone@bk.ru | **Art Sea Group Ltd**<br>Via publication on Plaintiffs' website. |
| **Wealthy Developments LP**<br>4 Queen Street, Suite 1,<br>Edinburgh, United Kingdom EH21JE | **Dmytro Fokin**<br>Via publication on Plaintiffs' website. |

Respectfully submitted,

/s/ *Dennis A. González*
**Dennis A. González**
Florida Bar No. 1032050
Dennis.gonzalez@hklaw.com
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: 305-374-8500
*Attorney for Plaintiffs*