## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

### Case No: 21-CV-23472-SCOLA/GOODMAN

RYAN BIRMINGHAM, et al.,

      Plaintiffs,

v.

ALEX DOE; JOHN DOES 1–3;
OLGA ABRYKOSOVA, et al.,

      Defendants.

_____/

## OMNIBUS REPORT AND RECOMMENDATIONS ON PLAINTIFFS' MOTIONS FOR DEFAULT JUDGMENT

In this nine-count, civil Racketeer Influenced and Corrupt Organizations Act ("RICO") case, Plaintiffs raise a bevy of claims against 42 Defendants arising from the creation and operation of RoFx, an allegedly fraudulent investment service. [ECF No. 64]. According to a Court-Ordered administrative status report, 26 Defendants have had a Clerk's default entered against them, seven Defendants have not yet been served, three Defendants are in settlement discussions with Plaintiffs, and six Defendants have been dismissed. [ECF No. 221]. Since that administrative status report was filed, the Court dismissed without prejudice six additional Defendants and Plaintiffs filed a notice of voluntary dismissal against three additional Defendants. [ECF Nos. 222; 224-25].[1]

---

[1]      The Undersigned notes that either Plaintiffs or the Court have dismissed all

Plaintiffs' motions request that the Court enter a default judgment against the following Defendants: Peter Mohylny ("Mohylny"); The Investing Online; Ester Holdings, Inc. ("Ester Holdings"); Wealthy Developments LP ("Wealthy Developments"); VDD-Trading, Ltd. ("VDD"); Dmytro Fokin ("Fokin"); Ivan Hrechaniuk ("Hrechaniuk"); Manuchar Daraselia ("Daraselia"); Brass Marker s.r.o. ("Brass Marker"); Sergiy Prokopenko ("Prokopenko"); Profit Media Group LP ("Profit Media Group"); Auro Advantages, LLC ("Auro Advantages"); Borys Konovalenko ("Konovalenko"); Mayon Holding Ltd. ("Mayon Holding"); Marina Garda ("Garda"); Mayon Solutions Ltd. ("Mayon UK"); Olga Tielly ("Tielly"); Notus, LLC ("Notus"); Global E-Advantages, LLC ("Global E-Advantages"); Alla Skala ("Skala")[2]; Olga Abrykosova ("Abrykosova"); Easy Com, LLC ("Easy Com"); ShopoStar, LLC ("ShopoStar"); Grovee, LLC ("Grovee"); Trans-Konsalt MR Ltd. ("Trans-Konsalt"); Art Sea Group Ltd. ("Art Sea Group"); and Mayon Solutions, LLC ("Mayon USA"). [ECF Nos. 180; 189].

United States District Court Judge Robert N. Scola referred both motions to the

---

Defendants who have responded to the Amended Complaint. Thus, the only Defendants against whom Plaintiffs are actually proceeding are those who have remained absent from the litigation. Essentially, each time a defendant has challenged Plaintiffs' allegations, the Defendant has been dismissed.

The result of this procedural history is that Plaintiffs have never been forced to confront questions from an opposing party over the sufficiency of their allegations.

[2]      At the time of filing their motion, Plaintiffs acknowledged that Defendant Skala had a pending motion to set aside the clerk's default. [ECF Nos. 177; 180]. This motion was granted by the Court [ECF No. 183] and Skala has since been dismissed as a defendant [ECF No. 225]. Therefore, although Skala is referenced in Plaintiffs' motion, the Undersigned will not address Skala in this analysis.

Undersigned for a Report and Recommendations. [ECF Nos. 194; 206]. For the reasons set forth below, the Undersigned respectfully recommends that the District Court **grant in part and deny in part** the motions. By way of summary, however, the Undersigned makes the following recommendations as to each count/Defendant:

Count I (RICO): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count II (RICO Conspiracy): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count III (Common Law Fraud): The Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' request for default judgment on Count III in whole against Defendants Mohylny and The Investing Online. Further, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs Leonov, Zarley, and Parent's request for **default judgment** against Defendant Ester Holdings and **deny** Plaintiffs Birmingham's and Hansen's request for default judgment against Defendant Ester Holdings;

Count IV (Conspiracy to Commit Fraud): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count V (Aiding and Abetting Fraud): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count VII (Conspiracy to Commit Conversion): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

3

Count VIII (Aiding and Abetting Conversion): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count IX (Unjust Enrichment): The Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' request for default judgment against Wealthy Developments, Notus, Global E-Advantages, Easy Com, ShopoStar, Grovee, Trans-Konsalt, Art Sea Group, VDD, Brass Marker, Profit Medica Group, and Auro Advantages. Further, the Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request as to all other Defendants.

## BACKGROUND

Plaintiffs' Amended Complaint contains the following counts: (1) Violation of the RICO Act, 18 U.S.C. § 1962(c); (2) RICO Conspiracy, 18 U.S.C. § 1962(d); (3) Common Law Fraud; (4) Conspiracy to Commit Fraud; (5) Aiding and Abetting Fraud; (6) Conversion; (7) Conspiracy to Commit Conversion; (8) Aiding and Abetting Conversion; and (9) Unjust Enrichment. [ECF No. 64].

For the underlying predicate acts supporting the substantive RICO count and the RICO conspiracy count, Plaintiffs accuse each Defendant of committing at least two of the following crimes:

(1) money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (2) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (3) money laundering in violation of 18 U.S.C. § 1956(a)(2)(A); (4) money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i); monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957; transportation of stolen, converted, or fraudulently-taken goods, securities or money in violation of 18 U.S.C. § 2314; (6) receipt, possession, concealment, sale, or disposal of stolen,

converted, or taken goods in violation of 18 U.S.C. § 2315; and (7) wire fraud in violation of 18 U.S.C. § 1343.

[ECF No. 180, p. 21].

In general terms, Plaintiffs' Amended Complaint alleges the following events transpired:

Between 2018 and 2021, an informal association of Ukrainians (the "RoFx Operators") operated a phony foreign exchange trading service via RoFx.net -- a website hosted in Jacksonville, Florida. [ECF No. 64, ¶¶ 1, 3-4, 17-18, 121]. The RoFx Operators claimed to have artificially intelligent software that could conduct foreign exchange trading on behalf of customers; the customers needed only to send funds to the RoFx Operators and, in return, the customers were promised passive income. *Id.* at ¶ 2. The RoFx Operators perpetrated this years-long fraud (the "RoFx Scheme") using a sophisticated website, an active customer service team, invoices, account statements, foreign exchange activity reported on third-party websites, and promotions via advertisements and sponsored articles -- and even allowed some customers to withdraw limited funds. *Id.* at ¶¶ 2, 61-125.

Potential RoFx customers could visit the website "RoFx.net" to engage the services of the trading algorithm. *Id.* at ¶ 63. According to the website, RoFx operated out of the United States, London, and Hong Kong. Customers were able to contact RoFx support via web-based chat, email, and telephone. *Id.* at ¶¶ 65-66. RoFx's website boasted that its trading algorithm obtained a 92.8% average annual profit since 2009. *Id.* at ¶ 71, Fig. 1. The website provided customers with data which purported to show how well their investments were doing and offered customers incentives (lower performance fees and higher share of daily

profit) for maintaining larger investment balances. *Id.* at ¶ 73.

RoFx Operators, together with other Defendants, published or caused to be published numerous online articles and reviews in an effort to add legitimacy to their operation. *Id.* at ¶ 79. For example, RoFx was featured in Reader's Digest, MyFxBook, self-published articles by The Investing Online, Facebook, Reddit, AP News, and Yahoo News. *Id.* at ¶¶ 80-83, 88.

Via these articles and emails sent to customers, RoFx misled its customers into believing their money was growing and that the company would be expanding via an Initial Public Offering ("IPO") connected to Warren Buffet's company, Berkshire Hathaway, as well as an Initial Coin Offering ("ICO"), for which its investors would be granted access to a presale. *Id.* at ¶¶ 87, 89, 91-97. RoFx.net was shut down on or about September 17, 2021, and the RoFx Operators stopped responding to customers. *Id.* at ¶ 127.

According to Plaintiffs, the entire RoFx platform was a fabrication. *Id.* at ¶ 102. There was no trading algorithm, there was never a registered company, customers' funds were not being invested on their behalf, the online advertising was fictitious, there was never going to be an IPO or a legitimate ICO, and customers were never free to withdraw their funds. *Id.* at ¶¶ 102-27.

Instead, Plaintiffs claim, Defendants engaged in an illegitimate enterprise meant to steal the funds of RoFx customers for their own benefit. According to Plaintiffs, the purported RICO participants can be grouped into the following categories:

**RoFx Operators:** the four, currently-unidentified individuals operating the RoFx Scheme.

**Promoter Defendants:** [3] companies which contributed to RoFx's false legitimacy by authoring articles, publishing trading activity, and causing RoFx to be featured as a legitimate business on social media.

**Company Organizers**: individuals and entities creating, acquiring, and transferring Front Companies. Company Organizers also directed the dissolution of Front Companies to further obscure the evidentiary trail linking illicit funds to Defendants.

**Front Companies**: clean companies -- companies not subject to any particular scrutiny -- able to satisfy Know Your Customer ("KYC") and Anti-Money Laundering ("AML") requirements and establish bank accounts. Front Companies and their principals established or used existing bank accounts primarily to receive RoFx customer funds, introducing the illicit funds into the financial system for onward movement through the RoFx money laundering network. Front Companies were generally actively involved in the scheme for only a finite period of time. Certain of the Front Companies -- Trans-Konsalt, Aware Choice, and VDD -- assumed hybrid roles, both receiving customer funds and acting as a conduit for sending limited RoFx customer "withdrawals" back to customers in furtherance of the Scheme, and to conceal the existence of the Money Laundering Enterprise.

**Layering Companies**: existing companies with a high volume of financial transactions, selected to obfuscate the flow of illicit funds. Layering Companies received transactions from both RoFx customers and Front Companies and then, as directed by the RoFx Operators, sent the illicit funds onward to Cash- Out Companies, other Layering Companies, or returned dribbles of payments back to RoFx customers as "withdrawals" in furtherance of the Scheme and to conceal the existence of the Money Laundering Enterprise.

---

[3]   Although the Amended Complaint repeatedly refers to "Promoter Defendants," this moniker is never explicitly assigned to a set of defendants. In Section II, Plaintiffs group Defendants Ester Holdings and The Investing Online into the group "Promoters of the RoFx Scheme." [ECF No. 64, ¶¶ 20-21]. Elsewhere when discussing these two Defendants, Plaintiffs precede the discussion by referring to the Defendant as a Promoter Defendant. *Id.* at ¶¶ 81 ("Promoter Defendant Ester Holdings published purported daily RoFx trading activity on MyFxBook.com."); 82 ([T]he RoFx Operators hired Promoter Defendant The Investing Online to author, publish, and distribute several articles describing the RoFx Scheme.").

**Cash-Out Companies**: the exit point for the illicitly-obtained funds. Cash-Out Companies established accounts around the world and received funds from Front and Layering Companies. Money mules withdrew and couriered cash from Cash-Out Companies to the RoFx Operators.

*Id.* at ¶¶ 4; 17-21; 129 (internal citations omitted).

The scheme would follow a similar format for each customer "investment." The customer would be directed to send their money to either one of the Front Companies or one of the Layering Companies. Once the money was delivered, the destination company would then distribute the money as directed by the RoFx organizers. As the RoFx organizers became increasingly concerned about regulatory oversight, they began directing additional people to create more Front Companies with bank accounts to further hide the volume of their transactions.

The actions of Timothy Stubbs[4], one of the named Defendants, provides an example of this scheme in action. Plaintiffs allege that Stubbs opened a Bank of America Account under the name Grovee on November 18, 2020. *Id.* at ¶ 184. Between November 2020 and May 2021, RoFx Operators directed customers to send at least $250,000 to Grovee Bank of America accounts. *Id.* at ¶ 186. Stubbs then forwarded the money as instructed by RoFx Operators. *Id.*

Plaintiffs provide a summary of the number of transactions, as well as the relevant timeline for each of the Front Companies and Layering Companies on pages 47-52 of their Amended Complaint. *Id.* at ¶¶ 202-07.

---

[4]    The claims against Timothy Stubbs have been dismissed without prejudice. [ECF No. 224].

## **LEGAL STANDARD**

"Obtaining a default judgment is a two-step process: first, the plaintiff must seek an entry of default from the clerk of court; and second, after entry of a clerk's default, the plaintiff can seek a default judgment." *St. Michael Press Publ'g Co. v. One Unknown Wreck Believed to be the Archangel Michael*, No. 12-80596-Civ-Brannon, 2013 WL 12171816, at *1 (S.D. Fla. Feb. 12, 2013).

Federal Rule of Civil Procedure 12(a)(1)(A)(i) states that a defendant has 21 days from the date of service to respond to a complaint. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). A party may then apply to the district court for a default final judgment. Fed. R. Civ. P. 55(b)(2); *Alfa Corp. v. Alfa Mortg. Inc.*, 560 F. Supp. 2d 1166, 1173 (M.D. Ala. 2008).

A court may not enter a final default judgment based solely on the existence of a clerk's default. *Id.* at 1174. Instead, a court is required to examine the allegations to see if they are well-pleaded and present a sufficient basis to support a default judgment on the causes of action. *Id.* (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Only those factual allegations that are well-pleaded are admitted in a default judgment. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

The decision whether to enter a default judgment "is committed to the discretion of the district court." *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1576 (11th Cir. 1985). Default judgments are "generally disfavored" because this Circuit has a "strong policy of

9

determining cases on their merits." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244–45 (11th Cir. 2015). In addition to assessing whether the complaint adequately sets forth facts to support the plaintiff's claims, a court considering the entry of a valid default judgment must "have subject-matter jurisdiction over the claims and have personal jurisdiction over the defendant." *Osborn v. Whites & Assocs. Inc.*, No. 1:20-cv-02528, 2021 WL 3493164, at *2 (N.D. Ga. May 20, 2021) (citing *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1215 & n.13 (11th Cir. 2009)).

A court may conduct a hearing on a motion for default judgment when, in order "to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2); *see also Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 911-12 (11th Cir. 2011) (finding that Rule 55(b)(2) "leaves the decision to hold an evidentiary hearing to the court's discretion").

## <u>ANALYSIS</u>

As stated previously, Plaintiffs have placed the individual Defendants in six categories. Each Defendant is assigned to either one or multiple different categories. The Amended Complaint then explains which counts apply to which Defendants by including in the count title the categories of Defendants to which the count applies (i.e., Count I is against the RoFx Operators, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals). For purposes of creating a roadmap, the Undersigned will summarize which counts apply to which categories of Defendants and

which defaulting Defendants are in which category:

Count I (RICO) (RoFx Operators,[5] Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Wealthy Developments; VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count II (RICO Conspiracy) (RoFx Operators, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Wealthy Developments; VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count III (Common Law Fraud) (RoFx Operators, Peter Mohylny, and Promoter Defendants): Mohylny, The Investing Online, and Ester Holdings;

Count IV (Conspiracy to Commit Fraud) (Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Mohylny; The Investing Online, and Ester Holdings; Wealthy Developments VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count V (Aiding and Abetting Fraud) (Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Mohylny; The Investing Online, and Ester Holdings; Wealthy Developments; VDD; Fokin; Hrechaniuk;

---

[5]  The Undersigned does not consider Mohylny to be covered by the Amended Complaint's definition of "RoFx Operator." Although Plaintiffs list Mohylny under the subsection "Operators of the RoFx Scheme," earlier in the Amended Complaint, "RoFx Operator" is explicitly defined as John Does 1-3 and Alex Doe. [ECF No. 64, ¶¶ 17-18]. Further, in Count III, Plaintiffs include Mohylny as a distinct Defendant, separate from the "RoFx Operators."

Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count VI (Conversion) (RoFx Operators): None;

Count VII (Conspiracy to Commit Conversion) (Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Mohylny; Wealthy Developments; VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count VIII (Aiding and Abetting Conversion) (Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals): Mohylny; Wealthy Developments; VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Konovalenko; Mayon Holding; Garda; Mayon UK; Tielly; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group; and Mayon USA;

Count IX (Unjust Enrichment) (RoFx Operators, Front Companies and Principals, and Layering Companies and Principals): VDD; Fokin; Hrechaniuk; Daraselia; Brass Marker; Prokopenko; Profit Media Group; Auro Advantages; Notus; Global E-Advantages; Abrykosova; Easy Com; ShopoStar; Grovee; Trans-Konsalt; Art Sea Group.

As explained more thoroughly below, in the first 252 paragraphs of the Amended Complaint, Plaintiffs describe in great detail the events that took place and each Defendants involvement in those events. However, when discussing the actual claims against Defendants (which the first 252 paragraphs reveal are based on substantially different conduct and involvement), Plaintiffs often resort to merely reciting the relevant statutory language -- and sometimes failing to include the necessary statutory language -- and stating

in a conclusory fashion that the element has been established (presumably via incorporation of the first 252 paragraphs of the Amended Complaint).

The result of this method is that the Court must then guess about which allegations support which elements and then must make inferences (which Plaintiffs do not even argue exist or otherwise request be made in their motions) on necessary elements such as Defendants' state of mind or knowledge of overarching events. Given the complexity of this task -- and the guesswork which would need to be done -- the Court is unwilling to parse through every allegation of the Amended Complaint and speculate as to which events and actions Plaintiffs believe support which elements and why.

### 1. RICO

Under RICO, it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To sustain a civil RICO claim, a plaintiff must establish four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).

"With regard to elements (1) and (2) of the four-part test under § 1962(c), the plaintiffs must establish 'conduct of an enterprise' and that the enterprise had a common goal." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1283–84 (11th Cir. 2006), a*brogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 714–15 (11th Cir. 2014) (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d

246 (1981) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.").

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

The conduct element requires application of the "operation or management" test.[6] *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017). Whether an individual meets the operation or management requirement does not depend solely on that person's rank or title within an enterprise. *Id.* "Because the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise, even lower-rung participants or virtual outsiders may, by virtue of their conduct, find themselves ensnared." *United States*

---

[6] The Eleventh Circuit uses the term "conduct" and the phrase "operated or managed" interchangeably when discussing the elements of a civil RICO claim. *Compare Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) ("To recover, a civil plaintiff must establish that a defendant *(1) operated or managed* (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." (emphasis added)) *with Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) ("To make out a RICO claim, the plaintiff must plead *(1) conduct* (2) of an enterprise (3) through a pattern (4) of racketeering activity." (emphasis added and internal quotations omitted)).

*v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014) (cleaned up) (internal citations omitted).[7] Notwithstanding the breadth of the RICO net, a plaintiff must still demonstrate that the defendant "played 'some part in directing [the enterprise's] affairs,' which includes implementing or making decisions related to its affairs." *Id.* at 1320 (quoting *United States v. Starrett*, 55 F.3d 1525, 1542, 1548 (11th Cir. 1995) (alteration in original)).

"To meet the third and fourth elements and demonstrate a pattern of racketeering activity," a plaintiff must show that the defendant committed "at least two acts of racketeering—known as 'predicate acts.'" *Cont'l 332 Fund, LLC v. Albertelli*, No. 20-13133, 2021 WL 3184586, at *3 (11th Cir. July 28, 2021) (citing *United States v. Browne*, 505 F.3d 1229, 1257 (11th Cir. 2007). A predicate act "includes any of a long list of state and federal crimes" -- including, as relevant here, wire fraud, money laundering, and interstate transportation of stolen property. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215 (11th Cir. 2020); 18 U.S.C. § 1961(1). There must be enough "facts with respect to *each* predicate act to make it independently indictable as a crime." *Id.* (emphasis added).

Civil RICO claims which involve a fraud claim must be pled with an increased level of specificity. *See* Fed. R. Civ. P. 9(b). "To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged

---

[7]     Plaintiffs' motion misattributed the source of this quotation to the Eleventh Circuit's decision in *United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995).

fraud." *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007)

(citing *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997)).

a. Enterprise

In the Amended Complaint, Plaintiffs allege that the defaulting Defendants

"constitute[] an enterprise with a common purpose 'to hide launder or otherwise

wrongfully retain the proceeds of the RoFx Scheme.'" [ECF No. 180 (citing ECF No. 64, ¶

261)]. They say that Front Companies, Layering Companies, and Cash-Out Companies

"work[ed] in tandem to accept payments from the defrauded Plaintiffs, obscure the RoFx

Scheme, and ultimately distribute the funds to the RoFx Operators after channeling them

through a global network of international banks, shell companies, and cryptocurrency

exchanges. [ECF No. 180 (citing No. 64, ¶¶ 261-65)]. Plaintiffs contend that this is sufficient

to establish an "illegitimate association-in-fact" dedicated to laundering the money stolen

from Plaintiffs.

The Supreme Court requires three structural features of an "association-in-fact"

enterprise: (1) a "purpose," (2) "relationships among those associated with the enterprise,"

and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose."

*Boyle v. United States*, 556 U.S. 938, 944, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). The

sufficiency of Plaintiffs' allegations supporting the first and third elements requires little

discussion. The purpose of the enterprise -- obtaining Plaintiffs' money under false pretense

and obscuring the ultimate destination of the money -- is well-pled based on any reading of

the Amended Complaint. Further, according to Plaintiffs, the RoFx Scheme operated

between 2018 and 2021, which is more than enough time to pursue the enterprise's nefarious purpose.

"Proving sufficient relationships for an associated-in-fact enterprise is not a particularly demanding task." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017). Plaintiffs, however, must still demonstrate that Defendants "acted as a continuing unit, and not merely independently." *Id.* Such a demonstration may often be elusive without direct evidence of a formal agreement. Although Plaintiffs' Amended Complaint does not allege facts which would support the existence of a formal agreement, the surrounding circumstances are sufficient to establish the unified nature of the task.

The RoFx Operators would need to have the account information for the bank accounts of the companies in which Plaintiffs' money would be deposited. This would require pre-deposit coordination and communication. Further, this communication would have to continue in order for the party to know where to transfer the money and when to close the bank account. Moreover, it is implausible to think that an individual would not be caught by surprise if thousands of dollars were deposited into his bank account with no prior warning. Thus, here, the conduct itself is sufficient to establish the minimum requirements of an enterprise.

b. Operation or Management

Plaintiffs allege that "[t]he RoFx Operators and the Defaulting Defendants participated in a coordinated campaign of money laundering and wire fraud." [ECF No. 180]. In Plaintiffs' view, all Defaulting Defendants meet the operation and management test

17

because "each individual and entity involved in the enterprise had a distinct and important role, ranging from receiving funds from RoFx customers, moving those funds along to other points in the Scheme, and creating the requisite structures to launder and hide the RoFx Operators' illicit gains." *Id.*

However, whether a defendant has an important or distinct role in an enterprise is not the gravamen of the operation and management test because at least "some part in *directing* the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "The critical inquiry in determining whether a RICO-defendant was involved in the 'operation or management' of the enterprise is whether the defendant 'conducted or participated in the conduct of the enterprise's affairs, not just [his or her] own affairs." *Coquina Invs. v. Rothstein*, No. 10-60786-Civ, 2011 WL 197241, at *3 (S.D. Fla. Jan. 20, 2011) (quoting *Reves*, 507 U.S. at 185).

The court's discussion in *Hpc US Fund 1 v. Wood*, No. 0:13-CV-61825-UU, 2014 WL 12496558, at *3 (S.D. Fla. June 11, 2014) illustrates this distinction well:

> [The] [p]laintiffs have pleaded with sufficient particularity how [the] [d]efendants Wellesley and Burgess participated in the alleged fraud, and have adequately pled that they participated in the operation or management of the RICO enterprise. [The] [p]laintiffs allege that Defendant Wood, through a variety of companies and individuals, perpetrated a scheme where he fraudulently conveyed [the] [p]laintiffs' real property interests for less than reasonably equivalent or fair market value, and retained the proceeds from these conveyances for his personal benefit or funneled the proceeds to entities owned or controlled by himself or [the] other [d]efendants. Wood and Burgess created Wellesley to purchase an ownership interest in Pan American. At various times, Wood was the director of Wellesley and Burgess was an officer of Wellesley. Wood represented that certain pieces of real property remained in [the] [p]laintiffs' portfolio[,] while actual [sic] transferring the property to

Wellesley at extremely reduced values or for free. Burgess executed or witnessed a number of these fraudulent transfers. Wellesley then sold at least one of these properties at below market values. [The] [p]laintiffs allege that Burgess was aware of how cash flowed from Wellesley to other companies owned by Wood and that Burgess received payments from Wood's company, Whydah, and from Wellesley.

*Id.* at *3 (internal citations to the record omitted). In contrast, the *Hpc US Fund 1* Court found

the following allegations insufficient to satisfy the operation or management test:

[The] [p]laintiffs have only alleged the following with respect to Breton: (1) that he worked out of the same office as Blackport; (2) he was previously sanctioned by the Securities [and] Exchange Commission for unrelated activity; (3) he received checks from Wood's company, Whydah; and (4) according to Wellesley's website, he was an officer of the Wellesley Fund.

*Id.* at *4 (internal citations to the record omitted).

Although Plaintiffs allege distinct actions taken by each of the Defaulting Defendants

(e.g., Wealthy Developments received funds from RoFx customers totaling at least €29,600

and $47,200 among 12 transactions between April and September of 2018 and Profit Media

Group received funds from RoFx customers totaling at least €2,000 and $84,999 among 3

transactions between January and July of 2019), many of the allegations involve similar

methodology or manner of participation in the enterprise. To the extent possible, the

Undersigned will organize the analysis by manner of participation.

First, Plaintiffs allege that many of the Defaulting Defendants operated *at the direction*

*of* RoFx Operators. For example, Plaintiffs detail VVD's involvement as follows:

151. Also, in early 2019, **the RoFx Operators activated Front Company VDD-Trading.** VDD's directors Dmytro Fokin and Manuchar Daraselia created a bank account to use for RoFx transactions.

152. Between February and November 2019, the **RoFx Operators directed** some customers to send funds to VDD. *See id.* at 3–4. Dmytro and Manuchar, using VDD's bank account, sent the funds onward as **directed by the RoFx Operators.**

153. Afterward, **the RoFx Operators directed** Dmytro and Manuchar to dissolve VDD to conceal their wrongdoing. Dmytro and Manuchar did so on October 13, 2020.

[ECF No. 64, ¶¶ 151-53 (emphasis added and footnotes removed)]. Likewise, Plaintiffs'

allegations against Brass Marker contain similar language:

146. By October 2018, the RoFx Operators were attracting more and larger investments. At this point in the scheme, the RoFx Operators were exclusively using the SWIFT network for interbank transactions. Apparently believing they could remain under the regulatory radar by distributing transactions onto another financial network, and wanting to distribute transactions through another part of Europe, **the RoFx Operators activated Front Company Brass Marker.**

147. Brass Marker, based in the Czech Republic, could establish a bank account taking advantage of the Eurozone's SEPA financial network. Brass Marker did so, via its officer Sergiy Prokopenko, and **at the direction of the RoFx Operators.**

148. Between November 2018 and January 2019, the **RoFx Operators directed** some customers to send contributions to Brass Marker. *See* Ex. 6 at 2. Sergiy, using Brass Marker's bank account, sent the funds onward as **directed by the RoFx Operators.**

*Id.* at ¶¶ 146-48 (emphasis added and footnotes removed).

Although these positions within the enterprise are certainly important to the scheme,

Plaintiffs do not allege that either of these entities made any managerial decisions or

directed any of the enterprise's affairs. To the contrary, Plaintiffs' Amended Complaint

makes it clear that both VVD and Brass Maker took action only at the direction of the RoFx

Operators. This is also true of Plaintiffs' allegations against: Wealthy Developments, *id.* at ¶ 140; Fokin, *id.* at ¶¶ 141-45, 151-53; Hrechaniuk, *id.* at ¶¶ 141-45; Daraselia, *id.* at ¶¶ 151-53; Prokopenko, *id.* at ¶¶ 146-48; Profit Media Group, *id.* at ¶¶ 149-50; Notus, *id.* at ¶¶ 171-72 Global E-Advantages, *id.* at ¶¶ 176-78 Abrykosova[8], *id.* at ¶¶ 177-78; Easy Com, *id.* at ¶¶ 179-80; ShopoStar, *id.* at ¶¶ 173-75; and Grovee, *id.* at ¶¶ 184-86.

This type of conduct does not meet the operation and management test. In their motions, Plaintiffs' Defendant-specific arguments offer little in support of their contention that this element is met. For example, when explaining why the allegations against Easy Com satisfy this element, Plaintiffs state:

> The RoFx Operators directed RoFx customers to transfer funds in excess of $3.4 million into Front Company Easy Com's two bank accounts opened around January 2021. These funds were then transferred onward to other parts of the Money Laundering Enterprise to launder and hide the funds at the behest of the RoFx Operators.

[ECF No. 180, p. 7 (internal citations to the record omitted)].

"[A]llegations that a defendant merely aided or abetted in the conduct of the enterprise or performed activities -- even when the activities are necessary -- for the operation of the enterprise are insufficient when pleading a civil RICO count." *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-60046-CIV, 2006 WL 8431505, at *6 (S.D. Fla. Jan. 20, 2006) (citing *In re Managed Care Lit.*, 298 F. Supp. 2d 1259, 1276 (S.D. Fla. 2003)). Certainly, the

---

[8]    Plaintiffs spell this Defendant's name two different ways in the Amended Complaint: Arbykosova and Abrykosova. In the paragraphs cited, it is spelled Arbykosova. However, the Undersigned will continue to spell this Defendant's name "Abrykosova," which is consistent with the Amended Complaint's case style.

activities of these Defendants are important to the RoFx scheme -- even necessary for its operation -- yet not only do Plaintiffs fail to allege any facts which support a finding that these Defendants directed any affairs of the RoFx scheme, but Plaintiffs' Amended Complaint makes clear that these Defendants acted only at the direction of the RoFx Operators.

Courts routinely dismiss claims which levy similar allegations concerning this element:

> We can divine no triable issue of fact as to whether Holmes or Habers participated in the "operation or management" of FSSC or Sebag. As Trustees concede, Lugo and Garrity were the "key" defendants and Vigman held the "de facto leadership role." Holmes and Habers were customers who exerted control only over their own accounts, not over the operation or management of the enterprise as a whole. Trustees' contention that by placing trades (or allowing others to place trades) in their own accounts at FSSC and Sebag, Holmes and Habers participated in the "operation or management" of the firms proves too much. Under Trustees' theory, each and every bank depositor who transfers funds into or out of his or her account would also qualify as a participant in the operation or management of the operation. *Reves* requires more. *Baumer v. Pachl*, 8 F.3d 1341, 1343–45 (9th Cir. 1993) (attorney who helped prepare letters and partnership agreement, and assisted in a bankruptcy proceeding, did not meet *Reves['] "operation or management"* test, as he held no "formal position in the limited partnership" and did not "play any part in directing the affairs of the enterprise"); *see also Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y. 1993) (holding that law firm's power to induce management to take certain actions was not equivalent to power to conduct or participate directly or indirectly in conduct of affairs of those corporations); *Amalgamated Bank of New York v. Marsh*, 823 F. Supp. 209 (S.D.N.Y. 1993) (holding that defendant that allegedly permitted bank to deposit embezzled funds into its own account did not conduct or participate in the operation or management of the bank's affairs for RICO purposes). In short, Holmes's and Habers' "active participation" in the scheme to defraud does not equate to "participat[ion] in the *operation or management* of the *enterprise*."

*Sec. Inv. Prot. Corp. v. Holmes*, 76 F.3d 388 (9th Cir. 1996); *see also Lavastone Cap. LLC v.*

*Coventry First LLC*, No. 14-CV-7139 JSR, 2015 WL 4940471, at *7 (S.D.N.Y. July 30, 2015) (the plaintiff's evidence of generalized statements that the defendant was a leader who made decisions and set guidelines and exercised authority to approve certain transactions was insufficient to meet the operation or management test when there were no allegations that the defendant understood "the alleged conspiracy's general nature and was aware that her actions went beyond her 'individual role'"); *Williams v. Ford Motor Co.*, 980 F. Supp. 938, 942-43 (N.D. Ill. 1997) (an automobile dealership did not participate in the operation or management of an automobile manufacturer that was claimed to be a RICO enterprise in a case arising from an alleged scheme to defraud purchasers of an extended warranty purchase plan; although the dealership processed plan applications, charged an inspection fee, and conducted repair work, it was an outsider that did not exert control over the manufacturer's affairs).

Plaintiffs' Amended Complaint establishes that Wealthy Developments, VVD, Brass Maker, Fokin, Hrechaniuk, Daraselia, Prokopenko, Profit Media Group, Notus, Global E-Advantages, Abrykosova, Easy Com, ShopoStar, and Grovee were mere participants in the enterprise who exercised no control or discretionary authority over the actions of the enterprise. Therefore, these Defendants do not meet the operation and management test.

The allegations against Defendants Garda and Tielly also fail the operation or management test. Although Plaintiffs' allegations against Garda differ slightly from the Defendants discussed above, they make clear that "Garda used her authority over Mayon UK and Mayon USA to direct Mayon agents and employees *at the behest of the RoFx Operators*

*and Konovalenko*." [ECF No. 64, ¶ 170 (emphasis added)].

The use of the term "direct" within the phrase is insufficient to attribute a managerial position to Garda. *Bank of New York Mellon v. Morandini*, No. 17-CV-22595-KMW, 2018 WL 6788858, at *1 (S.D. Fla. Oct. 3, 2018) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Likewise, although Tielly held a director role within Mayon Solutions, there are no facts alleged which support a finding that she exercised any control over the enterprise's operations.

As explained in the Amended Complaint, however, Konovalenko and the companies Mayon Holding, Mayon UK, and Mayon USA (which Konovalenko directly or indirectly controlled) were much more involved in the grander affairs of the enterprise. [ECF No. 64, ¶¶ 161-81]. For example, Konovalenko, either himself or through one of the Mayon companies, formed or directed the formation of many of the front companies. Additionally, Konovalenko took actions in order to distance himself from the money laundering scheme by selling ownership interests, purchasing other ownership interests, creating Front Companies, and directing the actions of other individuals involved in the enterprise (such as Garda, Skala, Tielly, and Anna Shymko). Thus, these four Defendants meet the operation or management test.

Likewise, the allegations against Auro Advantages, Trans-Konsalt, and Art Sea Group are also sufficient to meet the operation or management test. [ECF No. 64, ¶¶ 156-60; 190-93; 199-201]. As noted previously, many of the Defaulting Defendants took actions

exclusively at the direction of the RoFx Operators.[9] Because the RoFx Operators controlled Auro Advantages, Trans-Konsalt, and Art Sea Group directly and it was through those companies that decisions about where to send certain funds were made, as well as attempts to develop business relationships, then these entities satisfy the operation or management test. *See In re Managed Care Litig.*, 298 F. Supp. 2d at 1277.

In summary, the allegations against VVD, Brass Maker, Fokin, Hrechaniuk, Daraselia, Prokopenko, Profit Media Group, Notus, Global E-Advantages, Abrykosova, Easy Com, ShopoStar, and Grovee are insufficient to establish that any of these Defendants meet the operation or management test necessary for civil RICO liability. But the allegations against Konovalenko, Mayon Holding, Mayon UK, Mayon USA, Auro Advantages, Trans-Konsalt, and Art Sea Group demonstrate that these Defendants exercised the necessary level of control over the affairs of the enterprise.

   c.   Predicate Acts

Plaintiffs allege that the Defaulting Defendants committed the predicate acts of (1) Money Laundering, in violation of 18 U.S.C. § 1956; (2) Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957; (3) Transportation of Stolen Goods, in violation of 18 U.S.C. § 2314; (4) Sale or Receipt of Stolen Goods, in violation of 18 U.S.C. § 2315; and (5) Wire Fraud, in violation of 18 U.S.C. § 1343. Before turning to the sufficiency of Plaintiffs' allegations, the Undersigned will recite the

---

[9]    The Amended Complaint sufficiently alleges that the RoFx Operators exercised control of the actions of the enterprise in a manner which satisfies the operation and management test.

elements for each of these offenses.

A plaintiff alleging money laundering as a predicate act for a civil RICO claim must first set forth facts showing "(1) that the defendant(s) conducted or attempted to conduct a financial transaction; (2) that the transaction involved the proceeds of "specified unlawful activity"; and (3) that the defendant(s) knew the proceeds were from some form of unlawful activity." *Bryan v. Countrywide Home Loans*, No. 8:08-CV-794-T-23EAJ, 2008 WL 4790660, at *4 (M.D. Fla. Oct. 27, 2008) (citing *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999)).

Next, the allegations must satisfy either § 1956(a)(1)(A) or (a)(1)(B). *Id.* The former may be satisfied by showing that the defendant(s) acted with the intent to promote the carrying on of specified unlawful activity . . . [and] [t]he latter may be satisfied by showing that the defendant(s) knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Id.* (internal citations and quotations omitted).

To establish a violation of 18 U.S.C. § 1957, a plaintiff must demonstrate "(1) that the defendant knowingly engaged in a monetary transaction, (2) that the defendant knew the property involved derived from specified unlawful activity, and (3) that the property was of a value greater than $10,000." *United States v. Johnson*, 450 F.3d 366, 375 (8th Cir. 2006). The term "specified unlawful activity" means any act or activity constituting an offense under 18 U.S.C. § 1961(1). *United States v. Johnson*, 440 F.3d 1286, 1289 (11th Cir. 2006) (citing 18 U.S.C. § 1956(c)(7)(A)).

To prevail on predicate acts under 18 U.S.C. §§ 2314-15, a plaintiff must show that the defendant "received, possessed, transported, transmitted, or transferred in interstate commerce more than $5000 that was stolen or converted, with knowledge that the monies were stolen or converted." *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 699 (S.D. Fla. 2006), aff'd sub nom. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009).

To establish liability under the federal wire fraud statute, a plaintiff must show the following elements: "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs, (2) that they did so willingly with an intent to defraud, and (3) that the defendants used . . . interstate wires for the purpose of executing the scheme." *PortionPac Chem. Corp. v. Sanitech Sys., Inc.*, 210 F. Supp. 2d 1302, 1307 (M.D. Fla. 2002) (quoting *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000)).

Each of these offenses require proof of a scienter. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991) (section 1343 requires intent to defraud), abrogation on other grounds recognized in *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348 (11th Cir. 2018); *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992) (section 1956 requires that the defendant "knew that the proceeds stemmed from felonious activity"); *United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994) (section 1957 "requires that the defendant know that the property is 'criminally derived'"); *United States v. Montminy*, 936 F.2d 626, 627 (1st Cir. 1991) (section 2314 requires that "the defendant knew that property was converted or taken by fraud at the time of the transport").

Further, "[w]hen a RICO claim is based on predicate acts involving fraud, those predicate acts must be pleaded with particularity, in accordance with Fed. R. Civ. P. 9(b)." *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008). However, the "RICO predicate acts not sounding in fraud need not necessarily be pleaded with the particularity required by Fed. R. Civ. P. 9(b). When fraud is pleaded as an alternative claim, the non-fraud claims in the complaint need not be pleaded with particularity unless the same misrepresentation forms the basis of both the fraud and non-fraud claim." *Id.* (citing *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277–78 (11th Cir. 2006).

With these principles in mind, the Undersigned turns to the allegations against each of the defaulting Defendants:

### 1. *Money Laundering*

Plaintiffs allege that the following Defendants committed either a single or multiple predicate acts of money laundering under § 1956(a)(1): Wealthy Developments, VDD, Fokin, Hrechaniuk, Daraselia, Brass Marker, Prokopenko, Profit Media Group, Auro Advantages, Konovalenko, Mayon Holding, Garda, Mayon UK, Tielly; Notus, Global E-Advantages, Abrykosova, Easy Com, ShopoStar, Grovee, Trans-Konsalt, Art Sea Group, and Mayon USA.

The Undersigned writes to address only the scienter element of this offense. On this issue, Plaintiffs argue that "[e]ach of the Defendants knew that the proceeds were from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7). [ECF No.

180].[10] As support for this argument, Plaintiffs refer to Paragraph 269 of the Amended Complaint, which states "[a]t the time the RoFx Operators directed those transactions and the Laundering Defendants executed them, each of the Defendants knew the property involved represented the proceeds of some form of unlawful activity." [ECF No. 64, ¶ 269].

"A RICO plaintiff's allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'" *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 949 (11th Cir. 1997) (quoting *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989). Certainly, there may be additional factual allegations within the Amended Complaint which Plaintiffs might believe support an *inference* of scienter. However, Plaintiffs do not cite to or otherwise argue *why* other factual allegations support making that inference as to each Defendant. The Court will not comb through the Amended Complaint to assess this topic on a Defendant-by-Defendant basis. *See Belony v. Amtrust Bank*, No. 09-82335-CIV, 2011 WL 2297669, at *2 (S.D. Fla. June 8, 2011) (finding that a defendant's "failure to cite [ ] authority ... [made] it difficult for the Court to rule in [the defendant's] favor" and that the "deficient memorandum of law [was] itself a basis to deny [the] motion"); *see also Yuken Corp. v. Gedcore LLC*, No. 22-20661-CIV, 2022 WL 3701233, at *4 (S.D. Fla. June 21, 2022) ("Judges are not like pigs, hunting for truffles buried in briefs." (quoting *United States*

---

[10]      Plaintiffs' arguments concerning Mayon USA, which were made in their separate motion [ECF No. 189], offer no additional arguments which would alter the Undersigned's analysis. By way of example, Plaintiffs argue that "Mayon USA knew that the proceeds were from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7)." [ECF No. 189]. Thus, the single difference between the two motions on this issue is rather than saying "each of the Defendants," Plaintiffs refer to Mayon USA directly.

*v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

Thus, without assessing whether the other elements have been met, the Undersigned finds that Plaintiffs have not adequately alleged that any of the Defendants knew that the proceeds were from specified unlawful activity, as is required by § 1956(a)(1).

Plaintiffs also allege that the following Defendants committed either a single or multiple predicate acts of money laundering under § 1956(a)(2): Notus, ShopoStar, Global E-Advantages, Grovee, Wealthy Developments, Fokin, and Hrechaniuk. Although the underlying affirmative action taken differs than the action prohibited by § 1956(a)(1), the scienter elements are identical. Here, Plaintiffs argue that the Amended Complaint sufficiently establishes both theories of intent. Again, the Undersigned will address only the intent of Defendants.

As support for their claim that these Defendants' actions were done "with the intent to promote the carrying on of specified unlawful activity," Plaintiffs refer exclusively to paragraphs 280-81 of the Amended Complaint. Paragraphs 280-81 allege the following conduct:

> 280. The RoFx Operators and the Laundering Defendants knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraphs 203 to 209.

> 281. The RoFx Operators and the Laundering Defendants did so with the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(A) and (c)(7)—namely, the RoFx Scheme described in paragraphs 61 to 127.

[ECF No. 64, ¶¶ 280-81]. As with other allegations discussed above, this type of statement is

conclusory and insufficient to establish a defendant's state of mind. Referring to paragraphs 61-127 offers no additional insight, as those paragraphs merely describe the actions of RoFx (without offering any insight as to these Defendants' knowledge of the scheme).

Likewise, Plaintiffs refer to paragraphs 283-84 of the Amended Complaint as support for their theory that Defendants "knew that the funds represented the proceeds of the RoFx Scheme and that the purpose of such transportation, transmission, and transfer was to conceal or disguise the nature, location, source, ownership, or control of the proceeds." These two paragraphs offer the following allegations:

> 283. The RoFx Operators and the Laundering Defendants knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraphs 203 to 209.

> 284. The RoFx Operators and the Laundering Defendants did so knowing the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity—namely, the RoFx Scheme described in paragraphs 61 to 127—and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(B)(i) and (c)(7); specifically, the RoFx Scheme described in paragraphs 61 to 127.

[ECF No. 64, ¶¶ 283-84]. This language merely parrots the language of the money laundering statute, which is conclusory and insufficient to support default judgment.

In summary, Plaintiffs fail to explain in their motion which facts (if any) support a finding that any of these Defendants had the requisite knowledge necessary to support a money laundering charge. The paragraphs identified in Plaintiffs' motion are conclusory

and merely track the language of the money laundering statute, which is insufficient to establish money laundering as a predicate act. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987) (RICO plaintiffs must "provide some factual basis for conclusory allegations of intent"), abrogated on other grounds *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).

2. *Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity*

Plaintiffs allege that the following Defendants committed multiple violations of 18 U.S.C. § 1957: Notus, ShopoStar, Auro Advantages, Global E-Advantages, Grovee, Easy Com, Art Sea Group, Profit Media, Trans-Konsalt, VDD, Brass Marker, Wealthy Developments, Mayon UK, Daraselia, Hrechaniuk, Prokopenko, Fokin, Mayon USA, and Tielly. Plaintiffs argue that each of these Defendants engaged in multiple financial transactions which exceeded $10,000 in value. Missing from their argument, however, is *any* mention of the intent requirement.

The Eleventh Circuit has interpreted § 1957 as follows: "The statute requires that the defendant know that the property is 'criminally derived,' but it does not require that the defendant know that the property was derived from 'specified unlawful activity.' 'Criminally derived property' is defined as 'any property constituting, or derived from, proceeds obtained from a criminal offense.'" *Baker*, 19 F.3d at 614.

The earlier-noted deficiencies in Plaintiffs' money laundering allegations also exist

when assessing whether this predicate act has been sufficiently pleaded.[11] While there may be conduct within the Amended Complaint which is sufficient to infer that these Defendants were aware that the monetary transactions involved property which was criminally derived, Plaintiffs have not offered any insight into which facts establish the knowledge of each particular Defendant. The Undersigned is unwilling to parse through the Amended Complaint to make the connections that Plaintiffs should have articulated in their motions or in the Amended Complaint.

Accordingly, the Undersigned finds that there is insufficient information to support the claim of engaging in monetary transactions in property derived from specified unlawful activity as a predicate act.

3. *Interstate Transportation of Stolen Property*

Plaintiffs allege that the following Defendants committed either violations of 18 U.S.C. § 2314 or 18 U.S.C. § 2315: Global E-Advantages, Notus, Wealthy Developments,

---

[11]    In both of Plaintiffs' motions for default judgment, they cite paragraph 286 of the Amended Complaint as support for the knowledge element of this predicate act. [ECF Nos. 180; 189]. Paragraph 286 states:

> The RoFx Operators and the Laundering Defendants engaged in monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3)—namely, the RoFx Scheme described in paragraphs 61 to 127. These monetary transactions are detailed in paragraphs 203 to 209.

[ECF No. 64, ¶ 286]. This paragraph's deficiencies are greater than those discussed concerning the money laundering claim because the paragraph does not even include a knowledge allegation; instead, the paragraph treats the matter as one of strict liability, assuming that the mere fact that property was criminally derived is sufficient.

Brass Marker, Profit Media Group, VDD, Auro Advantages, ShopoStar, Easy Com, Grovee, Trans-Konsalt, Art Sea Group, Tielly, Fokin, Prokopenko, Daraselia, Hrechaniuk, Abrykosova, Mayon USA, and Konovalenko.

Here, Plaintiffs acknowledge that "[a] critical element of a Section 2314 violation is proof of scienter, namely, that the defendant knew that the [sic] property [sic] converted or taken by fraud at the time of the transport." [ECF No. 180 (quoting *Omnipol, a.S. v. Worrell*, 421 F. Supp. 3d 1321, 1352 (M.D. Fla. 2019))]. They say that "a RICO plaintiff need not produce direct evidence of scienter." *Id.* (citing *Wolff v. Leadenhall Bank & Tr.*, No. 03-22778-CIV, 2005 WL 8165194, at *3 (S.D. Fla. Apr. 1, 2005)).

Despite correctly articulating a RICO plaintiff's burden to establish scienter, Plaintiffs fail to offer any insight into how their Amended Complaint actually establishes either direct or circumstantial evidence of any of these Defendants' states of mind. Plaintiffs point to paragraph 291 as establishing scienter for the § 2314 violations and paragraph 294 as establishing scienter for the § 2315 violations, which state:

> 291. The RoFx Operators and the Laundering Defendants did so knowing the money was stolen, converted, or taken by the RoFx Scheme's fraud or artifice.
>
> ***
>
> 294. The RoFx Operators and the Laundering Defendants did so knowing the money had been stolen, unlawfully converted, or taken via the RoFx Scheme.

[ECF No. 64, ¶¶ 291, 294].

Similar to Plaintiffs' allegations of scienter concerning the other predicate acts, these allegations are conclusory and fail to sufficiently plead the knowledge element of this

34

predicate act. *See Twombly*, 550 U.S. at 557, 127 S.Ct. 1955 ("Naked assertions devoid of further factual enhancement will not suffice.").

### 4. Wire Fraud

Finally, Plaintiffs allege that the following Defendants committed the predicate act of wire fraud: Notus, ShopoStar, Auro Advantages, Global E-Advantages, Grovee, Easy Com, Art Sea Group, Brass Marker, Profit Media Group, Trans-Konsalt, VDD, Wealthy Developments, Abrykosova, Daraselia, Hrechaniuk, Prokopenko, Mayon USA, and Fokin.

When a RICO plaintiff alleges wire fraud as an underlying predicate act, the allegations must meet Rule 9(b)'s heightened pleading standard. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). To satisfy this standard, a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks*, 116 F.3d at 1380–81. "The plaintiff must allege facts with respect to *each* defendant's participation in the fraud." *Am. Dental Ass'n*, 605 F.3d at 1291 (emphasis added).

Although Plaintiffs specifically identify each of these Defendants' wire-based transactions, they rely on the following general allegation concerning the four elements required under Rule 9(b):

> 296. With specific intent to defraud, the RoFx Operators and the Laundering Defendants knowingly devised or participated in a scheme to defraud the Plaintiffs by means of material misstatements and omissions, specifically that Plaintiffs' contributions:

a. would be utilized by RoFx's forex robot trading platform to make trade decisions on behalf of Plaintiffs and for Plaintiffs' benefit, as set forth in paragraphs 61 to 70 and 102 to 127;

b. would be committed to foreign exchange trading so that Plaintiffs could receive a return on investment in the form of a percentage of RoFx's daily trading profit, as set forth in paragraphs 65 to 67 and 102 to 127;

c. could be withdrawn by Plaintiffs at their discretion, as set forth in paragraphs 81 to 91 and 110;

d. would remain in each respective Plaintiffs' accounts for their own use, as set forth in paragraph 111; and

e. would increase in value because the RoFx Scheme would be partnering with Warren Buffet and Berkshire Hathaway, as set forth in paragraph 87 to 90 and 114.

[ECF No. 64, ¶ 296].

This type of general allegation is insufficient to meet Rule 9(b)'s heightened pleading standard. The problem with this type of general assignment of misrepresentations is evidenced by the impossibility created by Plaintiffs' allegations. Although Plaintiffs attribute the fraud described in paragraph 82 to each of these Defendants, the fraudulent acts described in this paragraph purportedly began in 2018 and Defendants Global E-Advantages, Easy Com, and Grovee did not even become involved in the enterprise until 2020. [ECF No. 64, ¶¶ 176, 180, 182]. Thus, these fraudulent misrepresentations, despite being attributed to them in the Amended Complaint, could not have been made by Global E-Advantages, Easy Com, and Grovee.

Even if there were no factual impossibilities within Plaintiffs' allegations, their

general attribution of all fraudulent statements to each instance of wire fraud is impermissible. A RICO complaint "must set forth facts establishing the asserted scheme to defraud and the specific facts of *each* alleged crime of mail or wire fraud. The RICO claim, in other words, must read like a 'mini-indictment,' alleging separate 'counts' of mail or wire fraud." *Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1376 (S.D. Fla. 2012) (emphasis added). Plaintiffs' Amended Complaint fails to provide any transaction-based specifics and, instead, attributes every transaction to every purported misrepresentation described in the RoFx Scheme.

Finally, Plaintiffs fail to point to any specific allegation establishing each Defendant's scienter. *Id.* ("[T]he plaintiff must demonstrate that the defendants acted with scienter, i.e., a specific intent to defraud.").

In summary, because Plaintiffs' allegations fail to satisfy Rule 9(b)'s heightened pleading standard and Plaintiffs have failed to identify which paragraphs in the Amended Complaint (if any) establish the scienter of each of these Defendants, Plaintiffs' wire fraud allegations cannot serve as a predicate act.

   d.  <u>Pattern of Racketeering Activity</u>

[For purposes of this section of the analysis, the Undersigned operates as if the predicate acts had been sufficiently pleaded (which they have not). This is because there is a chance Plaintiffs may seek to amend their Complaint a second time in order to fix any deficiencies concerning the predicate acts. As explained below, even if the predicate acts were all appropriately pleaded (which they are not), there would still be myriad issues with

Plaintiffs' RICO claims against many of the Defaulting Defendants.].

In order to establish a pattern of racketeering activity, a RICO plaintiff must allege "at least two acts of racketeering activity." 18 U.S.C. §§ 1962(c), 1961(5). An act of racketeering activity, commonly known as a "predicate act," includes any of a long list of state and federal crimes. *See* 18 U.S.C. § 1961(1). A plaintiff must put forward sufficient facts as to each predicate act to make it independently indictable as a crime. *See Brooks*, 116 F.3d at 1381.

In addition to alleging the minimum number of indictable predicate acts, "a plaintiff must plausibly allege that the defendant is engaged in 'criminal conduct of a continuing nature.'" *Cisneros*, 972 F.3d at 1216 (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original)). A plaintiff can establish continuing criminal conduct in two ways: (1) "a series of related predicates extending over a substantial period of time" or (2) "the threat of continuity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242, 109 S. Ct. 2893, 2902, 106 L. Ed. 2d 195 (1989).

As explained by the Supreme Court,

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*Id.*

"Because the language of § 1962(c) provides for liability for a person engaged in a

RICO enterprise, not the enterprise itself, the elements of a cause of action under § 1962(c) must be alleged as to each individual defendant." *Emess Cap., LLC v. Rothstein*, No. 10-60882-CIV, 2011 WL 13214302, at *4 (S.D. Fla. Mar. 9, 2011), report and recommendation adopted, No. 10-60882-CIV, 2011 WL 13214308 (S.D. Fla. Dec. 21, 2011) (citing *De Falco v. Bernas*, 244 F.3d 286, 306 (1st Cir. 2001)); *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987).

Thus, "[i]n determining whether a pattern has been stated against any particular defendant, the court considers only the alleged offenses in which that defendant was purportedly involved, directly or indirectly, or for which that defendant bears some responsibility." *See* Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11.D.2.c., at 198 (5th ed.); *see also Cisneros*, 972 F.3d at 1215 ("Beyond establishing the existence of a RICO enterprise, a plaintiff must allege that *each defendant* participated in the affairs of the enterprise through a 'pattern of racketeering activity[.]'" (emphasis added)); *Al-Ghena Int'l Corp. v. Radwan*, No. 13-61557-CIV, 2013 WL 12237726, at *4 (S.D. Fla. Dec. 23, 2013) ("[A pattern of racketeering activity] must be pled with particularity under Rule 9(b) as against each [d]efendant."); *Pulphus v. Sullivan*, No. 02 C 5794, 2003 WL 1964333, at *9 (N.D. Ill. Apr. 28, 2003) ("To be held liable under § 1962(c), each defendant must have engaged in a pattern of racketeering activity, evidenced by the commission of at least two predicate acts.").

Applying this principle, courts have not been reluctant to reject RICO claims against individual defendants in a RICO enterprise, even if the enterprise as a whole satisfies the continuity requirement. For example, in *Banks v. Wolk*, 918 F.2d 418, 419 (3d Cir. 1990), the court examined the district court's denial of the plaintiff's motion to amend his complaint

"on the grounds that the amended complaint would still fail to state a RICO claim." Although the initial complaint (which was dismissed) alleged a RICO claim against multiple entities based on only a single fraudulent real estate transaction, the proposed amended complaint contained six additional allegations against two of the defendants concerning fraud related to real estate transactions, including the initial fraudulent real estate transaction. The Third Circuit conducted a defendant-by-defendant analysis and stated this about two defendants who were involved in only the real estate transaction from the initial complaint:

> In this case, defendants Wolk and Weiner are alleged only to have participated in the AP Building fraud, and there is no indication that either was involved, directly or indirectly, in any of the additional schemes. Consequently, we must consider only the AP Building scheme allegations in determining whether a sufficient "pattern" has been alleged against either Wolk or Weiner. Even if the AP Building scheme were part of a pattern of acts committed by the Cohens, the additional schemes cannot affect the liability of Wolk or Weiner, since they neither participated in those frauds nor agreed to their commission.

*Id.* at 421.

Likewise, in assessing the sufficiency of a RICO allegation involving two episodes occurring years apart, in which only two defendants (Gleason and Foster) participated in both, the First Circuit stated the following:

> We recognize that, as pleaded, the 1986 and 1988 episodes each featured serial transactions that had some common reference points, most notably the victims' identities and the Gleason/Foster axis. Moreover, the purposes of the underlying transactions were at least similar. But notwithstanding these facts, plaintiffs' RICO claim founders on the bald assertion that these two episodes, nearly two years apart in time, hundreds of miles apart in space, and involving two largely distinct groups of participants, were somehow pieces of a unitary scheme. We fully agree with the court below that the facts as alleged,

while arguably sufficient to show relatedness with regard to the actions of common participants such as Gleason and Foster, did not implicate any of the other defendants in the same way. No allegations appeared suggesting that, say, Humes or Commonwealth Federal were involved in the 1986 episode, or that Evans, the Swartz Firm, Sweet, or Carthage Federal were involved in the 1988 episode. In the absence of any demonstrable imbrication, the plaintiffs' claim that these episodes were successive segments in a single scheme implicating the defendants' collective actions is nothing more than a conclusory assertion which need not be honored under Rule 12(b)(6).

*Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 44–45 (1st Cir. 1991), abrogated on other grounds

*Salinas v. United States*, 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

Plaintiffs argue that default judgment is appropriate based upon either theory of continuity: closed- or open-ended. Thus, the Undersigned will address each theory in turn:

Although courts have not established a bright line rule for the amount of time necessary to establish close-ended continuity, they have provided guidance about what is an insufficient amount of time. The Eleventh Circuit has explicitly held that six to nine months is insufficient. *Aldridge v. Lily–Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir. 1992) (holding that a mail fraud scheme lasting approximately six months "was accomplished in too short a period of time . . . to qualify it as a pattern of racketeering activity"); *Jackson*, 372 F.3d at 1265 (admitting that "[t]he overwhelming weight of case authority suggests that nine months is not an adequately substantial period of time" and holding that [i]n view of the narrow scope of the alleged racketeering activity and the [nine-month time] frame in which it is said to have taken place, the district court correctly held that the plaintiffs did not meet the closed-ended continuity requirement necessary to sustain a RICO violation").

In other jurisdictions, courts have rejected schemes which have lasted between six months and two years. *See, e.g., Efron v. Embassy Suites (P. R.), Inc.*, 223 F.3d 12 (1st Cir. 2000) (finding no closed-ended continuity where predicate acts occurred over 21–month period); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (stating that the Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time'"); *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467–68 (2d Cir. 1995) (finding that courts of appeals have consistently considered eleven months to be insufficiently "substantial"); *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("[T]welve months is not a substantial period of time."); *Menasco v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (finding no continuity when predicate acts with a single goal occurred over a one-year period); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (finding seventeen-month period insufficient to show continuity); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (concluding that thirteen months is not a substantial period of time); *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 407 (8th Cir. 1999) (holding that ten-month period is "too short" to constitute substantial period for purposes of closed-ended continuity); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366–67 (9th Cir. 1992) ( "We have found no case in which a court [of appeals] has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").

Further, in assessing the relevant duration, courts look only to the period of time during which the predicate acts were committed, not the period of time underpinning the entire scheme. *Emess Cap., LLC*, 2011 WL 13214308, at *4 (rejecting argument that the

42

relevant period should begin when the defendant began the scheme in 2005 and considering only the seven-week period in 2009 in the continuity analysis); *Norfolk S. Ry. Co. v. Boatright R.R. Prod., Inc.*, No. 2:17-CV-01787-AKK, 2018 WL 2299249, at *5 (N.D. Ala. May 21, 2018), on reconsideration in part, No. 2:17-CV-01787-AKK, 2019 WL 1199836 (N.D. Ala. Mar. 14, 2019) ("For purposes of, at least, the closed-ended continuity analysis, the relevant time period encompasses 'the specific incidents . . . actually charged.'" (quoting *Jackson*, 372 F.3d at 1266)); *Feinstein*, 942 F.2d at 46, *abrogation on other ground recognized in United States v. Velazquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021) (holding that "in assessing the longevity of a RICO scheme involving mail fraud, the scheme's duration must be measured by reference to the particular defendant's fraudulent activity"); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) ("The relevant period . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place.").

Plaintiffs allege that the following Defendants satisfy close-ended continuity based on the length of their conduct:

- **Notus.** The RoFx Operators repeatedly directed customers to send funds to Notus between about October 2019 and July 2021—a period of 21 months— which is sufficient to establish close-ended continuity. [ECF No. 64, ¶ 172].

- **ShopoStar.** The RoFx Operators repeatedly directed customers to send funds to ShopoStar between about January 2020 and September 2021—a period of 20 months—which is sufficient to establish close-ended continuity. *Id.* at ¶ 173.

- **Auro Advantages.** The RoFx Operators repeatedly directed customers to send funds to Auro Advantages between about April 2019 and September 2021—a period of 29 months—which is sufficient to establish close-ended continuity. *Id.* at ¶ 157.

- **VDD.** The RoFx Operators repeatedly directed customers to send funds to VDD between about February 2019 and November 2019 before dissolving it in October 2020—a total period of 20 months—which is sufficient to establish close-ended continuity. *Id.* at ¶¶ 152–53.

- **Fokin** served as director of Front Companies VDD and Aware Choice—creating and managing their bank account transactions from 2018 to 2021.

- **Konovalenko** served as either owner, member, director, or manager of each of the Mayon entities at some point between August 2019 to present. *Id.* at ¶ 170.

- **Daraselia** served as director of VDD between early 2019 and its dissolution on October 13, 2020, a period sufficient to establish close-ended continuity. *Id.* at ¶¶ 151–53.

- **Hrechaniuk** served as director of Aware Choice between at least June 2018 and its dissolution on March 23, 2021, a period sufficient to establish close-ended continuity. *Id.* at ¶¶ 146–48.

- **Tielly** served as either owner or director during the period between March 2018 and present, a period sufficient to establish close-ended continuity. *Id.* at ¶ 170(c).

- **Garda** served as member and shareholder of Defendants Mayon Solutions LLC and Mayon Holding between April 2019 and July 2020, a period sufficient to establish close-ended continuity. *Id.* at ¶ 170.

- **Mayon UK** served as a tool to buy Front Companies for use in the RoFx Scheme between August 2019 and September 2021—a total period of 23 months—which is sufficient to establish close-ended continuity. *Id.* at ¶¶ 165, 170.

[ECF No. 180].

- **Mayon USA** conducted illicit transactions (both directly and indirectly through the Front Companies it created) in furtherance of the RoFx Scheme between at least April 2019 and March 2021—a period of 22 months—which is sufficient to establish close-ended continuity.

[ECF No. 189].

   In determining whether conduct satisfies close-ended continuity, the court looks not

only to the length of time of the alleged pattern of racketeering activity, the court may also consider "'number of victims, number of racketeering acts, variety of racketeering acts, whether the injuries were distinct, complexity and size of the scheme, and nature or character of the enterprise or unlawful activity.'" *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011) (quoting *Ward v. Nierlich*, 617 F. Supp. 2d 1226, 1238 (S.D. Fla. 2008)).

Although the RoFx enterprise's scheme is vast and complex, many of the individual Defendants' roles are isolated in nature, serving as temporary conduits for the illegally procured funds. Thus, while the evaluation for certain Defendants may be allotted more leeway on the length of time necessary to satisfy closed-ended continuity, the analysis for others will not.

The alleged predicate acts for Defendants Notus, ShopoStar, Fokin, VDD, Daraselia, Hrechaniuk, and Garda span less than two years. [ECF No. 64 ¶¶ 141-44, 151-52 (Fokin received and sent funds through Aware Choice and VDD during a 19-month span); Hrechaniuk (Hrechaniuk received and sent funds through Aware Choice during a 19-month span); ¶ 152 (VDD and Daraselia received and sent funds during a ten-month span); ¶ 170 (Garda was connected to the Mayon entities for 16 months); ¶ 172 (Notus received and sent funds during a 21 month span); ¶¶ 173-74 (ShopoStar received and sent funds during a 20 month span)].

In *Magnifico*, the court admitted that its finding that close-ended continuity was satisfied -- which concerned allegations spanning 18 months, involving "mail fraud, wire

fraud, immigration document fraud, and human trafficking and forced labor" -- was a close

call on a *motion to dismiss*, recognizing that the facts were viewed in the light most favorable

to the plaintiff and that more discovery was appropriate. 783 F. Supp. 2d at 1229. Too many

of the factors which weighed in favor of finding closed-ended continuity in *Magnifico* are not

present here. Thus, the Undersigned finds that Plaintiffs have not sufficiently alleged close-

ended continuity for these Defendants.

In contrast, the allegations against Auro Advantages, Konovalenko, Tielly, Mayon

USA, and Mayon UK satisfy the close-ended continuity requirement based on either length

of time alone or on length of time plus the characteristics of their activity. Auro Advantages'

alleged predicate acts span 29 months, which is a sufficient period of time. [ECF No. 64, ¶

157]. Konovalenko's actions span 25 months, and he was involved with all Mayon entities,

as well as Notus, ShopoStar, Global E-Advantages, and Easy Com, which is sufficient due to

the length of time -- and because of the complexity of the scheme and alleged predicate acts.

*Id.* at ¶¶ 161-81.

Mayon USA, which was connected to Konovalenko and interacted with many other

players of the RoFx Scheme, participated for 22 months, but still satisfies close-ended

continuity based on the complexity of its involvement. Likewise, Tielly and Mayon UK's

involvement spans 25 months, and they were also involved in acquiring Notus, ShopoStar,

Global E-Advantages, and Easy Com, which is sufficient due to the length of time and the

complexity of the scheme and alleged predicate acts. *Id.*

In summary, the only defaulting Defendants whose actions satisfy the close-ended

continuity theory for a patten of racketeering are Auro Advantages, Konovalenko, Tielly, Mayon USA, and Mayon UK.

In support of their theory of open-ended continuity, Plaintiffs state that they "established that each of these Defendants committed the predicate acts as part of their regular course of business and will continue unless and until they are prevented from committing such acts, thereby satisfying open-ended continuity." [ECF No. 180 (citing ECF No. 64, ¶ 299); 189 (making the same allegation but substituting "each of these Defendants" with "Mayon USA")]. As factual support for this argument, Plaintiffs cite paragraph 299 of the Amended Complaint, which, in relevant part, states "[Defendants'] commission of these predicate acts is part of a general course of business and will continue unless and until they are prevented from committing such acts." [ECF No. 64, ¶ 299].

A conclusory allegation that acts will continue until the defendants are prevented from continuing to commit such acts is insufficient to establish open-ended continuity. *MasTec Renewables Puerto Rico LLC v. Mammoth Energy Servs., Inc.*, 494 F. Supp. 3d 1233, 1240 (S.D. Fla. 2020) ("[S]imply relying on conclusory allegations that, once begun, the alleged misconduct threatens to continue into the future, is insufficient [to establish open-ended continuity]." (cleaned up)); *see also Kivisto v. Miller, Canfield, Paddock & Stone*, PLC, 413 F. App'x 136, 138 (11th Cir. 2011); *Bank of New York*, 2018 WL 6788858, at *1 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Moreover, this threat of continuity is undermined by other allegations within the

Amended Complaint. For example, it is directly contradicted by an earlier paragraph, which states that "[o]n or about September 17, 2021, the RoFx Operators shut down RoFx.net and stopped responding to customers." [ECF No. 64, ¶ 127]. Similarly, many of the named corporate Defendants are no longer in business and have admittedly been dissolved. *See id.* at ¶ 145 (Aware Choice was dissolved on March 23, 2021); ¶ 153 (VVD was dissolved on October 13, 2020); ¶ 181 (Notus was dissolved on September 16, 2021).

In "open-ended" cases that rely on alleging the threat of continuity, plaintiffs can meet their burden by establishing either that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Jackson*, 372 F.3d at 1265.

As explained by the Eleventh Circuit, it is "clear that single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." *Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009); *see also Aldridge*, 953 F.2d at 593–94 (concluding that a scheme to deprive employees of their vacation benefits for the year 1982 did not pose a threat of repetition despite the fact that the defendant company allegedly continued to take steps to conceal their wrongdoing).

Here, the RoFx scheme has a definitive ending point: the day the website shut down and the RoFx Operators stopped responding to the duped customers. The possibility that these people might engage in similar behavior in the future is insufficient. If that were the case, then nearly every scheme in which the defendants are not criminally prosecuted and

incarcerated would meet the requirements for open-ended continuity. Plaintiffs have alleged no specific threat beyond their unsupported, conclusory allegation, which falls well short of establishing open-ended continuity.

In summary, only Auro Advantages, Konovalenko, Tielly, Mayon USA, and Mayon UK's actions constitute a pattern of racketeering (based on a theory of closed-ended continuity). The allegations against all other Defendants fail on this element.

e.  Conclusion

Plaintiffs fail to establish that they are entitled to a default judgment on their RICO claim against any of the Defaulting Defendants. Although Plaintiffs successfully pleaded an enterprise, a required element (or multiple elements) is lacking for each of the Defaulting Defendants. Concerning the second element, only Konovalenko, Mayon Holding, Mayon UK, Mayon USA, Auro Advantages, Trans-Konsalt, and Art Sea Group satisfy the operation or management test. Concerning the third and fourth elements, Plaintiffs have not sufficiently pleaded or argued that any predicate act has been established for any of the Defaulting Defendants and, even if they had, only Auro Advantages, Konovalenko, Tielly, Mayon USA, and Mayon UK's actions would satisfy the continuity element.

Because of these deficiencies, the Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment on Count I.

2.  **RICO Conspiracy**

Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c). 18 U.S.C. § 1962(d). "A

plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d at 950 (quoting *United States v. Church*, 955 F.2d 688, 694 (11th Cir. 1992)).

However, a conspiracy by itself "furnishes no cause of action." *Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1311 (11th Cir. 2000). "The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed. If the underlying cause of action is not viable, [then] the conspiracy claim must also fail." *Id.*; *see also Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007) ("[W]here a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails.").

As discussed earlier, Plaintiffs' substantive RICO count fails due to deficiencies in the operation or management test, continuity, the underlying predicate acts, or a combination of deficiencies (due to the deficiencies concerning the underlying predicate acts, the RICO Count would fail against all Defendants). The Amended Complaint offers no additional factual allegations which would support a different finding on these issues as it concerns Plaintiffs' RICO conspiracy count. Therefore, Plaintiffs are not entitled to default judgment on Count II. *See Emess Cap., LLC*, 2011 WL 13214302, *10-11 (granting motion to dismiss as to RICO conspiracy claims when allegations supporting Section 1962(c) claim failed to establish actual RICO violation).

3. **Common Law Fraud**

50

Plaintiffs seek entry of a default judgment against Mohylny, Ester Holdings, and The Investing Online for common law fraud.

To sustain a common law fraud claim under Florida law, a plaintiff must establish "(1) a false statement of material fact; (2) [the] [d]efendant's knowledge that the statement is false; (3) [the] [d]efendant's intention that [the] [p]laintiffs rely on the statement; and (4) injury to [the] [p]laintiffs acting in reliance on the statement." *Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825, 829 (S.D. Fla. 1996) (citing *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)). "'[C]ommon law fraud claims are generally duplicative to the RICO claims that are premised upon multiple acts of . . . fraud.'" *Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*, No. 612CV1138ORL40DAB, 2015 WL 12839138, at *7 (M.D. Fla. Feb. 16, 2015) (quoting *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1323 (S.D. Fla. 2009)). "The essential difference is that, to prove a common law fraud claim, a plaintiff must have actually relied on [the] defendant's false representation such that it caused [the] plaintiff's injury." *Id.*

As with other fraud claims, charges of common law fraud must comply with Rule 9(b)'s heightened pleading standard. *See Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286–89 (S.D. Fla. 2011) (applying Rule 9(b) to claims for securities fraud under Florida Securities and Investor Protection Act, negligent misrepresentation, and common-law fraud). When specific factual information is "peculiarly within the defendant's knowledge or control," the Eleventh Circuit permits this heightened pleading standard to be applied less stringently. *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15,

2003).

> Elaborating on this concept, the Eleventh Circuit has offered the following guidance:
>
> Rule 9(b)'s heightened pleading requirement also may be applied less stringently when the "fraud allegedly occurred over a period of time." *Fujisawa Pharm. Co. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill .1993); *see also Lab. Corp. of Am.*, 290 F.3d at 1314 n.25 (acknowledging that Rule 9(b)'s heightened pleading requirement may be relaxed "in appropriate circumstances to aid those alleging prolonged multi-act schemes"). In that instance, the plaintiff is not required to provide "a detailed allegation of all facts supporting each and every instance of submission of a false claim," *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002), but the complaint must set forth a representative sample "detail[ing] ... the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them," *Lab. Corp. of Am.*, 290 F.3d at 1310 (internal quotation marks omitted).

*Id.* at *5 n.6.

Plaintiffs aver that this relaxed interpretation of Rule 9(b) should be applied when assessing their common law fraud claim. Concerning Mohylny, Plaintiffs allege that he was involved with the myriad false statements on the RoFx domain, including its fraudulent trading background, its customer base, the effectiveness of its AI, and the illusory performance of the duped customers' accounts. [ECF No. 64, ¶¶ 63-76, 313]. Ester Holdings published false "daily RoFx trading activity" on MyFxBook.com. *Id.* at ¶¶ 81, 124, 313. Lastly, The Investing Online made and published or caused to be published multiple articles online which parroted the claims being made on the RoFx website. *Id.* at ¶¶ 82, 87, 125, 313.

Although Plaintiffs do not include the specific time frame of each and every misrepresentation, given the complexity of the scheme and the fact that much of this more precise information would be exclusively in the possession of Defendants, this level of detail

is unnecessary. The purpose of Rule 9(b)'s particularity requirement is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotations omitted). The level of detail in the Amended Complaint concerning the nature and source of each misrepresentation is sufficient to accomplish that purpose.

The second and third elements -- knowledge of the falsehood and intent that Plaintiffs rely on the statement -- are readily established via the allegations in the Amended Complaint. As explained in the Amended Complaint, there was never any artificial trading algorithm, there were never any profits, the customer base was exorbitantly inflated, and the performance of Plaintiffs' portfolios were fabricated. Given the complete lack of veracity of every single claim made by RoFx, it is implausible that any of these Defendants would have believed any of their misrepresentations were accurate. Likewise, the Amended Complaint establishes that the purpose of these statements was to induce people to "invest" their money with RoFx so that the RoFx operators could then steal the money.

For the final element, Plaintiffs must show that they relied on these misrepresentations and that it caused them injury. The injury suffered by Plaintiffs is identical in substance: after the RoFx website went offline, each of them lost all or nearly all of the money they invested with RoFx. However, Plaintiffs' path to their injury varies. Beneath is a summary of the misrepresentations each of the named Plaintiffs relied upon in choosing to invest with RoFx:

53

Ryan Birmingham: (1) "forex trading review sites, Google searches, and Trustpilot"; and (2) the RoFx website [ECF No. 64, ¶¶ 210-15];

Roman Leonov: (1) "promotions on Facebook and Reddit and via Trustpilot reviews"; (2) MyFxBook.com; (3) press releases; and (4) the RoFx website *Id.* at ¶¶ 216-32;

Steven Hansen: (1) information obtained from Google searches boasting about RoFx's success; and (2) the RoFx website *Id.* at ¶¶ 233-36;

Jonathan Zarley: (1) Facebook ads, Google searches, and RoFx's website; and (2) MyFxBook.com *Id.* at ¶¶ 237-44

Mitchell Parent: (1) "a series of Facebook ads sowing [sic] false information"; (2) the RoFx website; (3) MyFxBook.com; and (4) online articles *Id.* at ¶¶ 245-52.

In summary, all named Plaintiffs relied on the misrepresentations of Mohylny and The Investing Online because each of them visited the RoFx website and read the online articles which The Investing Online caused to be published. However, the allegations of the Amended Complaint establish that only Plaintiffs Leonov, Zarley, and Parent visited MyFxBook.com, which is where Ester Holdings made its misrepresentations. Thus, default judgment against Ester Holdings in favor of Birmingham and Hansen is unsupported because the Amended Complaint does not establish that either Birmingham or Hansen's injuries are attributable to any of Ester Holdings' misrepresentations.

Accordingly, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' request for default judgment on Count III in whole against Defendants Mohylny and The Investing Online. Further, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs Leonov's, Zarley's, and Parent's request for default judgment

on Count III against Defendant Ester Holdings and **deny** Plaintiffs Birmingham's and

Hansen's request for default judgment against Defendant Ester Holdings.

4. **Conspiracy to Commit Fraud, Aiding and Abetting Fraud, Conspiracy to Commit Conversion, and Aiding and Abetting Conversion**

Although the specifics of these Counts vary slightly based on differences in the

underlying tort and the level of action required for liability, they each share the same

knowledge requirement.

A civil conspiracy -- whether based on fraud or conversion -- requires: "(a) an

agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by

unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d)

damage to plaintiff as a result of the acts done under the conspiracy.'" *Charles v. Fla.*

*Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008) (quoting *Raimi v.*

*Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). "Each coconspirator need not act to

further a conspiracy; each 'need only know of the scheme and assist in it in some way to be

held responsible for all of the acts of his coconspirators.'" *Id.* at 1161 (quoting *Donofrio v.*

*Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987) (also stating that "[t]he existence of a

conspiracy and an individual's participation in it may be inferred from circumstantial

evidence")).

When alleging a conspiracy based on fraud, "[i]t is enough . . . to detail the relevant

aspects of the underlying fraud (with the possible exception of facts that are within [the]

[d]efendants' exclusive knowledge or control); to explain the factual basis for concluding

that Defendants were aware of the fraud; and, to explain the factual basis for determining that they substantially assisted in its commission." *Leader Trade Sols. Corp. v. Dell World Trade LP, L.L.C.*, No. 09-22701-CIV, 2010 WL 11506346, at *10 (S.D. Fla. Feb. 16, 2010); *see also Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1297 (M.D. Fla. 2018) (applying this standard to a conspiracy to defraud claim).

Aiding and abetting shares similar elements. Although no Florida court has explicitly recognized a cause of action for aiding and abetting fraud, Florida courts have assumed that the cause of action exists. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017) (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 371–72 (Fla. 5th DCA 2005)).

Operating under this assumption, "Florida courts have presumed that a tort claim for aiding and abetting fraud has three elements: (1) the existence of 'an underlying fraud'; (2) that '[t]he defendant had knowledge of the fraud'; and (3) that '[t]he defendant provided substantial assistance to advance the commission of the fraud.'" *Id.* at 1097-98 (quoting *ZP No. 54 Ltd. P'ship*, 917 So. 2d at 372) (alterations in original). Courts have acknowledged that these elements differ only concerning the nature of the underlying wrongdoing. *Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, No. 15-CV-60653, 2015 WL 12862724, at *5 (S.D. Fla. Aug. 20, 2015) ("[T]he elements of aiding and abetting are the same for both [aiding and abetting breach of fiduciary duty and aiding and abetting conversion].").

Thus, the differences between these claims are only whether the underlying tort is fraud or conversion and whether the individual defendant was required to only "assist the

conspiracy in some way" or was required to "provide substantial assistance to advance the commission of the [tort]." Importantly, for purposes of this analysis, these offenses share the requirement that the defendant have knowledge of the tort or the scheme.

While Plaintiffs' Amended Complaint thoroughly details the aspects of the underlying tort as well as each Defendant's specific overt acts or substantial assistance, their allegations concerning knowledge of the tort are (again) conclusory, stating only that

> Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals agreed to participate with one or more of the RoFx Operators to commit the fraud detailed in Count III, *supra*, doing so knowing they were furthering or concealing the fraud or, alternatively, doing so recklessly knowing the predictable result of their actions would further or conceal the fraud.

> \*\*\*

> Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals aided the RoFx Operators to commit or conceal the fraud detailed in Count III, *supra*, doing so knowing they were assisting the RoFx Operators commit or conceal the fraud or, alternatively, doing so recklessly, knowing the predictable result of their actions would assist the RoFx Operators to commit or conceal the fraud.

> \*\*\*

> Peter Mohylny and the Promoter Defendants, Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals, agreed to participate with the RoFx Operators to commit conversion as detailed in Count VI, *supra*, doing so knowing they were furthering or concealing conversion of the RoFx customers' funds or, alternatively, doing so recklessly knowing the predictable result of their actions would further or conceal conversion of the RoFx customers' funds.

> \*\*\*

> Peter Mohylny and the Company Organizer Defendants, Front Companies and Principals, and Layering Companies and Principals, aided the RoFx Operators to commit or conceal the conversion detailed in Count VI, *supra*, doing so knowing they were assisting the RoFx Operators to commit or conceal the conversion or, alternatively, doing so recklessly knowing the predictable result of their actions would assist the RoFx Operators to commit or conceal the conversion.

[ECF No. 64, ¶¶ 319, 324, 334, 339].

Absent from this thread-bare recitation of knowledge is any reference to which paragraphs in the Amended Complaint establish that each Defendant was aware of the fraudulent scheme in which they were participating or abetting. Plaintiffs' motions offer no additional guidance. [ECF Nos. 180; 189].

For example, in support of their argument for a default judgment on the conspiracy to commit fraud claim, Plaintiffs state only that "[a]s outlined below, each of the Defaulting Defendants agreed to participate with one or more of the RoFx Operators to commit the fraud detailed in Count III of the Amended Complaint, doing so knowing they were furthering or concealing the fraud or, alternatively, recklessly knowing the predictable result of their actions would further or conceal the fraud" and citing to paragraph 319 of the Amended Complaint. [ECF No. 180; 189 (making the same argument, but in the singular as to Mayon USA)].

A cursory review of the Amended Complaint reveals the problems created by the lackluster efforts to plead knowledge for many of the Defendants. For example, the allegations against Jase Victor Davis (who is not one of the Defaulting Defendants but is

charged in this Count) illustrate the insufficiency of Plaintiffs' knowledge allegations. All substantive allegations against Davis are contained in a single paragraph of the Amended Complaint:

> On December 3, 2020, Mayon facilitated the transfer of Easy Com to Jase Victor Davis, who acted as agent for the RoFx Operators. Davis opened two bank accounts for Easy Com around January 2021 and was the sole signatory on these accounts. From that point forward, the RoFx Operators directed RoFx customers to deposit at least $3.4 million into Easy Com's accounts, which Davis sent onward as directed by the RoFx Operators.

[ECF No. 64, ¶ 180].

This paragraph offers no facts supporting the conclusory statement that Davis was an "agent for the RoFx Operators" or what is meant by the fact that Mayon facilitated that transfer. Essentially (and without even making the argument), Plaintiffs ask that the Court infer that because money was sent to a bank account controlled by Davis and he forwarded it on, Davis must have been aware of the fraudulent scheme. There are limits to the inferences a Court is required to make. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (in evaluating the sufficiency of a plaintiff's pleadings, the court must indulge reasonable inferences in plaintiff's favor, "but [the Court is] not required to draw plaintiff's inference"); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) ("[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." (citation omitted)).

More importantly, however, "[t]he Court is not required 'to parse the complaint

searching for allegations of misrepresentations that could conceivably form the basis' for Plaintiff[s'] claims." *Great Fla. Bank v. Countrywide Home Loans, Inc.*, No. 10-22124-CIV, 2011 WL 382588, at *2 (S.D. Fla. Feb. 3, 2011) (quoting *Ferrell v. Durbin*, 311 F. App'x 253, 259 (11th Cir. 2009)).

Count IV of the Amended Complaint accuses more than thirty corporations and individuals of conspiracy to commit fraud. Yet only a single paragraph is offered as support of every single Defendant's knowledge of the fraudulent scheme. Because neither Plaintiffs' Amended Complaint nor their motion offer any insight into the knowledge of the individual Defendants, the Court would be required to read through all 252 paragraphs which Plaintiffs incorporated into this count and guess about which paragraphs offer either direct or circumstantial evidence of each Defendant's knowledge.

Because the Amended Complaint offers only a conclusory allegation in support of the knowledge element, the Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for default judgment for Counts IV, V, VII, and VIII.

5. **Unjust Enrichment**

To succeed on a claim for unjust enrichment, a plaintiff must show:

> (1) the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant has voluntarily accepted and retained the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

*Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999) (quoting *Greenfield v. Manor Care, Inc.*, 705 So. 2d 926, 930–31 (Fla. 4th DCA 1997)).

Notably, an unjust enrichment claim does not require the commission of an underlying wrong. As explained by the Eleventh Circuit:

> "Liability in unjust enrichment has in principle nothing to do with fault. It has to do with wealth being in one person's hands when it should be in another person's." Peter Birks, *Unjust Enrichment and Wrongful Enrich*ment, 79 Texas L. Rev. 1767, 1789 (2001). The paradigm examples of unjust enrichment are mistaken transfers. "As soon as [a] claimant relies on a wrong [to supply the unjust factor], the right on which he relies arises from that wrong, not from unjust enrichment." *Id.* at 1783.

*Guyana Tel. & Tel. Co. v. Melbourne Int'l Commc'ns, Ltd.*, 329 F.3d 1241, 1245 n.3 (11th Cir. 2003).

The Amended Complaint avers that "Plaintiffs and the Class conferred benefits—more than $75 million in funds—upon the RoFx Operators, Front Companies and Principals, and Layering Companies and Principals." [ECF No. 64, ¶ 343]. Although Florida courts have not explicitly defined what constitutes a "benefit," *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009), providing an individual with money certainly qualifies. The mere receipt of a benefit, however, is not enough; "the benefit must be conferred *directly* from the plaintiff to the defendant." *Fagan v. Cent. Bank of Cyprus*, No. 19-80239-CIV, 2021 WL 2845034, at *15 (S.D. Fla. June 28, 2021), report and recommendation adopted, No. 9:19-CV-80239, 2021 WL 2915109 (S.D. Fla. July 12, 2021) (citing *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1310 (M.D. Fla. 2009); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996)) (emphasis added); *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) ("[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant.")

This principle of law guides the Undersigned's interpretation of the meaning of the word "retained," as used in the context of unjust enrichment. A narrow definition of the word -- i.e., requiring a defendant in an unjust enrichment claim to still be in possession of the benefit -- would be overly restrictive and likely render unjust enrichment claims impossible to enforce. As explained by the Eleventh Circuit, mistaken transfers are simple examples of the type of event which is meant to create liability.

A common scenario of a mistaken transfer would involve a banking institution which accidentally made available extra money to a customer's account. If that customer were to withdraw the mistakenly-added funds, then, assuming the customer refused to return the funds, the bank could bring an unjust enrichment claim against the customer regardless of whether the customer was still in possession of the funds or had spent the funds.

However, if in that scenario the customer had spent the funds at a clothing store to purchase a leather jacket, then the bank would not then be able to bring an unjust enrichment claim against the clothing store based on the fact that it now possessed the funds which the customer should never have had in the first place.

Generally, the Amended Complaint establishes that Defendants received money from Plaintiffs without providing any value for the benefit. *Cf. Pincus v. Am. Traffic Sols., Inc.*, 25 F.4th 1339, 1341 (11th Cir. 2022) (a benefit may be unequitable when no value is given in exchange). Further, the Amended Complaint alleges that the money was received by the entities voluntarily and that it was only rarely returned to Plaintiffs (i.e., most of the money conferred was retained). Thus, the remaining issue is only whether the Defaulting

Defendants *directly* received the benefit.

Determining whether the Defaulting Defendants directly received a benefit also requires examining the relationship between the individual Defendants and the corporate Defendants. "It is well settled that owners . . . of a corporation are not personally liable for corporate acts until such time as the corporate veil has been successfully pierced. Even in a case of alleged fraud, the corporation's shareholders cannot be held accountable for the fraudulent acts of the underlying corporation, absent some alleged reason to disregard the corporate form." *EnduraCare Therapy Mgmt., Inc. v. Drake*, 681 S.E.2d 168, 171 (2009).

Thus, the owner of a corporation is not necessarily liable for an unjust enrichment claim based on a benefit conferred on the corporation. *Kopel v. Kopel*, 117 So. 3d 1147, 1152-53 (Fla. 3d DCA 2013), quashed on other grounds, *Kopel*, 229 So. 3d at 818 (holding that there was insufficient evidence to support the plaintiff's unjust enrichment claim where the plaintiff failed to put forth any evidence of a benefit conferred directly to the defendants, rather than indirectly to corporations owned by them); *cf. Apex Toxicology, LLC v. United HealthCare Servs., Inc.*, No. 17-61840-CIV, 2020 WL 13551299, at *9 (S.D. Fla. July 7, 2020) (declining to hold a corporation liable for unjust enrichment based on money an affiliated corporation had received because -- even if it benefited the corporation -- the plaintiff did not plead facts supporting piercing the corporate veil between the two corporations); *CFLB P'ship, LLC v. Diamond Blue Int'l, Inc.*, No. 3D21-1335, 2022 WL 3903152, at *1 (Fla. 3d DCA Aug. 31, 2022) ("[The] [p]laintiffs did not allege or prove the factors necessary to 'pierce the corporate veil' here, and without a piercing of the corporate veil a direct benefit from [the]

[p]laintiffs to Partnership cannot be shown. Although the undisputed facts here may, understandably, be viewed as evidence of inequitable circumstances warranting a finding of unjust enrichment, without evidence demonstrating that a direct benefit was conferred on Partnership, [the] [p]laintiffs' claims of unjust enrichment necessarily fail as a matter of law.")

Here, Plaintiffs have not alleged facts which would support piercing the corporate veil, nor have they made any argument that such an action is appropriate. Thus, the following Defendants -- individuals who did not directly receive a benefit from Plaintiffs -- cannot be liable for unjust enrichment under the current version of the Complaint: Abrykosova, Fokin, Hrechaniuk, Daraselia, and Prokopenko.

Plaintiffs' motion seeks default judgment on only the issue of liability. Thus, at this time, the Undersigned makes no assessment of which specific transactions alleged would satisfy the direct conferral element of an unjust enrichment claim. Accordingly, on the issue of liability -- meaning only that the Amended Complaint contains at least a single mention of a direct conferral of a benefit -- the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' motion for default judgment on Count IX against Wealthy Developments, Notus, Global E-Advantages, Easy Com, ShopoStar, Grovee, Trans-Konsalt, Art Sea Group, VDD, Brass Marker, Profit Medica Group, and Auro Advantages.

## CONCLUSION

For the reasons stated above, the Undersigned makes the following recommendations concerning each Count/Defendant:

Count I (RICO): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count II (RICO Conspiracy): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count III (Common Law Fraud): the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' request for default judgment on Count III in whole against Defendants Mohylny and The Investing Online. Further, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs Leonov's, Zarley's, and Parent's request for **default judgment** against Defendant Ester Holdings and **deny** Plaintiffs Birmingham's and Hansen's request for default judgment against Defendant Ester Holdings;

Count IV (Conspiracy to Commit Fraud): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count V (Aiding and Abetting Fraud): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count VII (Conspiracy to Commit Conversion): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count VIII (Aiding and Abetting Conversion): The Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for a default judgment;

Count IX (Unjust Enrichment): The Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' request for default judgment against Wealthy Developments,

Notus, Global E-Advantages, Easy Com, ShopoStar, Grovee, Trans-Konsalt, Art Sea Group, VDD, Brass Marker, Profit Medica Group, and Auro Advantages. Further, the Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request as to all other Defendants.

## OBJECTIONS

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on December 6, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola

All counsel of record